UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GULF RESTORATION NETWORK, *et al.*, | CIVIL ACTION |
| Plaintiffs, | NO. 12-677 |
| VERSUS | SECTION "E" (3) |
| LISA P. JACKSON, Administrator of the United States Environmental Protection Agency, and THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | JUDGE SUSIE MORGAN<br><br>MAGISTRATE JUDGE DANIEL E. KNOWLES, III |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS**

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, American Farm Bureau Federation ("AFBF"), The Fertilizer Institute ("TFI"), National Pork Producers Council ("NPPC"), Agricultural Retailers Association, National Corn Growers Association, Arkansas Farm Bureau Federation, Illinois Farm Bureau, Iowa Farm Bureau Federation, Kansas Farm Bureau, Kentucky Farm Bureau, Louisiana Farm Bureau Federation, Minnesota Farm Bureau Federation, Mississippi Farm Bureau Federation, Missouri Farm Bureau, Nebraska Farm Bureau Federation, Oklahoma Farm Bureau, South Dakota Farm Bureau Federation, Tennessee Farm Bureau Federation, Wyoming Farm Bureau, Illinois Fertilizer & Chemical Association, Missouri Agribusiness Association, Illinois Pork Producers Association, Iowa Pork Producers Association,

Minnesota Pork Producers Association, Missouri Pork Association, Tennessee Pork Producers Association, and Wisconsin Pork Producers Association (collectively, "Agricultural Associations") respectfully move to intervene as defendants in this action.

Plaintiffs Gulf Restoration Network, Missouri Coalition for the Environment, Iowa Environmental Council, Tennessee Clean Water Network, Minnesota Center for Environmental Advocacy, Sierra Club, Waterkeeper Alliance, Inc., Prairie Rivers Network, Kentucky Waterways Alliance, Environmental Law & Policy Center, and the Natural Resources Defense Council Inc. (collectively, "Plaintiffs") seek more stringent regulation of nutrient runoff in the vast Mississippi River Basin.[1]  Among other things, Plaintiffs seek a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary to protect water quality in the states of the Mississippi River Basin.  Plaintiffs allege that they presented the Agency with "undisputed evidence" that such criteria are necessary.  *See* Amended Complaint [DN 22] ("Am. Compl.") ¶¶ 4, 48-49.  They aver that existing water quality criteria are not sufficiently protective in reducing excess nutrients (primarily nitrogen and phosphorus) in the Mississippi River Basin and the northern Gulf of Mexico.  *See id.* ¶ 36.

If Plaintiffs succeed in this action, the U.S. Environmental Protection Agency ("EPA") could be compelled to step in and establish numeric nutrient criteria that may be more stringent than existing water quality criteria for the Mississippi River Basin states.  Such action would result in additional regulatory burdens on the Agricultural Associations' members – many of whom hold Clean Water Act permits or are subject to state laws that limit nutrient runoff.

---

[1] The Mississippi River Basin includes all or portions of Alabama, Arkansas, Colorado, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Tennessee, Texas, Virginia, West Virginia, Wisconsin, and Wyoming.

Accordingly, the Agricultural Associations should be granted intervention as of right in this action under Federal Rule of Civil Procedure 24(a) or, alternatively, should be granted permissive intervention under Rule 24(b).

**Overview Of The Agricultural Associations' Interests In Nutrient Regulation**

The Agricultural Associations are a group of national and state trade associations that represent the interests of the fertilizer industry (which produces and sells fertilizers containing nitrogen and phosphorus), row-crop farmers, ranchers, and livestock and poultry producers (who use fertilizers and manage manure containing nitrogen and phosphorus) throughout the Mississippi River Basin.  Many of the Agricultural Associations have previously represented their members in litigation such as this, where the claims present important issues of national policy and the interpretation of laws affecting their members.  *See, e.g.*, *Fla. Wildlife Fed'n v. Jackson*, No. 08-cv-324 2012 WL 537529 (M.D. Fla. Feb. 18, 2012) (challenge to EPA's numeric nutrient criteria for the State of Florida's flowing waters and lakes); *Am. Farm Bureau Fed'n v. EPA*, No. 11-cv-67 (M.D. Pa. complaint filed Jan. 10, 2011) (challenge to EPA's Chesapeake Bay water quality regulation for nitrogen, phosphorus, and sediment); *Nat'l Pork Producers Council et al. v. EPA*, 635 F.3d 738 (5th Cir. Mar. 15, 2011) (challenge to EPA's revised Clean Water Act regulations for concentrated animal feeding operations); *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486 (2nd Cir. 2005) (challenge to EPA's Clean Water Act regulations for concentrated animal feeding operations).

