EXHIBIT 1

## DECLARATION OF DON PARRISH

I, Don Parrish declare under penalty of perjury as follows:

1.      I am the Senior Director of Regulatory Relations at the American Farm Bureau

Federation ("AFBF").  I offer this Declaration based on my personal knowledge in support of

AFBF's motion to intervene in this action.

2.      The American Farm Bureau Federation is a voluntary general farm organization

formed in 1919 to protect, promote, and represent the business, economic, social, and

educational interests of American farmers.  AFBF represents more than 6.2 million member

families through member state Farm Bureau organizations in all fifty states and Puerto Rico.

Many AFBF member families own and operate farms that produce the row crops, livestock, and

poultry that provide safe and affordable food for Americans and a growing global population.

There are AFBF member family farms in each of the states in the Mississippi River Basin,

including Alabama, Arkansas, Colorado, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky,

Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Mexico, New York,

North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Tennessee, Texas,

Virginia, West Virginia, Wisconsin, and Wyoming.  Many of these farms conduct farming

activities that result in the need to engage in management to control nutrients (nitrogen and

phosphorus) that could enter waters of the United States such as the Mississippi River or its

tributaries.

3.      AFBF routinely advocates on behalf its members before the U.S. Congress, the

Executive Branch and federal courts, on many issues, including the regulation of nutrients under

the Clean Water Act.  For example, AFBF is a plaintiff in litigation challenging the total

maximum daily load ("TMDL") for nitrogen, phosphorus, and sediment for the Chesapeake Bay.

*American Farm Bureau Federation v. United States Environmental Protection Agency*, No. 11-cv-67 (M.D. Pa. complaint filed Jan. 10, 2011). AFBF was also a plaintiff challenging EPA's numeric nutrient criteria for Florida. *Florida Wildlife Federation et al. v. Jackson et al.*, No. 08-cv-324 2012 WL 537529 (N.D. Fla. Feb. 18, 2012).

4.     Some of AFBF's member farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S. These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus. AFBF's member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.     AFBF livestock or poultry member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff. Member farms that produce only row crops work closely with local land grant universities to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.     I have reviewed the Complaint filed by the plaintiffs in this action. The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin. Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients. If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria and also establish TMDLs for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for the Mississippi River Basin states. Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by AFBF members and any farmer that seeks permit coverage in the

future. Such criteria and TMDLs would also be implemented through nutrient management requirements for farms that are not regulated through point source discharge permits. As a general farm organization representing farmers who produce all types of farm commodities in each state in the Mississippi River Basin, AFBF, as well as its members, will be affected by the legal conclusions and remedies rendered by this court.

7.     Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of AFBF's members by increasing the costs associated with developing and implementing nutrient management plans. Nutrient management is already an expensive part of the operation of a livestock or poultry farm, and the costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the nutrient management plans would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 3, 2012.

Don Parrish

3

# EXHIBIT 2

## DECLARATION OF WILLIAM HERZ

I, William Herz, declare under penalty of perjury as follows:

1.        I am the Vice President of Scientific Programs at The Fertilizer Institute ("TFI"). I offer this Declaration based on my personal knowledge in support of TFI's motion to intervene in this action.

2.        The Fertilizer Institute ("TFI"), represents the nation's fertilizer industry, including processors, importers, retailers, wholesalers, and companies that provide services to the fertilizer industry.  It is governed by a Board of Directors representing the importing, manufacturing, wholesale and retail sectors of the industry.  The organization's purposes include representing the fertilizer industry in legislative and regulatory activities and defending and advancing the industry as it faces shifting environmental issues.  TFI's members own and operate fertilizer mining, production, processing, and retailing facilities in of the following states in the Mississippi River Basin, including Alabama, Arkansas, Colorado, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Tennessee, Texas, Virginia, Wisconsin, and Wyoming.

3.        TFI's advocacy encompasses efforts before Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including nutrient regulation under the Clean Water Act.  TFI is a plaintiff in litigation challenging the total maximum daily load ("TMDL") for nitrogen, phosphorus, and sediment for the Chesapeake Bay. *American Farm Bureau Federation v. United States Environmental Protection Agency*, No. 11-cv-67 (M.D. Pa. complaint filed Jan. 10, 2011).   TFI was also a plaintiff challenging EPA's numeric nutrient criteria rulemaking for lakes and flowing waters in Florida.  *Florida Wildlife*

*Federation et al. v. Jackson et al.*, No. 08-cv-324 2012 WL 537529 (M.D. Fla. Feb. 18, 2012).

4.     TFI's members own and operate fertilizer mining, production, processing, and retailing facilities within the Mississippi River Basin.  TFI's members hold permits issued pursuant to CWA Section 402, 33 U.S.C. § 1342, for point source or storm water discharges of nutrients – primarily nitrogen and phosphorus – into waters in the Mississippi River Basin. These members must comply with discharge limitations in their Clean Water Act permits that do not cause or contribute to nutrient concentrations that exceed applicable water quality standards. TFI's members also hold permits issued pursuant to Clean Water Act Section 404, 33 U.S.C. § 1344 (for the discharge of dredged or fill material) that include water quality standards for wetlands mitigation projects.  In addition, TFI's members distribute and sell fertilizers to farmers throughout the states of the Mississippi River Basin.

5.     I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek, among other things, a decision declaring that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states within the Mississippi River Basin.  The plaintiffs take the position that existing water quality criteria are inadequate in terms of nutrient regulation.  If plaintiffs are successful in their effort, EPA must issue numeric nutrient criteria and establish TMDLs that are more stringent than existing water quality regulations for the Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be applied in discharge limitations for nitrogen and phosphorus in TFI's members' Clean Water Act permits for point source discharges and discharges of dredged and fill material.  As a trade organization representing the fertilizer industry in each state in the Mississippi River Basin, TFI's members will collectively and individually be affected by the legal conclusions and remedies rendered by this court.

6.     Any court order requiring EPA to promulgate new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of TFI's members by increasing the costs associated with complying with discharge limitations.  The costs associated with complying with existing permit requirements would be expected to increase substantially if plaintiffs were successful in this suit.  Moreover, regulation by EPA or states that unreasonably restricts the use of the fertilizer by farmers would reduce the demand for fertilizer in the U.S.'s agricultural heartland and would substantially and adversely affect the livelihoods of TFI's members who sell and distribute fertilizers.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 4, 2012.

WILLIAM HERZ

# EXHIBIT 3

## DECLARATION OF MICHAEL C. FORMICA

I, Michael C. Formica, declare under penalty of perjury as follows:

1.      I am the Chief Environmental Counsel at the National Pork Producers Council ("NPPC").   I offer this Declaration based on my personal knowledge in support of NPPC's and its state affiliates' motion to intervene in this action.

2.      NPPC is a non-profit trade association representing the interests of pork producers throughout the United States.  NPPC's mission is to serve as an advocate for reasonable legislation and regulations, develop revenue and market opportunities, and protect the livelihood of the nation's 67,000 pork producers, which it represents through forty-three affiliated state associations.  NPPC's mission includes representing pork producers in administrative and judicial proceedings involving national regulations and other government actions that affect the production of pork in the United States.

3.      NPPC's advocacy encompasses efforts before Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients and development of Water Quality Standards under the Clean Water Act. For example, NPPC is currently a plaintiff in litigation challenging the total maximum daily load ("TMDL") for nitrogen, phosphorus, and sediment for the Chesapeake Bay.  *American Farm Bureau Federation v. United States Environmental Protection Agency*, No. 11-cv-67 (M.D. Pa. complaint filed Jan. 10, 2011).   NPPC has also been actively involved in challenges to EPA regulations affecting nutrient regulation for concentrated animal feeding operations.  *Nat'l Pork Producers Council et al. v. EPA*, 635 F.3d 738 (5th Cir. Mar. 15, 2011) (challenge to EPA's revised Clean Water Act regulations for concentrated animal feeding operations); *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486 (2nd Cir. 2005) (challenge to EPA's Clean Water Act

regulations for concentrated animal feeding operations).