Many of the Agricultural Associations' members hold individual or general permits that regulate point source discharges[2] into waters of the United States issued pursuant to Clean Water

---

[2] The Clean Water Act defines a "point source" as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  This

(continued…)

3

Act Section 402, 33 U.S.C. § 1342.  *See* Ex. 1, Parrish Decl. ¶ 4; Ex. 2, Herz Decl. ¶ 4; Ex. 3, Formica Decl. ¶ 11; Ex. 6, Welch Decl. ¶ 4; Ex. 7, Nelson Decl. ¶ 4; Ex. 8, Hill Decl. ¶ 4; Ex. 9, Holdren Decl. ¶ 4; Ex. 10, Haney Decl. ¶ 4; Ex. 12, Aasness Decl. ¶ 4; Ex. 13, Knight Decl. ¶ 4; Ex. 14, Hurst Decl. ¶ 4; Ex. 15, Rempe Decl. ¶ 4; Ex. 16, Wilke Decl. ¶ 4;  Ex. 17, Held Decl. ¶ 4; Ex. 18, Rose Decl. ¶ 4; Ex. 19, Hamilton Decl. ¶ 4.  These members implement nutrient management plans for nitrogen and phosphorus to comply with the requirements of their point source permits.  *See id.*  Many of the Agricultural Associations' members that do not hold Clean Water Act permits for point source discharges nonetheless implement nutrient management plans for nitrogen and phosphorus pursuant to state laws to minimize nutrient runoff from nonpoint sources.[3]  Ex. 1, Parrish Decl. ¶ 5; Ex. 6, Welch Decl. ¶ 5; Ex. 7, Nelson Decl. ¶ 5; Ex. 8, Hill Decl. ¶ 5; Ex. 9, Holdren Decl. ¶ 5; Ex. 10, Haney Decl. ¶ 5; Ex. 11, Anderson Decl. ¶ 4; Ex. 12, Aasness Decl. ¶ 5; Ex. 13, Knight Decl. ¶ 5; Ex. 14, Hurst Decl. ¶ 5; Ex. 15, Rempe Decl. ¶ 5; Ex. 16, Wilke Decl. ¶ 5;  Ex. 17, Held Decl. ¶ 5; Ex. 18, Rose Decl. ¶ 5; Ex. 19, Hamilton Decl. ¶ 5. In addition, some of TFI's members hold permits for the discharge of dredged or fill material issued pursuant to Clean Water Act Section 404, 33 U.S.C. § 1344, that include water quality standards for wetlands mitigation projects.  *See* Ex. 2, Herz Decl. ¶ 4.  Thus, if Plaintiffs prevail in this lawsuit and EPA must promulgate numeric nutrient criteria for states in the Mississippi River Basin, those criteria likely will result in new requirements that will adversely affect the Agricultural Associations' members.  *See, e.g.,* Ex. 1, Parrish Decl. ¶ 6-7; Ex. 2, Herz

---

(continued…)

includes, among other things, "pipe[s], ditch[es], channel[s], tunnel[s]" as well as "concentrated animal feeding operation[s]."  *Id.*

[3] Nonpoint sources are not defined in the Clean Water Act, but generally include any source of water pollution other than a point source discharge.  *See Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165-66 (D.C. Cir. 1982).

Decl. ¶ 5-6; Ex. 3, Formica Decl. ¶ 12-14; Ex. 4, Coppock Decl. ¶ 6; Ex. 5, Doggett Decl. ¶ 5-6.