      4.     The Iowa Pork Producers Association ("Iowa Pork"), an affiliate of NPPC, is an industry-inclusive organization whose mission is to provide a unified voice to promote and educate for a sustainable, socially responsible, profitable and globally competitive pork industry. Iowa Pork, through its grassroots organization of 70 structured county associations across the state, serves as the unified voice for Iowa's pork producers.

      5.     The Illinois Pork Producers Association ("Illinois Pork"), an affiliate of NPPC, is an agricultural trade association whose mission includes representation of its producer members on regulatory and public policy issues. Illinois Pork, through its grassroots organization, represents more than 2,900 pork producers in more than 20 counties throughout Illinois.

      6.     The Minnesota Pork Producers Association ("Minnesota Pork"), an affiliate of NPPC, is an agricultural trade association whose missions includes representation of its producer members on regulatory and public policy issues at the local, state, and federal levels, and working with government agencies on issues impacting the production of pork in Minnesota

      7.     The Missouri Pork Association, ("Missouri Pork"), an affiliate of NPPC, is an agricultural trade association whose mission includes representation of its producer members on regulatory and public policy and minimizing the barriers to success for its producer members

      8.     The Tennessee Pork Producers Association ("Tennessee Pork"), an affiliate of NPPC, is an agricultural trade association whose mission includes representation of its producer members on regulatory and public policy and minimizing the barriers to success for its producer members

      9.     The Wisconsin Pork Association ("Wisconsin Pork"), an affiliate of NPPC, is an agricultural trade association whose mission includes the representation of its pork industry

members with a strong emphasis on social issues, public and government policies, environment, animal welfare and safety.

10.     NPPC, Iowa Pork, Illinois Pork, Minnesota Pork, Missouri Pork, Tennessee Pork, and Wisconsin Pork member families own and operate farms that produce high-quality pork to the domestic and world markets.  Some of these farms are located within the states in the Mississippi River Basin, including Colorado, Illinois, Indiana, Iowa, Kansas, Kentucky, Minnesota, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, and Wisconsin.  All of the larger farms are regulated to control discharges of nutrients (nitrogen and phosphorus) into the waters of the U.S. (including the Mississippi River and its tributaries) – either as "point source" dischargers that hold Clean Water Act permits whose terms address their animal production areas and the land application area if they use the manure for crop production, or under designations established by state laws designed to protect these waters.

11.     Some of these member farms hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the United States.  These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus.  These member farms must take steps to prevent discharges from their production areas, and in the case of their land application area (if any), they must use the manure according to specific approved terms under a nutrient management plan in order for any stormwater discharges to qualify for the Clean Water Act's agricultural stormwater exemption.  Under EPA's regulations for concentrated animal feeding operations, even those member farms that do not hold permits for point source discharges will be subject to CWA penalties if they have discharges from their animal production areas, or if they have stormwater discharges from any

land application areas if they did not apply manure in accordance with appropriate agronomic and conservation standards.  Furthermore, these members, as a general matter, implement such nutrient management plans as a best practice to assist in ensuring the most efficient and agronomic application of nutrients.  In the case of those members that hold permits for point source discharges, the required scope of their nutrient management plans is defined by EPA's regulation for concentrated animal feeding operations, and must be followed also to qualify their land application activities for the agricultural stormwater exemption.  Important technical details of these planning requirements are generally established by state mandates and directives issued pursuant to state laws.  As a practical matter, these same mandates and directives guide what are considered to be the "appropriate" agronomic conservation practices needed to qualify the land application activities of non-permit holders for the agricultural stormwater exemption as well.

12.     I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin.  According to the plaintiffs, existing water quality criteria are not sufficiently protective in limiting excess nutrients.  If plaintiffs prevail in this lawsuit, EPA must step in and issue numeric nutrient criteria and also issue TMDLs that are more stringent than the existing water quality regulations for the Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be applied in permit conditions in Clean Water Act point source permits.  They would also be implemented through nutrient control requirements for sources of non-point source water pollution.

13.     As agricultural trade organizations representing farmers who produce pork in the states of the Mississippi River Basin, NPPC, Iowa Pork, Illinois Pork, Minnesota Pork, Missouri Pork, Tennessee Pork, and Wisconsin Pork, as well as their members, will be affected by the

legal conclusions and remedies rendered by this court.

14.     Any court order requiring EPA to promulgate new numeric criteria and TMDLs would directly affect the livelihood and productive commercial capabilities of NPPC's members and the members of Iowa Pork, Illinois Pork, Minnesota Pork, Missouri Pork, Tennessee Pork, and Wisconsin Pork, by increasing the costs associated with nutrient management plans. Nutrient management is already an expensive part of the operation of a pork farm, and the costs associated with these plans would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on May 7, 2012.


_____
Michael C. Formica

EXHIBIT 4

## DECLARATION OF DAREN COPPOCK

I, Daren Coppock, declare under penalty of perjury as follows:

1.      I am the President and Chief Executive Officer of the Agricultural Retailers Association ("ARA").   I offer this Declaration based on my personal knowledge in support of ARA's motion to intervene in this action.

2.      The Agricultural Retailers Association is a national non-profit trade organization for agricultural retailers and distributors of agronomic crop inputs with members covering virtually all of the 50 states and representing over 70 percent of all crop input materials sold to America's farmers.   These inputs are used to nourish and protect a wide variety of crops, from major row crop commodities to specialty crops.   Members not only sell agronomic crop inputs but actually apply with their own equipment basic crop nutrients and crop protection products; over half of our members custom apply fertilizer for their customers on about 45% of their total acres served.   ARA membership is diverse, from small family-run businesses of 10 employees to farmer cooperatives with one thousand or more employees and large corporations with thousands of employees and multiple branches.   Suppliers of the products sold by retailers are also members of the association.

3.      ARA's mission is to advocate, influence, educate, and provide services to support its members in their quest to maintain a profitable business environment, adapt to a changing world and preserve their freedom to operate.   ARA's members, including those in the states of the Mississippi River Basin, provide their farmer customers with essential crop inputs like fertilizer, seed, pesticide, and equipment; application services; and crop consulting services which provide the latest information and best management practices regarding fertilizer rates, placement, timing, and product selection.   These inputs are essential for crop production.   ARA

members are trusted resources for their farmer customers concerning products and techniques needed to produce crops which also help to preserve and protect the crops, the soil and the environment.  ARA members have been instrumental in educating their farmer customers as to the benefits of no-till, limited till, and conservation tillage, technologies which in turn produce less runoff of nutrients and pesticides.  This data has been documented by the USDA.  ARA members also promote "4R" principles for fertilizer – choosing the right product, applied at the right time, at the right rate, and in the right place.

4.      ARA's advocacy encompasses efforts before Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients, the development of best management practices, the regulation of nonpoint sources and protecting the agricultural stormwater runoff exemption under the Clean Water Act.  For example, ARA participated in litigation challenging the EPA's numeric nutrient criteria for the State of Florida's flowing waters and lakes.  *See Fla. Wildlife Fed'n v. Jackson*, No. 08-cv-324, 2012 WL 537529 (M.D. Fla. Feb. 18, 2012).

5.      As mentioned above, ARA's members sell fertilizer, seed and crop protection to farmers throughout the United States, including in each of the states of the Mississippi River Basin.   As such, the commercial market for fertilizer has a dramatic effect on the livelihoods of ARA's members.

6.      I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin.  According to the plaintiffs, existing water quality criteria are not sufficiently protective in limiting excess nutrients.  If plaintiffs prevail in this lawsuit, EPA must step in and issue numeric nutrient criteria and also

issue TMDLs that will likely be more stringent than the existing water quality regulations for the

Mississippi River Basin states.  These actions could have material impacts on ARA members and

their customers.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 7,
2012.