### Clean Water Act Procedures For Establishing Water Quality Standards

The Clean Water Act places primary authority with each state to adopt water quality standards for its water bodies.  33 U.S.C. § 1313(c)(2)(A).  Water quality standards consist of "designated uses" for waterbodies and "water quality criteria" necessary to protect those uses.  *Id.*; *see also* 40 C.F.R. § 131.2.  Each state must designate one or more uses for each of its water bodies (such as recreation, drinking water supply, or aquatic life uses) and identify water quality criteria (characteristics) necessary to protect these uses.  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.2, 131.10 and 131.11.  States may express such criteria as numeric limits on pollutants or as "narrative statements."  40 C.F.R. §§ 131.3(b), 131.11(b)(2).

State-promulgated standards are subject to EPA review and approval to ensure that they meet the Clean Water Act's requirements.  33 U.S.C. § 1313(c)(2)-(3).  EPA also has limited authority under the Act to "step in and promulgate water quality standards itself."  *Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993).  EPA may only do so if "(1) it determines that a state's proposed new or revised standard does not measure up to [Clean Water Act] requirements and the state refuses to accept EPA-proposed revisions to the standard or (2) a state does not act to promulgate or update a standard but, in the EPA's view, a new or revised standard is necessary to meet [Clean Water Act] muster."  *Id.* (citing 33 U.S.C. § 1313(c)(3)-(4)).

### Identification Of Impaired Waters And Establishment Of TMDLs

The next step in establishing regulations to protect water quality is set forth in Section 303(d) of the Clean Water Act, which requires each state to identify waters "within its boundaries" for which limitations on point source discharges are not stringent enough to implement the water quality standards "applicable to such waters."  33 U.S.C. § 1313(d)(1)(A).  Upon identifying those waters, each state must then establish a priority ranking of those waters.

*See id.*  For each listed ("impaired") water, the state must establish a total maximum daily load ("TMDL") for pollutants that EPA identifies as "suitable for such calculation."  *Id.* § 1313(d)(1)(C).  The Clean Water Act does not define "total maximum daily load," but it directs that a TMDL be established "at a level necessary to implement the applicable water quality standards."  *Id.*

Like water quality standards, state lists of impaired waters and state-established TMDLs are subject to EPA review and approval.  *See id.* § 1313(d)(2).  If EPA disapproves of a TMDL or if a state fails to establish a required TMDL, EPA has 30 days to establish one.  *See id.*

### Plaintiffs' Petition For EPA Rulemaking And The Filing Of This Lawsuit

Plaintiffs petitioned EPA in July 2008: (i) to establish numeric criteria for nitrogen and phosphorus (numeric nutrient criteria or "NNC") for each of the 50 states where such criteria are not in place; (ii) alternatively, to establish NNC for the thirty-one states within the Mississippi River Basin and the northern Gulf of Mexico; and (iii) at a minimum, establish NNC for the ten mainstem states along the Mississippi River.  Plaintiffs further requested that EPA establish TMDLs for nitrogen and phosphorus for waters within the Mississippi River Basin that do not meet the new NNC that EPA establishes.  *See* Am. Compl., Ex. A.

EPA denied the petition on July 29, 2011, explaining that "the comprehensive use of federal rulemaking authority is [not] the most effective or practical means of addressing [Plaintiffs'] concerns at this time."  Am. Compl., Ex. B at 1.  EPA detailed ongoing efforts at the state and federal levels to address nutrient pollution in the Mississippi River Basin and ultimately concluded that those efforts are "the most effective and sustainable way to address widespread and pervasive nutrient pollution."  *Id.* at 4.  In EPA's view, the unilateral exercise of its rulemaking authority, particularly on the broad scale requested by Plaintiffs, "is not a practical or efficient way to address nutrients at a national or regional scale."  *Id.*

6

Following EPA's denial of their Petition, Plaintiffs initiated this action. Plaintiffs argue that past EPA and state actions have not effectively reduced excess nutrients in the Mississippi River Basin, specifically criticizing the "largely general and 'narrative' (i.e., non-numeric)" water quality standards of the ten Mississippi River mainstem states. Am. Compl. ¶ 36. According to Plaintiffs, numeric nutrient criteria are necessary to meet the requirements of the Clean Water Act and to protect against further nutrient pollution. *See id.* ¶ 37.