Daren Coppock

EXHIBIT 5

## DECLARATION OF JON DOGGETT

I, Jon Doggett, declare under penalty of perjury as follows:

1.      I am the Vice President of Public Policy at the National Corn Growers Association ("NCGA").   I offer this Declaration based on my personal knowledge in support of NCGA's motion to intervene in this action.

2.      The National Corn Growers Association is a non-profit trade association that represents 37,000 corn farmers nationwide and the interests of more than 300,000 growers who contribute through corn checkoff programs in their states.  NCGA and its 48 affiliated state associations and checkoff organizations work together to create and increase opportunities for our members and our industry.  NCGA represents its members' concerns in national legislative, judicial, and regulatory agencies' decisions affecting agriculture. NCGA's advocacy encompasses efforts on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act and under state law.  For example, NCGA is a plaintiff in litigation challenging the total maximum daily load ("TMDL") for nitrogen, phosphorus, and sediment for the Chesapeake Bay. *American Farm Bureau Federation v. United States Environmental Protection Agency*, No. 11-cv-67 (M.D. Pa. complaint filed Jan. 10, 2011).

3.      NCGA member families own and operate farms.  Some of these farms are located within each of the states in the Mississippi River Basin, including all or portions of the states of Alabama, Arkansas, Colorado, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Tennessee, Texas, Virginia, West Virginia, Wisconsin, and Wyoming.  Many of NCGA member farms must implement nutrient management plans, as required by state laws, to control non-point source

nutrient discharges.

4.      I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin.  According to the plaintiffs, existing water quality criteria are not sufficiently protective in limiting excess nutrients.  If plaintiffs prevail in this lawsuit, EPA must step in and issue numeric nutrient criteria and also issue TMDLs that are more stringent than the existing water quality regulations for the Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be applied in permit conditions in Clean Water Act point source permits.  They would also be implemented through nutrient control requirements for sources of non-point source water pollution under state law.

5.      As an agricultural trade organization representing farmers who produce corn in each state in the Mississippi River Basin, NCGA, as well as its members, will be affected by the legal conclusions and remedies rendered by this court.

6.      Any court order requiring EPA to promulgate new numeric criteria and TMDLs would directly affect the livelihood and productive commercial capabilities of NCGA's members by increasing the costs associated with their nutrient management plans.  Nutrient management is already an expensive part of the operation of a corn farm, and the costs associated with these plans would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 7, 2012.

Jon Doggett

2

EXHIBIT 6

## DECLARATION OF EWELL WELCH

I, Ewell Welch, declare under penalty of perjury as follows:

1.      I am the Executive Vice-President at the Arkansas Farm Bureau Federation ("ArFB").   I offer this Declaration based on my personal knowledge in support of the American Farm Bureau Federation's motion to intervene in this action.

2.      ArFB is a non-profit organization that advocates, and provides programs to foster, the interests of agriculture, agri-businesses, and its members in the State of Arkansas.  Many of our affiliated member families own and operate farms that raise livestock or poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries.

3.      ArFB's advocacy routinely encompasses efforts before the Arkansas legislature and state agencies concerning issues that affect agriculture, including the regulation of nutrients.

4.      Some of ArFB's affiliated members' farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S.  These permits are issued by our state regulator agency. The permits regulate the discharge of nutrients – primarily nitrogen and phosphorus.  ArFB's affiliated members' farms implement nutrient management plans to comply with the requirements of their point source permits.

5.      ArFB livestock or poultry affiliated member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff.  Member farms in Arkansas that produce only row crops work closely with our local land grant university, the University of Arkansas, to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.      I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Arkansas.  Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in [state] and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Arkansas and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by ArFB's affiliate members and any farmer that seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Arkansas that are not regulated through point source discharge permits.  As a general farm organization representing farmers who produce all types of farm commodities in Arkansas, ArFB, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.      Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of ArFB members by increasing the costs associated with developing and implementing nutrient management plans. Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm.  The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May
01____, 2012

_Ewell R. Welch_
EWELL WELCH

3

# EXHIBIT 7

## DECLARATION OF PHILIP NELSON

I, Philip Nelson declare under penalty of perjury as follows:

1.      I am the President of the Illinois Agricultural Association a/k/a the Illinois Farm Bureau® ("Farm Bureau") and I have been so since December of 2003. I am also a member of the Board of Directors of the American Farm Bureau Federation ("AFBF") and I serve as Chairman of the Trade Advisory Committee for AFBF.

2.      The Farm Bureau is a not for profit agricultural association, whose mission is to improve the economic well being of agriculture and enrich the quality of farm life. The Farm Bureau represents over 80,000 farmer member in local, state and national legislative and political activities. Today, approximately two out of every three Illinois Farmers are members of the Illinois Farm Bureau.

3.      Illinois Farm Bureau's advocacy routinely encompasses efforts before the Illinois Environmental Protection Agency, ("IEPA"), the United States Environmental Protection Agency (" USEPA") , the United States Department of Agriculture (" USDA"),  the U.S. Congress and the Illinois General Assembly, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act. For example, the Farm Bureau helped develop and fund the Keeping it for the Crop by 2025 Nutrient Strategy for Illinois agricultural producers which supports educational and research programs to improve water quality and increase nutrient efficiency. The Farm Bureau advocated on behalf of its members with the IEPA on the proposed Concentrated Animal Feeding Operation Rules and the National Pollutant Discharge Elimination System Pesticide Permit for the state of Illinois. In addition, the Farm Bureau participated in several committees which provided input to the USDA and the IEPA on nutrient management issues.

4.      Some of Illinois Farm Bureau's member farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S.  The IEPA issues NPDES permits.  These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus. Farm Bureau's member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.      Illinois Farm Bureau livestock or poultry member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff.  Along with the Farm Bureau, member farms in Illinois that produce row crops work closely with the University of Illinois to help ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.  The Farm Bureau helped fund the development of a website owned by the University of Illinois which provides information on livestock nutrient management plans.

6.      I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Illinois.  Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Illinois and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Illinois and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by Farm Bureau members and any farmer that seeks permit coverage in the future.  Such

criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Illinois that are not regulated through point source discharge permits. As a general farm organization representing farmers who produce all types of farm commodities in Illinois, Farm Bureau, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.     Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive capabilities of Farm Bureau members by increasing the costs associated with developing and implementing nutrient management plans. Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm. The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 4, 2012.

Philip Nelson

# EXHIBIT 8

## DECLARATION OF CRAIG HILL

I, Craig Hill, declare under penalty of perjury as follows:

1.      I am the President of the Iowa Farm Bureau Federation, the largest general farm organization in the state of Iowa.  I offer this Declaration based on my personal knowledge in support of the Iowa Farm Bureau Federation's motion to intervene in this action.

2.      The Iowa Farm Bureau Federation is an independent, non-governmental, voluntary organization of farm  families united with the freedom to analyze their problems and formulate action to achieve educational improvement, economic opportunity, and social advancement and, thereby, to promote the national well-being.  The Iowa Farm Bureau Federation is dedicated to helping farm families prosper and improve their quality of life.  The Iowa Farm Bureau Federation is a member of the American Farm Bureau Federation.  Many of our member families own and operate farms that raise livestock or poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries.  Iowa is blessed with much arable land on which to grow food, feed, fiber, and fuel.  Of the approximately thirty-six million (36 million) acres within our state borders, almost thirty-one million (30.8 million) acres is used for farming. With eighty-eight percent (88%) of our state's land included in the state's 92,400 farms, Iowa has the largest percentage of land area  that is utilized for agriculture among the fifty states.  Iowa is the nation's leader in producing corn, soybeans, pork and eggs and is in the top ten of all states for producing silage, oats, alfalfa hay, beef, wool, and lambs.  Agriculture and agriculture-related industries are important to Iowa's economy, accounting for  twenty-seven percent of the state's economic output in 2007, the last

year for which complete data is available, and  is responsible for one out of six jobs in Iowa.[1]  As a result, if the Plaintiffs are successful, any change in how farmers utilize nutrients would greatly impact agricultural production and the economy in the rural areas where most farmers live and work.