Plaintiffs assert two claims in this litigation. First, they allege that EPA unlawfully denied their administrative petition by failing to provide reasons for the denial that comport with the "relevant statutory factors in Section 303(c)(4)(B) of the Clean Water Act." *See id.* ¶ 45. Second, Plaintiffs allege that, in light of the "undisputed evidence" in their Petition that new NNC are necessary to satisfy the requirements of the Clean Water Act, EPA unlawfully failed to determine that NNC are necessary for the ten Mississippi River mainstem states. *Id.* ¶¶ 48-49.

At bottom, Plaintiffs allege that existing water quality regulations throughout the Mississippi River Basin, which the Agricultural Associations' members must expend considerable resources to comply with, do not satisfy the Clean Water Act's requirements, so EPA must establish additional nutrient regulations.

## ARGUMENT

Federal Rule of Civil Procedure 24, which governs motions for leave to intervene, is to be construed liberally, and doubts should be resolved in favor of the proposed intervenor. *Poynor v. Chesapeake Energy L.P.*, 570 F.3d 244, 248 (5th Cir. 2009). Rule 24 recognizes two paths to intervention. Under Rule 24(a), a party is entitled to intervene as a matter of right if the party "claims an interest relating" to the action and "is so situated that disposing of the action may as a practical matter impair or impede" the party's "ability to protect its interest." Fed. R.

7

Civ. P. 24(a). Alternatively, a party may seek "permissive" intervention under Rule 24(b)(1), if the party has a "claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). For reasons explained below, the Agricultural Associations are entitled to intervene under Rule 24(a) and, alternatively, should be permitted to intervene under Rule 24(b). The Agricultural Associations' motion to intervene is timely; their business, regulatory, and property interests, and those of their members, are at risk in this litigation; an adverse decision would substantially impair those interests; and existing parties do not represent adequately the Agricultural Associations' interests.

I.  **THE AGRICULTURAL ASSOCIATIONS' MOTION TO INTERVENE IS TIMELY.**

Intervention of right and permissive intervention both require the filing of a "timely" motion to intervene. Fed. R. Civ. P. 24(a), (b)(1). When assessing the timeliness of a motion for leave to intervene, a district court should consider: (1) the length of time between the would-be intervenor's learning of his interest and his petition to intervene, (2) the extent of prejudice to existing parties from allowing late intervention, (3) the extent of prejudice to the would-be intervenor if the petition is denied, and (4) any unusual circumstances. *Poynor*, 570 F.3d at 247–48 (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977)); *see also Ross v. Marshall*, 426 F.3d 745, 754 (5th Cir. 2005) (same).

The Agricultural Associations' motion is unquestionably timely because only approximately one month has passed since Plaintiffs filed their amended complaint, the government defendants have not filed a responsive pleading or motion, and no parties would be prejudiced by their intervention. *See, e.g., Poyner*, 570 F.3d at 248–50 (reversing finding that intervention was untimely, as abuse of discretion, even though sought more than two years after would-be intervenor learned of its interest in the litigation and after entry of the final order); *Ross*

8

*v. Marshall*, 426 F.3d at 754–56; *Edwards v. City of Houston*, 78 F.3d 983, 1001 (5th Cir. 1996) (en banc) ("that these motions were filed prior to entry of judgment favors timeliness, as most of our case law rejecting petitions for intervention as untimely concern motions filed after judgment was entered in the litigation").