  3.  The Iowa Farm Bureau Federation's advocacy routinely encompasses efforts before Iowa's local governments, Iowa's Judicial and Executive Branches, , and the Iowa General Assembly.  The Iowa Farm Bureau Federation also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advances issues  on behalf of its members, including the regulation of nutrients under the Clean Water Act.  For example, the Iowa Farm Bureau Federation has taken an active role in advocating for increased funding for water quality programs, such as watershed improvement grants, conservation costs share programs, the conservation reserve enhancement program, the conservation buffer strip program, watershed coordinator positions, Clean Water Act §319 watershed projects and increased state monitoring of the quality of our state's waters.  Within the last two years, the Iowa Farm Bureau Federation advocated for leadership among the state and federal government agencies with authority or programming over water quality to work together to prioritize and organize efforts to improve Iowa's water quality.  This effort resulted in the re-activation of the Water Resources Coordinating Council and collaborative efforts between state and federal agencies and state universities over the past eighteen months to develop a science-based nutrient strategy that reduces nutrients in our waters as part of a solution that works for all Iowans.  The Iowa Farm

---

[1] Analysis of data from the 2007 U.S. Census of Agriculture, U.S. Bureaus of Economic Development and Labor Statistics, the United States Department of Agriculture, and the IMPLAN economic modeling software from MIG, Inc. provided by the Coalition to Support Iowa's Farmers and may be accessed at http://www.supportfarmers.com/

Bureau Federation also advocates for its members before state courts. The Iowa Farm Bureau Federation recently filed a petition for judicial review challenging the adoption of a Clean Water Act regulation in *Iowa Farm Bureau Federation v. Environmental Protection Commission,* CV-008371, (Iowa District Court for Polk County, currently on appeal to the Iowa Supreme Court)[2]. The case alleges the rulemaking body was improperly constituted when it adopted the regulation, since the necessary votes for adoption included a paid-staff advocate of the Iowa Environmental Council, and an improperly seated out-of-state resident, both of whom were appointed members of the rulemaking board .

4.      Some of Iowa Farm Bureau Federation's member farms are livestock or poultry operations that hold individual or general permits issued by the state pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S. These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus. Iowa Farm Bureau Federation's member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.      Even Iowa Farm Bureau Federation's livestock or poultry member farms that do not hold permits for point source discharges, nonetheless implement nutrient management plans pursuant to state laws enacted to limit nutrient runoff. Member farms in Iowa that produce only row crops work closely with Iowa State University, and their private crop consultants to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.      I have reviewed the Complaint filed by the plaintiffs in this action. The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient

---

[2] Respondent-Intervenors in the case include some of the Plaintiffs in the present action: Iowa Environmental Council, Sierra Club, and Environmental Law and Policy Center.

criteria are necessary for states in the Mississippi River Basin, including Iowa. Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients. If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Iowa and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Iowa and other Mississippi River Basin states. Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by Iowa Farm Bureau Federation members and any farmer that seeks permit coverage in the future. Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Iowa that are not regulated through point source discharge permits. As a general farm organization representing farmers who produce all types of farm commodities in Iowa, the Iowa Farm Bureau Federation, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.   Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of Iowa Farm Bureau Federation members by increasing the costs associated with developing and implementing nutrient management plans, new conservation practices, and likely requiring changes in the authorized use of acres of currently productive Iowa farmland. Nutrient management and conservation practices are already an expensive part of the operation of a livestock, poultry, or row crop farm in Iowa. The costs associated with these plans, including man-hours, hiring of engineers and other experts, and the implementation of the plans themselves, would be expected to increase substantially if plaintiffs were successful in this suit.

4

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 7, 2012.


Craig Hill

EXHIBIT 9

## DECLARATION OF TERRY D. HOLDREN

I, Terry D. Holdren declare under penalty of perjury as follows:

1.      I am the General Counsel at the Kansas Farm Bureau.   I offer this Declaration based on my personal knowledge in support of Kansas Farm Bureau's motion to intervene in this action.

2.      Kansas Farm Bureau exists to serve Farm Bureau members in Kansas through programs, products and services which enhance the business and profession of farming, increase member's net income, provide superior value in the marketplace, and improve the quality of life in Kansas.  Many of our member families own and operate farms that raise livestock or poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries.  Kansas farmers typically produce more wheat than any other state in the nation. The state also ranks number one in production of grain sorghum and is a near the top in terms of production of sunflowers, corn, soybeans and hay.  Kansas also leads in production of beef, typically ranking third in cattle and calves on farms and third in cattle and calves on grain feed. The state also produces significant numbers of hogs, sheep and lambs and has growing production of meat goats and milk.  One in five Kansans work in jobs related to agriculture and food production.

3.      Kansas Farm Bureau's advocacy routinely encompasses efforts before administrative agencies or legislative bodies in the state of Kansas.  Kansas Farm Bureau also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it

advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act. For example, the organization was among groups signaling an intent to intervene recently when the Friends of the Kaw filed a notice of intent to sue the state of Kansas over the nutrient standards issue. While the original Notice of Intent has now expired parties on all sides maintain a significant interest in the issue and frequent discussions about the state's water quality standards are ongoing.

4.       Some of Kansas Farm Bureau's member farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S. The Kansas Department of Health and Environment has long issued Section 402 permits to producers in the state. For more than 20 years the Kansas permitting program for livestock facilities has been more stringent than the federal program, requiring producers to develop livestock waste management plans long before nutrient management plans were required at the federal level. These plans and permits regulate the discharge of nutrients – primarily nitrogen and phosphorus. Kansas Farm Bureau's member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.       Kansas Farm Bureau livestock or poultry member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff. Member farms in Kansas that produce only row crops work closely with local land grant universities namely Kansas State University to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses. Increasingly, Kansas producers have adopted precision application technologies to ensure stewardship of the state's waters.

6.      I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Kansas.  Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Kansas and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Kansas and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by Kansas Farm Bureau members and any farmer that seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Kansas that are not regulated through point source discharge permits.  As a general farm organization representing farmers who produce all types of farm commodities in Kansas, Kansas Farm Bureau, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.      Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of Kansas Farm Bureau members by increasing the costs associated with developing and implementing nutrient management plans.  Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm.  The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2012.

Terry D. Holdren

EXHIBIT 10

## DECLARATION OF MARK HANEY

I, Mark Haney declare under penalty of perjury as follows:

1.      I am the President of Kentucky Farm Bureau.  I offer this Declaration based on my personal knowledge in support of Kentucky Farm Bureau's motion to intervene in this action.

2.      Kentucky Farm Bureau, a member of American Farm Bureau, is a voluntary organization of farm families and their allies dedicated to serving as the voice of agriculture by identifying problems, developing solutions and taking actions which will improve net farm income, achieve better economic opportunities and enhance the quality of life for all. Many of our member families own and operate farms that raise livestock or poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries. Kentucky has a very diverse agricultural base that includes livestock production (poultry, equine, beef, dairy, swine, sheep and goat), grain production (corn, soybeans, wheat, tobacco and sorghum), fruit and vegetable, silviculture, and forage production.

3.      Kentucky Farm Bureau advocacy routinely encompasses efforts before the Kentucky General Assembly.  Kentucky Farm Bureau also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act.  For example, Kentucky Farm Bureau is currently working with the Kentucky Division of Water as it develops total maximum daily loads (TMDLs) for various watersheds across the state.  Kentucky Farm Bureau also continues active involvement on the Kentucky Agriculture Water Quality Authority, the entity tasked with review of water quality data and development of best management practices for the protection of surface and groundwater resources in Kentucky.