## II. THE AGRICULTURAL ASSOCIATIONS ARE ENTITLED TO INTERVENE AS OF RIGHT.

The Agricultural Associations are entitled to intervene in this proceeding as a matter of right. A party is entitled to intervene if: (1) the motion is timely, (2) the party claims an interest relating to the property or transaction that is the subject of the action, (3) the disposition of the action may as a practical matter impair or impede the party's ability to protect that interest, and (4) the party's interest is not adequately represented by existing parties. Fed. R. Civ. P. 24(a). The Agricultural Associations satisfy each of these requirements (timeliness is discussed above in Section I) and, therefore, the motion to intervene should be granted.

### A. The Agricultural Associations Have a Direct and Substantial Interest in this Litigation.

The Agricultural Associations and their individual members have a direct and substantial interest in this litigation because they engage in activities involving the production, sale, and use of fertilizers that contain nitrogen and phosphorus. The Agricultural Associations' members also produce, manage, and use manure that contains nitrogen and phosphorus. They must expend resources to comply with existing regulations governing nutrient discharges and runoff, and they would be affected by changes to those regulations.

Specifically, AFBF and NPPC both represent thousands of individual farms within the Mississippi River Basin states. Many of their member farms hold permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters. *See* Ex.

1, Parrish Decl. ¶ 4; Ex. 2, Herz Decl. ¶ 4; Ex. 3, Formica Decl. ¶ 11; Ex. 6, Welch Decl. ¶ 4; Ex. 7, Nelson Decl. ¶ 4; Ex. 8, Hill Decl. ¶ 4; Ex. 9, Holdren Decl. ¶ 4; Ex. 10, Haney Decl. ¶ 4; Ex. 12, Aasness Decl. ¶ 4; Ex. 13, Knight Decl. ¶ 4; Ex. 14, Hurst Decl. ¶ 4; Ex. 15, Rempe Decl. ¶ 4; Ex. 16, Wilke Decl. ¶ 4;  Ex. 17, Held Decl. ¶ 4; Ex. 18, Rose Decl. ¶ 4; Ex. 19, Hamilton Decl. ¶ 4. In order to comply with the requirements of those permits, AFBF's and NPPC's member farms implement nutrient management plans for nitrogen and phosphorus. *Id.* AFBF's and NPPC's member farms that do not hold permits for point source discharges must also implement nutrient management plans pursuant to state laws to control nutrient runoff. *See, e.g.,* Ex. 1, Parrish Decl. ¶ 5; Ex. 3, Formica Decl. ¶¶ 10-11.

Any court order requiring EPA to promulgate new numeric nutrient criteria and TMDLs would directly affect these members farms by increasing the costs associated with their nutrient management plans and implementation. Nutrient management is already an expensive part of the operation of farms, and the costs associated with these plans would be expected to increase substantially if plaintiffs were successful in this suit. *See* Ex. 1, Parrish Decl. ¶ 7; Ex. 3, Formica Decl. ¶ 14; Ex. 6, Welch Decl. ¶ 7; Ex. 7, Nelson Decl. ¶ 7; Ex. 8, Hill Decl. ¶ 7; Ex. 9, Holdren Decl. ¶ 7; Ex. 10, Haney Decl. ¶ 7; Ex. 11, Anderson Decl. ¶ 6; Ex. 12, Aasness Decl. ¶ 7; Ex. 13, Knight Decl. ¶ 7; Ex. 14, Hurst Decl. ¶ 7; Ex. 15, Rempe Decl. ¶ 7; Ex. 16, Wilke Decl. ¶ 7; Ex. 17, Held Decl. ¶ 7; Ex. 18, Rose Decl. ¶ 7; Ex. 19, Hamilton Decl. ¶ 7.

TFI's members own and operate fertilizer mining, production, processing, and retailing facilities within the Mississippi River Basin. *See* Ex. 2, Herz ¶ 4; Ex. 20, Payne Decl. ¶ 4; Ex. 21, Taylor Decl. ¶ 4. TFI's members hold permits for point source or storm water discharges of nutrients into waters in the Mississippi River Basin, and these members must also comply with discharge limitations to comply with applicable water quality criteria. *See* Ex. 2, Herz ¶ 4; Ex.