4.      Some of Kentucky Farm Bureau's member farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S.  The Kentucky Division of Water KPDES Branch is responsible for issuing permits for the discharge of pollutants from any point source into waters of the Commonwealth.  These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus.  Kentucky Farm Bureau's member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.      Kentucky Farm Bureau livestock or poultry member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff.  Member farms in Kentucky that produce only row crops work closely with local land grant universities such as the University of Kentucky College of Agriculture to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.      I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Kentucky.  Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Kentucky and also establish TMDLs for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Kentucky and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by Kentucky Farm Bureau members and any farmer that seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented through nutrient management requirements for farms

2

regulated in Kentucky that are not regulated through point source discharge permits.  As a general farm organization representing farmers who produce all types of farm commodities in Kentucky, Kentucky Farm Bureau, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.     Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of Kentucky Farm Bureau members by increasing the costs associated with developing and implementing nutrient management plans.  Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm.  The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 6, 2012.

Mark Haney

EXHIBIT 11

## DECLARATION OF RONALD R. ANDERSON

I, Ronald R. Anderson, declare under penalty of perjury as follows:

1.       I am the President of the Louisiana Farm Bureau Federation, Inc., hereinafter referred to as "LFBF." I offer this Declaration based on my personal knowledge in support of Louisiana Farm Bureau Federation's motion to intervene in this action.

2.       LFBF is a free, independent, nongovernmental, voluntary organization of farm and ranch families united for the purpose of analyzing their problems and formulating action to achieve educational improvement, economic opportunity, and social advancement, thereby promoting the growth of our country, state, and the quality of our national life.   LFBF is a member of the American Farm Bureau Federation and is therefore local, national, and international in its scope and influence and is nonpartisan, nonsectarian, and non-secret in character.  LFBF is a statewide voluntary organization interested and involved in the agricultural economy.  It specifically represents the various segments of the agricultural industry and has as its main purpose to identify, analyze and propose solutions for farm problems at the local, state, and national levels.  Many of our member families own and operate farms that raise livestock or poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries.

3.       LFBF's advocacy routinely encompasses efforts before the Louisiana state legislature and various subdivisions of state and local government.  LFBF also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act.

4.      LFBF livestock or poultry farm members that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state or federal laws to limit nutrient runoff.  Member farms in Louisiana that produce only row crops work closely with the local land grant university,  Louisiana State University and Agricultural and Mechanical College,  to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

5.      I have reviewed the Complaint filed by the plaintiffs in this action.  Among other things, the plaintiffs seek a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Louisiana.  Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Louisiana and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Louisiana and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by members of LFBF and any farmer that seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Louisiana that are not regulated through point source discharge permits.  As a general farm organization representing farmers who produce all types of farm commodities in Louisiana, LFBF, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

6.      Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of  members of

LFBF by increasing the costs associated with developing and implementing nutrient management plans.  Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm.  The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of May, 2012.

Ronald R. Anderson, President
Louisiana Farm Bureau Federation, Inc.

EXHIBIT 12

## DECLARATION OF Perry Aasness

I, Perry Aasness declare under penalty of perjury as follows:

1.      I am the Executive Director at the Minnesota Farm Bureau Federation (MFBF). I offer this Declaration based on my personal knowledge in support of MFBF's motion to intervene in this action.

2.      The mission of MFBF is to be an advocate for agriculture driven by the beliefs and policies of our members. Many of our member families own and operate farms that raise livestock, poultry and/or crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries.

3.      MFBF's advocacy routinely encompasses efforts before the Minnesota state legislature and executive branch, including state agencies. MFBF also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act. For example, MFBF worked on the development and passage of Minnesota's Clean Water Legacy Act.

4.      Some of MFBF's member farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S. These permits are issued by the Minnesota Pollution Control Agency. These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus. MFBF's member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.      MFBF livestock or poultry member farms that do not hold permits for point

source discharges nonetheless implement nutrient management plans pursuant to state laws and regulations to limit nutrient runoff.  Member farms in Minnesota that produce only crops work closely with the University of Minnesota and the Minnesota Department of Agriculture to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.     I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Minnesota.  Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Minnesota and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Minnesota and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by MFBF members and any farmer that seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Minnesota that are not regulated through point source discharge permits.  As a general farm organization representing farmers who produce all types of farm commodities in Minnesota, MFBF, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.     Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of MFBF members by increasing the costs associated with developing and implementing nutrient management plans.  Nutrient management is already an expensive part of the operation of a livestock, poultry or

other type of farm.  The costs associated with these plans, including man-hours, hiring of

engineers and other experts, and implementation of the plans themselves would be expected to

increase substantially if plaintiffs were successful in this suit.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 7,
2012.

EXHIBIT 13

## DECLARATION OF MR. RANDY KNIGHT

I, Randy Knight declare under penalty of perjury as follows:

1.   I am the President of the Mississippi Farm Bureau Federation. I offer this Declaration based on my personal knowledge in support of Mississippi Farm Bureau Federation's motion to intervene in this action.

2.   The purpose of the Mississippi Farm Bureau Federation is to serve as a medium of federation with the American Farm Bureau Federation; to correlate and strengthen County Farm Bureaus in Mississippi; to promote, protect, and represent the business, economic, social, and educational interest of the farm family; to develop agriculture; to cooperate with agricultural agencies and organizations; to work for the general welfare of its fellow men; and, to accomplish these purposes, to exercise all powers granted by law, its charter, and bylaws. Many of our member families own and operate farms that raise livestock or poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries. Mississippi is home to 42,400 farms, with over 11 million farmed acres, and over 19.5 million farmed forestry acres, contributing $7.02 billion to the state's economy. Mississippi is the 4th largest broiler producing state, with 1,478 farms, raising approximately 765,000,000 birds, with a value of production of $2.21 billion.

3.   Mississippi Farm Bureau Federation's advocacy routinely encompasses efforts before the Mississippi Legislature and state government agencies.  Mississippi Farm Bureau Federation also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act.  For example, Mississippi is a no-

discharge state and all poultry producers are covered under a State Operating Dry Litter Multi-Media General Permit and the accompanying Nutrient Management Plan.  Mississippi Farm Bureau Federation routinely provides stakeholder input on behalf of our members related to the drafting and implementation of these permits and nutrient management plans.

4.   Some of Mississippi Farm Bureau Federation's member farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S.  The State of Mississippi has delegated authority under the Clean Water Act to issue permits within the State of Mississippi.  These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus.  Mississippi Farm Bureau Federation member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.   Mississippi Farm Bureau Federation livestock or poultry member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff.  Member farms in Mississippi that produce only row crops work closely with land grant universities, such as Mississippi State University (MSU), to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.   I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Mississippi. Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Mississippi and also establish total maximum daily loads ("TMDLs") for

nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Mississippi and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by Mississippi Farm Bureau Federation members and any farmer that seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Mississippi that are not regulated through point source discharge permits.  As a general farm organization representing farmers who produce all types of farm commodities in Mississippi, Mississippi Farm Bureau Federation, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.   Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of Mississippi Farm Bureau Federation members by increasing the costs associated with developing and implementing nutrient management plans.  Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm.  The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 5, 2012.

RANDY KNIGHT, President
Mississippi Farm Bureau Federation

EXHIBIT 14

## DECLARATION OF BLAKE HURST

I, Blake Hurst, declare under penalty of perjury as follows:

1.      I am the President at the Missouri Farm Bureau.   I offer this Declaration based on my personal knowledge in support of Missouri Farm Bureau's motion to intervene in this action.