21, Taylor Decl. ¶ 4.  In addition, many of TFI's members hold permits for the discharge of dredged or fill material that include provisions requiring compliance with water quality standards for wetlands mitigation projects.  *See* 33 U.S.C. § 1344; *see also* Ex. 2, Herz ¶ 4.  Any court order requiring EPA to promulgate new numeric nutrient criteria and TMDLs would directly affect TFI's members by increasing the costs associated with compliance with these permits.  *See* Ex. 2, Herz ¶¶ 5-6; Ex. 21, Taylor Decl. ¶¶ 5-6.  In addition, TFI's members distribute and sell fertilizers containing nitrogen and phosphorus to farmers throughout the states of the Mississippi River Basin.  Additional new regulation by EPA or states that restricts the use of the fertilizer by farmers would reduce the demand for fertilizer in the U.S.'s agricultural heartland and would affect the livelihood of TFI's members who sell and distribute fertilizers.  *See* Ex. 2, Herz ¶¶ 5-6; Ex. 20, Payne Decl. ¶¶ 5-6; Ex. 21, Taylor Decl. ¶¶ 5-6.

These interests are sufficient to establish the Agricultural Associations' right to intervene. *See Sierra Club v. Glickman*, 82 F.3d 106 (5th Cir. 1996) (per curium) (holding that interest of farmers in drawing water from an aquifer was sufficient to justify their intervention as of right in environmental group suit against federal agency, seeking to enjoin expenditure of "any funds to the farmers that directly or indirectly support pumping from the aquifer," and finding that farmers were real parties in interest and that suit targeted their pumping, because Sierra Club alleged that farmers' pumping constituted threat to endangered species and public health); *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (holding that timber purchaser trade groups were entitled to intervene as matter of right in suit brought by environmental group against federal agency, seeking to ban logging practices in Texas); *Sylvester v. Boissiere*, No. 05-5527, 2006 U.S. Dist. LEXIS 15500, *14 (E.D. La. Apr. 3, 2006) (noting that "the Fifth Circuit has warned against defining 'property or transaction' too narrowly" and that, if a potential intervenor

11

establishes that it is a real party in interest, that generally establishes sufficient interest for intervention).

### B. This Disposition of this Action May as a Practical Matter Impair or Impede the Agricultural Associations' Ability to Protect Their Interests.

It is equally clear that the disposition of this action may impair or impede the Agricultural Groups' ability to protect their interests. *See* Fed. R. Civ. P. 24(a)(2); *see also id*., advisory committee note (1966) ("If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene[.]").

If the Court were to grant the relief requested by Plaintiffs, EPA would be forced to determine that numeric nutrient criteria are necessary to meet the requirements of the Clean Water Act and to establish numeric nutrient criteria and TMDLs for states in the Mississippi River Basin. The Agricultural Associations' members would be subject to increased nutrient regulation and would have to expend additional resources to comply with new nutrient management requirements. *Cf. Glickman*, 82 F.3d at 109 (quoting *Conservation Law Found. v. Mosbacher*, 966 F.2d 39, 43 (1st Cir. 1992)) (concluding, in a suit by environmental groups to compel an agency to regulate fishing off the New England coast, that "[c]hanges in the rules will affect the proposed intervenors' business, both immediately and in the future").

Moreover, to protect their interests, the Agricultural Associations would be forced to bring independent actions in multiple venues as EPA began the process of establishing numeric nutrient criteria and TMDLs for each of these states. Some of the judgments reached in the proceeding before this Court could impair the Agricultural Associations' ability to defend its interests in those actions, and the Fifth Circuit has repeatedly ruled that "[t]he stare decisis effect of an adverse judgment constitutes a sufficient impairment to compel intervention." *Heaton v. Monogram Credit Card Bank*, 297 F.3d 416, 424 (5th Cir. 2002); *Glickman*, 82 F.3d 106, 109-10

12

PD.6329892.1

(same); *Espy*, 18 F.3d at 1207 (same); *see also Ranger Ins. Co. v. Events, Inc.*, No. 03-2831, 2004 U.S. Dist. LEXIS 17998, at *18–19 (E.D. La. Sept. 8, 2004) ("considerations of judicial economy guide this Court to allow intervention in order to avoid duplication of litigation").