2.      Missouri Farm Bureau is a grassroots, non-partisan general farm organization founded in 1915.  Farm Bureau is dedicated to promoting agriculture and improving the quality of life for our members.  Missouri Farm Bureau is a member of the American Farm Bureau Federation.  Many of our member families own and operate farms that raise livestock or poultry and/or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries. Agriculture is a major component of Missouri's economy and is quite diverse, ranking in the top ten nationally in the production of soybeans (5th), forage (2nd), corn for grain (9th), cotton (9th), broilers (10th), turkeys (4th), cattle and calves (6th) and hogs and pigs (7th).  In 2010, according to the U.S. Department of Agriculture's National Agriculture Statistics Service (NASS), Missouri had 108,000 farms that encompassed 29,100,000 acres.   In 2010, the average size of a Missouri farm was 269 acres and the average age of the principal operator was 57 years. NASS reported the total value of Missouri agriculture products sold in 2010 was $7.51 billion (12th nationally).  In 2010, Missouri farms produced 210,405,000 bushels of soybeans valued at $2.54 billion and 369,000,000 bushels of corn valued at $2.01 billion.

3.      Missouri Farm Bureau's advocacy routinely encompasses efforts before the Missouri General Assembly and state regulatory agencies and occasionally state courts. Missouri Farm Bureau also routinely advocates before the U.S. Congress, the Executive Branch and occasionally federal courts, where it advocates on behalf of its members on many issues,

including the regulation of nutrients under the Clean Water Act.  For example, for more than two

decades, Missouri Farm Bureau has been involved in issues relative to management of the

Missouri River and is currently preparing to provide oral and written comments on the U.S.

Army Corps of Engineers' (Corps) request for state water quality permits in conjunction with

modifications to a chute located within the Big Muddy National Fish and Wildlife Refuge in

Saline County, Missouri.  In addition, Missouri Farm Bureau strongly supports legislation

introduced in the U.S. House of Representatives that would prevent federal agencies from

finalizing guidance documents which significantly expand the scope of the Clean Water Act and

submitted written comments to the U.S. Environmental Protection Agency during the public

comment phase.

4.     Some of Missouri Farm Bureau's member farms are livestock or poultry

operations that hold individual or general permits issued pursuant to Clean Water Act Section

402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S.  These permits are

issued by the Missouri Department of Natural Resources.  These permits regulate the discharge

of nutrients – primarily nitrogen and phosphorus.  Missouri Farm Bureau's member farms

implement nutrient management plans to comply with the requirements of their point source

permits.

5.     Missouri Farm Bureau livestock or poultry member farms that do not hold permits

for point source discharges nonetheless implement nutrient management plans pursuant to state

laws to limit nutrient runoff.  Member farms in Missouri that produce only row crops work

closely with the local land grant university, the University of Missouri, to ensure that fertilizer is

applied in a manner that maximizes production while minimizing nutrient losses.

6.     I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs

seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient

criteria are necessary for states in the Mississippi River Basin, including Missouri.  Plaintiffs

take the position that existing water quality criteria are not adequate to protect against excess

nutrients.  If plaintiffs succeed in this lawsuit, regardless of the fact that the Missouri Department

of Natural Resources is developing state numeric nutrient criteria, EPA must promulgate

numeric nutrient criteria in Missouri and also establish total maximum daily loads ("TMDLs")

for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality

criteria and TMDLs that are currently in place for Missouri and other Mississippi River Basin

states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in

Clean Water Act permits currently held by Missouri Farm Bureau members and any farmer that

seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented

through nutrient management requirements for farms regulated in Missouri that are not regulated

through point source discharge permits.  As a general farm organization representing farmers

who produce all types of farm commodities in Missouri, Missouri Farm Bureau, as well as its

members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.      Any court order requiring EPA to issue new numeric standards and TMDLs

would directly affect the livelihood and productive commercial capabilities of Missouri Farm

Bureau members by increasing the costs associated with developing and implementing nutrient

management plans.  Nutrient management is already an expensive part of the operation of a

livestock, poultry or other type of farm.  The costs associated with these plans, including man-

hours, hiring of engineers and other experts, and implementation of the plans themselves would

be expected to increase substantially if plaintiffs were successful in this suit.

3

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 4, 2012.


_____
BLAKE HURST

EXHIBIT 15

## DECLARATION OF JAY E. REMPE, NEBRASKA FARM BUREAU

I, Jay E. Rempe, declare under penalty of perjury as follows:

1.     I am the Vice President of Governmental Relations at the Nebraska Farm Bureau Federation.  I offer this Declaration based on my personal knowledge in support of Nebraska Farm Bureau Federation's motion to intervene in this action.

2.     Nebraska Farm Bureau Federation's mission is to be the trusted voice for Nebraska farm and ranch families.  It supports Nebraska farm and ranch families through a wide variety of educational and advocacy efforts.  Nebraska Farm Bureau is a member-driven organization with thousands of farm and ranch family members and a network of local, state and national offices to help farm family's deal with the increasing complexity of agriculture.  Nebraska Farm Bureau Federation belongs to American Farm Bureau Federation to support its mission and efforts at the national level.  Many of Nebraska Farm Bureau member families own and operate farms that raise livestock, poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries.  Our members own and operate many of the 47,200 farms in Nebraska producing corn, soybeans, wheat, seed corn and other crops along with beef cattle, pork and poultry and other livestock.  Nebraska farms are family owned, average roughly 970 acres in size, and include both rain-fed and irrigated farms producing crops and cow-calf ranches, open lot feedlots and confined feeding operations producing livestock and poultry.  A significant portion of Nebraska's land base drains into the Missouri River, eventually feeding into the Mississippi River system.

3.     Nebraska Farm Bureau's advocacy routinely encompasses efforts before the Nebraska State Legislature, administrative agencies like the Nebraska Dept. of Environmental

Quality, local Natural Resources Districts, and district and state courts on issues related to the regulation of nutrient management and farming practices on Nebraska's farms and ranches. Nebraska Farm Bureau also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act. For example, Nebraska Farm Bureau recently communicated to Nebraska's Congressional delegation its support for legislation before Congress to limit an Environmental Protection Agency proposal to expand its authorities under the Clean Water Act.

4.     Some of Nebraska Farm Bureau's member farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S. Such permits are issued by the Nebraska Department of Environmental Quality and regulate the discharge of nutrients – primarily nitrogen and phosphorus. Nebraska Farm Bureau's member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.     Nebraska Farm Bureau livestock or poultry member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff. Member farms in Nebraska that produce row crops work closely with the University of Nebraska, local Natural Resources Districts, and crop consultants to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.     I have reviewed the Complaint filed by the plaintiffs in this action. The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient

criteria are necessary for states in the Mississippi River Basin, including Nebraska. Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients. If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Nebraska and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Nebraska and other Mississippi River Basin states. Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by Nebraska Farm Bureau members and any farmer that seeks permit coverage in the future. Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Nebraska that are not regulated through point source discharge permits. As a general farm organization representing farmers who produce all types of farm commodities in Nebraska, Nebraska Farm Bureau, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.          Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of Nebraska Farm Bureau members by increasing the costs associated with developing and implementing nutrient management plans. Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm. The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

3

I declare under penalty of perjury that the foregoing is true and correct. Executed on 5/4/12.

_____
Jay E. Rempe

EXHIBIT 16

## DECLARATION OF MONICA WILKE

I, Monica Wilke, declare under penalty of perjury as follows:

1.      I am the Executive Director of Oklahoma Farm Bureau, Inc.   I offer this Declaration based on my personal knowledge in support of Oklahoma Farm Bureau, Inc.'s motion to intervene in this action.

2.      Oklahoma Farm Bureau, Inc. is an independent, non-governmental voluntary organization of farm and ranch families united for the purpose of analyzing their problems and formulating action to achieve educational improvement, economic opportunity and social advancement, and thereby, to promote the national well-being. Oklahoma Farm Bureau, Inc. is the voice of agricultural producers at all levels. Oklahoma Farm Bureau, Inc. is composed of farm and ranch families and other persons with interest in agriculture who become members concurrently of an affiliated county Farm Bureau, the Oklahoma Farm Bureau, Inc. and the American Farm Bureau Federation. These local, state and national units are bound together by voluntary cooperative agreements which state the common objectives and procedures by which all three shall cooperate.  Many of our member families own and operate farms that raise livestock or poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries.