### III.  THE AGRICULTURAL ASSOCIATIONS' INTERESTS ARE NOT ADEQUATELY REPRESENTED BY AN EXISTING PARTY.

Finally, the Agricultural Associations are entitled to intervene as a matter of right because their interests are not adequately represented by any existing party.  The Supreme Court has stated that Rule 24(a)'s adequate-representation requirement should be treated as a "minimal" burden, which is "satisfied if the applicant shows that representation of his interest 'may be' inadequate." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *Doe #1 v. Glickman*, 256 F.3d 371, 380 (5th Cir. 2001) (same); *Espy*, 18 F.3d at 1207 (same); *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, No. 04-997, 2004 U.S. Dist. LEXIS 18277, at *8–9 (E.D. La. Sept. 10, 2004) (same).  The Agricultural Associations readily carry this minimal burden because their interests are distinct from those of the government defendants.

The Agricultural Associations' interests in this litigation differ from those of the government defendants because the government defendants are charged with representing the interests of varied public and private stakeholders possessing a broad spectrum of interests in the Mississippi River Basin, while the Agricultural Associations' foremost interest is in protecting the livelihood of their members.  In *Espy*, the Fifth Circuit confronted a divergence of interests analogous to that between the Agricultural Associations' interests and those of the government defendants here.  18 F.3d at 1207-08.  The Fifth Circuit noted the prospective intervenors' "minimal" burden in satisfying the inadequate representation requirement, and held that the government defendants' representation of the industry movants' interests was inadequate.  *Id*.

13

(emphasizing that "[t]he government must represent the broad public interest, not just the economic concerns of the timber industry").

In *Glickman*, the Fifth Circuit reached the same conclusion, noting that "[f]or this reason alone, the interests of [the prospective industry intervenors] will not necessarily coincide, even though, at this point, they share common ground." 82 F.3d at 110; *see also Heaton*, 297 F.3d at 425 ("Government agencies . . . must represent the public interest, not just the [individual] interests of one industry" and "that government's and private party's interests "may diverge in the future . . . is enough to meet the . . burden on this issue[.]"). Here, because there is "sufficient doubt" about the adequacy of the federal defendants' representation of the Agricultural Associations' interests, Rule 24(a)'s minimal burden is readily satisfied. *Trbovich*, 404 U.S. at 538 & n. 10 (finding a prospective intervenor met his "minimal" burden of showing possible inadequate representation of its interests by the government even where a statute expressly obligated the Secretary of Labor to serve his interests).

In addition, the Agricultural Associations' interests would not be adequately represented by the Federal Water Quality Coalition ("FWQC"), which has moved to intervene in this case. Doc. 27 (filed May 2, 2012). The memorandum in support of FWQC's motion to intervene states that FWQC represents a "group of industrial companies, municipalities, agricultural parties, and trade associations." Doc. 27-1 (filed May 2, 2012). FWCQ, therefore, represents a broader spectrum of interests than do the Agricultural Associations and, accordingly, FWCQ cannot adequately represent the more narrow and focused interests of the Agricultural Associations. Accordingly, the Court should allow the Agricultural Associations to intervene as a matter of right.

14

## IV. IN THE ALTERNATIVE, THE AGRICULTURAL ASSOCIATIONS SATISFY THE REQUIREMENTS FOR PERMISSIVE INTERVENTION.

Even if they are not entitled to intervene as of right, the Agricultural Associations should be granted leave to intervene under Rule 24(b), which allows "permissive" intervention. Permissive intervention is warranted where a party files a timely motion and when the party "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see Newby v. Enron Corp.*, 443 F.3d 416, 424 (5th Cir. 2006). "Rule 24(b) should be liberally construed," and, unless intervention would lead to undue delay or prejudice, "[b]asically . . . anyone may be permitted to intervene if his claim and the main action have a common question of law or fact." *Moore v. Tangipahoa Parish Sch. Bd.*, 298 F. Supp. 288, 292–93 (E.D. La. 1969) (quotation omitted).