3.      Oklahoma Farm Bureau, Inc.'s advocacy routinely encompasses efforts before Oklahoma agencies and the State Legislature.   Oklahoma Farm Bureau, Inc. also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act.

4.      Some of Oklahoma Farm Bureau, Inc.'s member farms are livestock or poultry operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S.  These permits are issued by EPA Region 6. These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus.  Oklahoma Farm Bureau, Inc.'s member farms implement nutrient management plans to comply the requirements of their point source permits.

5.      Oklahoma livestock or poultry member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff.  Member farms in Oklahoma that produce only row crops work closely with Oklahoma State University to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.      I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Oklahoma.  Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Oklahoma and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Oklahoma and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by Oklahoma Farm Bureau members and any farmer that seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Oklahoma that are not regulated through point source

2

discharge permits.  As a general farm organization representing farmers who produce all types of farm commodities in Oklahoma, Oklahoma Farm Bureau, Inc., as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.     Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of Oklahoma Farm Bureau, Inc. members by increasing the costs associated with developing and implementing nutrient management plans.  Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm.  The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 7, 2012.

_____
Monica Wilke

EXHIBIT 17

## DECLARATION OF MICHAEL HELD

I, Michael Held, declare under penalty of perjury as follows:

1.      I am the CEO at the South Dakota Farm Bureau.  I offer this Declaration based on my personal knowledge in support of South Dakota Farm Bureau's motion to intervene in this action.

2.      South Dakota Farm Bureau is an effective agriculture organization that serves its members by working to improve the personal, social, economic and political interests of South Dakota's farm and ranch families.  South Dakota Farm Bureau is a member of the American Farm Bureau Federation.  Many of our member families own and operate farms that raise livestock or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries. The South Dakota livestock industry has sales of $2.7 billion with beef cattle being the largest portion of the livestock sector.  Hogs, dairy and sheep production are also significant livestock sectors.

3.      South Dakota Farm Bureau's advocacy routinely encompasses efforts before the South Dakota Legislature and departments and agencies of state government.  South Dakota Farm Bureau also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act.  For example, South Dakota Farm Bureau played an active role when the General Livestock Permit was developed by the Department of Environment and Natural Resources for South Dakota to meet the EPA standard.  South Dakota Farm Bureau has been a leader in developing the vegetative treatment system as a method to improve water quality.  South Dakota Farm Bureau participates in the South Dakota 319 Task

Force effort to improve water quality.

South Dakota Farm Bureau helped finance a phosphorus study at South Dakota State University to advance the Clean Water Effort.

      4.     Some of South Dakota Farm Bureau's member farms are livestock operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S. These permits are issued by the State of South Dakota. These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus. South Dakota Farm Bureau's member farms implement nutrient management plans to comply with the requirements of their point source permits.

      5.     South Dakota Farm Bureau livestock member farms and ranches that do not hold permits for point source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff. Member farms in South Dakota that produce only row crops work closely with South Dakota State Universities to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

      6.     I have reviewed the Complaint filed by the plaintiffs in this action. The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including South Dakota. Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients. If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in South Dakota and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for South Dakota and other Mississippi River Basin states. Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water

Act permits currently held by South Dakota Farm Bureau members and any farmer that seeks

permit coverage in the future. Such criteria and TMDLs would also be implemented through

nutrient management requirements for farms regulated in South Dakota that are not regulated

through point source discharge permits. As a general farm organization representing farmers

who produce all types of farm commodities in South Dakota, South Dakota Farm Bureau, as well

as its members, will be directly affected by the legal conclusions and remedies rendered by this

court.

   7.  Any court order requiring EPA to issue new numeric standards and TMDLs

would directly affect the livelihood and productive commercial capabilities of South Dakota

Farm Bureau members by increasing the costs associated with developing and implementing

nutrient management plans. Nutrient management is already an expensive part of the operation

of a livestock or other type of farm. The costs associated with these plans, including man-hours,

hiring of engineers and other experts, and implementation of the plans themselves would be

expected to increase substantially if plaintiffs were successful in this suit.


I declare under penalty of perjury that the foregoing is true and correct. Executed on May 3,
2012.


Michael Held


3

EXHIBIT 18

## DECLARATION OF RHEDONA ROSE

I, Rhedona Rose, declare under penalty of perjury as follows:

1.      I am the Executive Vice President of the Tennessee Farm Bureau Federation ("TFBF").    I offer this Declaration based on my personal knowledge in support of TFBF's motion to intervene in this action.

2.      TFBF was formed in 1921 to develop, foster, promote and protect programs for the general welfare, including economic, social, educational and political well-being of farm people of the great state of Tennessee, and is a member of the American Farm Bureau Federation.    Currently, TFBF has over 650,000 member families, many of which own and operate farms that raise livestock or poultry or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries.

3.      TFBF's advocacy on behalf of its members in production agriculture routinely encompasses efforts before the state legislature, departments of the Executive Branch, and numerous local government entities. TFBF also routinely advocates before the U.S. Congress, the Executive Branch and federal courts, where it advocates on behalf of its members on many issues, including the regulation of nutrients under the Clean Water Act.

4.      Some of TFBF's members' farms are livestock or poultry operations that hold individual or general permits issued by the state pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S. These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus. TFBF's members implement nutrient management plans to comply with the requirements of their point source permits.

5.      TFBF livestock or poultry members' farms that do not hold permits for point

source discharges nonetheless implement nutrient management plans pursuant to state laws to limit nutrient runoff. Members that produce only row crops work closely with the University of Tennessee through its Extension Service and other programs to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.     I have reviewed the Complaint filed by the plaintiffs in this action. The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Tennessee. Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients. If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Tennessee and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Tennessee and other Mississippi River Basin states. Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by TFBF members and any farmer that seeks permit coverage in the future. Such criteria and TMDLs would also be implemented through nutrient management requirements for farms regulated in Tennessee that are not regulated through point source discharge permits. As a general farm organization representing farmers who produce all types of farm commodities in Tennessee, TFBF, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.     Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of TFBF's members by increasing the costs associated with developing and implementing nutrient management plans. Nutrient management is already an expensive part of the operation of a livestock, poultry or

2

other type of farm.  The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 4, 2012.

Rhedona Rose
Executive Vice President
Tennessee Farm Bureau Federation

EXHIBIT 19

## DECLARATION OF KEN HAMILTON

I, Ken Hamilton declare under penalty of perjury as follows:

1.     I am the Executive Vice President at the Wyoming Farm Bureau (WyFB).   I offer this Declaration based on my personal knowledge in support of Wyoming Farm Bureau's motion to intervene in this action.

2.     The primary goals of the WyFB are to take appropriate actions to protect private property rights and help members achieve an equitable return on their investment.  The WyFB is currently a member in good standing of the American Farm Bureau.  Many of our member families own and operate farms that raise livestock or row crops and therefore engage in management practices to control nutrients (nitrogen and phosphorus) that could enter waters of the United States such as the Mississippi River or its tributaries. Wyoming agricultural producers obtain significant revenue from the production of beef cattle and sheep in the livestock sector; and hay, sugar beets and malt barley in the cropping sector.  Wyoming ranks 1st in the nation in the size of farms and ranches, second in wool production and 3rd in breeding sheep.  Most of the cropping production is dependent upon irrigation.

3.     Wyoming Farm Bureau's advocacy routinely encompasses efforts before the Wyoming State Legislature as well as the various executive agencies including the Department of Environmental Quality.  Wyoming Farm Bureau also occasionally advocates before the U.S. Congress, the Executive Branch and federal courts, advocating on behalf of its members on issues, including the regulation of nutrients under the Clean Water Act.  For example, the WyFB actively participated in the development of Best Management Practices for agricultural producers and actively supports the Wyoming Association of Conservation Districts in their implementation of watershed programs in areas where there are water impairments.