The Agricultural Associations and the government's defenses in this action will involve common questions of law and fact because the Agricultural Associations oppose claims that the Clean Water Act requires EPA to issue numeric nutrient criteria in the Mississippi River Basin. As discussed above, the Agricultural Associations have applied to intervene in a timely fashion, and no undue prejudice or delay will result to any other party by granting their intervention. *See, e.g., Bd. of Trustees New Orleans Emp'rs Int'l Longshoremen's Ass'n v. Gabriel, Roeder, Smith & Co.*, No. 05-1221, 2006 WL 2631946, at *1 (E.D. La. Sept. 13, 2006) (affirming permissive intervention, which would cause no delay or prejudice, where "no substantive motions had been decided" and there was "ample time left to . . . adhere to the pre-trial schedule").

Moreover, as discussed above, permissive intervention is also appropriate because the Agricultural Associations are not "adequately represented by other parties" and, as

15

representatives of the parties most likely to bear the costs of new regulations, they are "likely to contribute significantly to the development of the underlying factual issues." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989). Indeed, the Agricultural Associations are providing declarations (attached) detailing potential impacts to their particularized interests. And even if this were not the case, any potential for "the stare decisis effect" of a lawsuit on a would-be intervenor should "tip the scales in favor of allowing permissive intervention even by one who is adequately represented." *Theriot v. Parish of Jefferson*, No. 95-2453, 1995 WL 731680, at *2 (E.D. La. Dec. 5, 1995).

The "nature and extent of [the Agricultural Associations'] interest" and their "standing to raise relevant legal issues" also support permissive intervention. *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 472 n.40 (5th Cir. 1984) (en banc); *see also In re Babcock & Wilcox Co.*, No. 01-912, 01-1187, 2001 WL 1095031, at *5 (E.D. La. Sept. 18, 2001) (finding permissive intervention appropriate where intervenors "may have a stronger incentive to oppose" the adverse parties than the parties on whose behalf intervention was sought, such that "the intervention will further the interests of justice by forcing the [adverse parties] to face a more vigorous opponent") (quotation omitted).

Finally, the Agricultural Associations do not seek to expand the scope of the claims at issue in this lawsuit and are willing and able to cooperate with the other defendants in these proceedings. Accordingly, if the Court grants Agricultural Associations' intervention request, they will coordinate as much as possible with the other defendants to maximize the efficiency of these proceedings and to avoid duplicative argument or briefing.

## CONCLUSION

For the foregoing reasons, Agricultural Associations meet the requirements for intervention pursuant to Rule 24(a) and 24(b) of the Federal Rules of Civil Procedure. The Agricultural Associations respectfully request that this Court grant this motion for leave to intervene in this proceeding. A proposed order is attached. As required by Rule 24(c) of the Federal Rules of Civil Procedure, the Agricultural Associations have also included with this filing an answer that sets out the defenses for which it seeks intervention.

Dated: May 10, 2012

                                          Respectfully submitted,

                                          PHELPS DUNBAR LLP

                                          /s/ S. Ault Hootsell III
                                          S. Ault Hootsell III, T.A. (#17630)
                                          Sarah Perkins Reid (#33311)
                                          365 Canal Street, Suite 2000
                                          New Orleans, LA 70130-6534
                                          Telephone: (504) 566-1311
                                          Telecopier: (504) 568-9130
                                          hootsela@phelps.com
                                          reids@phelps.com

                                          *Counsel for the Agricultural Associations*

OF COUNSEL:

Richard E. Schwartz
David P. Ross
David Y. Chung
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing memorandum (and attachments) was filed electronically using the Court's CM/ECF System this 10th day of May, 2012, which sent notification of such filing to the attorneys of record for each party, who have registered with the Court's CM/ECF system.

/s/ S. Ault Hootsell III