4.      Some of Wyoming Farm Bureau's member farms are livestock operations that hold individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into waters of the U.S.  These permits are issued by the Wyoming Department of Environmental Quality (DEQ).  These permits regulate the discharge of nutrients – primarily nitrogen and phosphorus.  Wyoming Farm Bureau's member farms implement nutrient management plans to comply with the requirements of their point source permits.

5.      Wyoming Farm Bureau livestock member farms that do not hold permits for point source discharges nonetheless implement nutrient management plans in agronomic rates to limit nutrient runoff.  Because of the high cost of fertilizers, member farms in Wyoming that produce only row crops work closely with local experts to ensure that fertilizer is applied in a manner that maximizes production while minimizing nutrient losses.

6.      I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs seek (among other things) a ruling that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states in the Mississippi River Basin, including Wyoming.  Plaintiffs take the position that existing water quality criteria are not adequate to protect against excess nutrients.  If plaintiffs succeed in this lawsuit, EPA must promulgate numeric nutrient criteria in Wyoming and also establish total maximum daily loads ("TMDLs") for nitrogen and phosphorus in rivers and streams that are more stringent than the water quality criteria and TMDLs that are currently in place for Wyoming and other Mississippi River Basin states.  Such numeric nutrient criteria and TMDLs would be the basis for new conditions in Clean Water Act permits currently held by Wyoming Farm Bureau members and any farmer that seeks permit coverage in the future.  Such criteria and TMDLs would also be implemented through nutrient management

2

requirements for farms regulated in Wyoming that are not regulated through point source discharge permits.  As a general farm organization representing farmers who produce all types of farm commodities in Wyoming, Wyoming Farm Bureau, as well as its members, will be directly affected by the legal conclusions and remedies rendered by this court.

7.    Any court order requiring EPA to issue new numeric standards and TMDLs would directly affect the livelihood and productive commercial capabilities of Wyoming Farm Bureau members by increasing the costs associated with developing and implementing nutrient management plans.  Nutrient management is already an expensive part of the operation of a livestock, poultry or other type of farm.  The costs associated with these plans, including man-hours, hiring of engineers and other experts, and implementation of the plans themselves would be expected to increase substantially if plaintiffs were successful in this suit.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 4th day of May, 2012.


_____
[NAME]

EXHIBIT 20

## DECLARATION OF JEAN PAYNE

I, Jean Payne, declare under penalty of perjury as follows:

1.        I am the President of the Illinois Fertilizer & Chemical Association ("IFCA").  I offer this Declaration based on my personal knowledge in support of IFCA's motion to intervene in this action.

2.        IFCA represents the interests of businesses and individuals who provide crop protection chemicals, nutrients, and related equipment and services to Illinois agricultural producers.  It is governed by a fifteen member Board of Directors representing the agricultural retail, manufacturing, and distribution sectors of the industry.  The organization's purposes include assisting and representing the crop production supply and service industry while promoting the sound stewardship and utilization of agricultural inputs.  IFCA is a member of The Fertilizer Institute, a national trade association that is also seeking to intervene in this litigation.

3.        IFCA's advocacy includes gathering and communicating useful information to its members, influencing policy-making processes that affect the industry, developing and fostering high standards of agronomic practices, and promoting and encouraging the safe and environmentally sound handling and use of nutrients and crop production products.  The regulation of nutrients under the Clean Water Act is among the many issues on which IFCA advocates on behalf of its members.

4.        IFCA's members own and operate fertilizer mining, production, processing, and retailing facilities within the Mississippi River Basin.  In addition, IFCA's members distribute and sell fertilizers to farmers throughout portions of the Mississippi River Basin located within Illinois.

5.        I have reviewed the Complaint filed by the plaintiffs in this action.  The plaintiffs

seek, among other things, a decision declaring that EPA unlawfully failed to determine that numeric nutrient criteria are necessary for states within the Mississippi River Basin, including Illinois.  The plaintiffs take the position that existing water quality criteria are inadequate in terms of nutrient regulation.  If plaintiffs are successful in their effort, EPA must issue numeric nutrient criteria and establish TMDLs that are more stringent than existing water quality regulations established by the State of Illinois.  Such numeric nutrient criteria and TMDLs would be implemented, among other means, through nutrient control requirements for sources of "nonpoint source" water pollution.

6.      As a trade organization representing the fertilizer industry in Illinois, IFCA's members will collectively and individually be affected by the legal conclusions and remedies rendered by this court.  Any court order requiring EPA to promulgate new numeric standards and TMDLs for the State of Illinois would substantially and adversely affect the livelihood and productive commercial capabilities of IFCA's members by decreasing the demand for fertilizer in the Mississippi River Basin.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 8, 2012.

_____

JEAN PAYNE

EXHIBIT 21

## <u>DECLARATION OF STEVE TAYLOR</u>

I, Steve Taylor, declare under penalty of perjury as follows:

1.     I am the President and Executive Director of the Missouri Agribusiness Association ("MO-AG"). I offer this Declaration based on my personal knowledge in support of MO-AG's motion to intervene in this action.

2.     MO-AG represents a wide range of agricultural business interests. Its members include agricultural retailers, distributors, and manufacturers of fertilizer products. MO-AG's mission is to advocate for the business of agriculture while offering services and networking opportunities for the agricultural business community.

3.     MO-AG represents its members before State and Federal legislators and agencies, advocating on various issues including regulation under the Clean Water Act. MO-AG has been involved in litigation on behalf of its members relating to water quality regulation. For example, in 2008, MO-AG intervened in a lawsuit brought by various plaintiffs seeking to limit the operations of a large farm in Missouri. *See State ex rel. Mo. Parks Ass'n v. Mo. Dep't of Natural Res.*, Case No. 07AC-CC000932 (Mo. Cir. Dec. 9, 2008).

4.     MO-AG members own and operate fertilizer production, processing, and retailing facilities within the Mississippi River Basin. In addition, MO-AG's members distribute and sell commercial fertilizer to agricultural producers for application on agricultural lands. Some of MO-AG's members hold permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source or storm water discharges of nutrients – primarily nitrogen and phosphorus – into waters in the Mississippi River Basin.

5.     I have reviewed the Complaint filed by the plaintiffs in this action. The plaintiffs seek, among other things, a decision declaring that EPA unlawfully failed to determine that

numeric nutrient criteria are necessary for states within the Mississippi River Basin, including Missouri. The plaintiffs take the position that existing water quality criteria are inadequate in terms of nutrient regulation. If plaintiffs are successful in their effort, EPA must issue numeric nutrient criteria and establish TMDLs that are more stringent than existing water quality regulations established by the State of Missouri. Such numeric nutrient criteria and TMDLs would be implemented, among other means, through discharge limitations or additional best management practices for nutrients in Clean Water Act permits and also through nutrient control requirements for sources of "nonpoint source" water pollution. As a trade organization representing the fertilizer industry in Missouri, MO-AG's members will collectively and individually be affected by the legal conclusions and remedies rendered by this court.

6.     Any court order requiring EPA to promulgate new numeric standards and TMDLs for the State of Missouri would directly affect the livelihood and productive commercial capabilities of MO-AG's members. If nutrient discharges are subject to these more stringent regulations in the Mississippi River Basin, MO-AG's members would incur financial losses due to decreased fertilizer sales to customers that must reduce their use of fertilizers. In addition, MO-AG's members may have to comply with additional best management practices or nutrient control requirements as a result of these new standards and TMDLs. Nutrient management is already an expensive part of our members' operations, and the costs associated with these plans would be expected to increase substantially if plaintiffs succeed in this suit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 3, 2012

_____
STEVE TAYLOR