# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

-------------------------------------------------------------------------

| | |
|---|---|
| GULF RESTORATION NETWORK, MISSOURI COALITION FOR THE ENVIRONMENT, IOWA ENVIRONMENTAL COUNCIL, TENNESSEE CLEAN WATER NETWORK, MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, SIERRA CLUB, WATERKEEPER ALLIANCE, INC., PRAIRIE RIVERS NETWORK, KENTUCKY WATERWAYS ALLIANCE, ENVIRONMENTAL LAW & POLICY CENTER, and the NATURAL RESOURCES DEFENSE COUNCIL, INC., | ) ) ) ) ) ) ) ) ) ) ) |
| | ) Civil Action |
| | ) No.: 2:12-cv-00677 |
| | ) Section "E," Division 3 |
| Plaintiffs, | ) Honorable J. C. Zainey |
| | ) Magistrate Judge Knowles |
| v. | ) |
| | ) |
| | ) |
| LISA P. JACKSON, Administrator of the United States Environmental Protection Agency, and THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |

-------------------------------------------------------------------------

## PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO EPA'S CROSS-MOTIONS AND REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Machelle Lee Hall
Adam Babich
Tulane Environmental Law Clinic
*Counsel for All Plaintiffs*

Ann Alexander
Natural Resources Defense Council
*Counsel for Plaintiffs Gulf Restoration Network, Missouri Coalition for the Environment, Iowa Environmental Council, Tennessee Clean Water Network, Minnesota Center for Environmental Advocacy, Sierra Club, Waterkeeper Alliance, Prairie Rivers Network, Kentucky Waterways Alliance, and Natural Resources Defense Council*

Bradley Klein
Environmental Law & Policy Center
*Counsel for Plaintiff Environmental Law and Policy Center*

April 3, 2013

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ........................................................................................ 1

ARGUMENT .............................................................................................4

    POINT I - THE COURT HAS JURISDICTION UNDER THE APA
            TO REVIEW EPA'S DENIAL OF PLAINTIFFS' PETITION.................4

      A.  EPA's Refusal to Render a Determination Under § 303(c)(4)(B) is
           Reviewable Regardless of the Reviewability of a Determination
           Itself ..........................................................................................5

      B.  The Presumption of Unreviewability Does Not Apply Where Denial
           of Rulemaking Petition is Challenged Under the  APA ……………………..7

      C.  Act § 303(c)(4)(B) Provides Ample Law to Apply to a Decision of
           Reviewability When Properly Interpreted in its Statutory Context………….10

           1.  The General Standard For Determining Reviewability Under
              APA § 701(a)(2) Calls for a Broad Review of The Statute as a
              Whole and its Associated Regulations .................................................11

           2.  Act § 303(c)(4)(B) Clearly Provides Sufficient Legal Standards
              for Judicial Review Within the Context of the Act as a Whole……...14

    POINT II - EPA'S FAILURE TO RESPOND, ONE WAY OR THE OTHER, TO
            THE CENTRAL QUESTION IN THE PETITION DID NOT COMPLY
            WITH THE ACT OR THE APA .................................................22

      A.  Section 303(c)(4)(B), like § 202, Contains a Non-Discretionary
           Mandate Triggered by a Discretionary Determination ………………………..24

      B.  Section § 303(c)(4)(B), Like § 202, Requires that the Necessity
           Determination be Grounded in Technical and Scientific Factors,
           Not Policy Preferences ..................................................................25

      C.  States' Role in the § 303 Standard Setting Process Has No Bearing
           on the Applicability of Massachusetts v. EPA .................................29

POINT III - EPA'S FAILURE TO MAKE A NECESSITY DETERMINATION
        IN RESPONSE TO THE PETITION WAS ARBITRARY,
        CAPRICIOUS,   AN ABUSE OF DISCRETION, AND
        OTHERWISE NOT IN ACCORDANCE WITH LAW…………………….33

    A.  Plaintiffs Have Demonstrated that the Current Record Does
        Not Support EPA's Categorical Refusal to Make a Necessity
        Determination  …………………………………………………………………35

    B.  Plaintiffs Need Not Prove Necessity Because They Are Not
        Asking the Court to Order a Necessity Determination ……………………...37

    C.  Defendants have Failed to Demonstrate that Existing State
        Efforts are Adequate to Meet the Requirements of the Act………………….40

    D.  Policy Arguments Against Numeric Criteria are Irrelevant and
        Unavailing……………………………………………………………………42

POINT IV - PLAINTIFFS HAVE REQUESTED APPROPRIATE RELIEF…………..44

CONCLUSION…………………………………………………………………………..46

## TABLE OF AUTHORITIES

**Cases**                                                                                              Page(s)

*Am. Canoe Ass'n, Inc. v. U.S. EPA,*
    30 F. Supp. 2d 908 (E.D. Va. 1998)……………………………………………………21, 30

*Am. Horse Prot. Ass'n, Inc. v. Lyng,*
    812 F.2d 1, 5 (D.C. Cir. 1987)…………………………………………………...6, 7, 8, 10

*AT&T Corp. v. Iowa Utilities Board,*
    525 U.S. 366 (1999)……………………………………………………………………...26

*Beno v. Shalala*, 30 F.3d 1057, 1066
    (9th Cir. 1994)……………………………………………………………………13, 22

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340, 345 (1984)……………………………………………………………...11

*Bullard v. Webster*, 623 F.2d 1042, 1045
    (5th Cir. 1980)……………………………………………………………………....11

*CC Distrib., Inc. v. United States*, 883 F.2d 146
    (D.C. Cir. 1989)……………………………………………………………………....11

*C.K. v. Shalala*, 883 F. Supp. 991
    (D.N.J. 1995)……………………………………………………………………..22

*Chevron v. Natural Res. Def. Council,*
    468 U.S. 1227 (1984)……………………………………………………………33

*Christopher Vill., Ltd. P'ship v. Retsinas,*
    190 F.3d 310 (5th Cir. 1999)……………………………………………………...6

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)……………………………………………………...4, 5, 11, 17

*Cody v. Cox,* 509 F.3d at 620……………………………………………………12, 13, 14

*Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.,*
    677 F.3d 1073 (11th Cir. 2012)…………………………………………………...9, 11

*Davis Enter. v. U.S. EPA,*
    877 F.2d 1181, 1185 (3d Cir. 1989)…………………………………………………..14

*Davis v. Jackson*, No. 8:09-CV-1070-T-17 TBM, 2010 WL 2431952
    (M.D. Fla. June 16, 2010)…………………………………………...……9, 19

*Dickson v. Sec'y of Def.*,
    68 F.3d 1396, 1399-1404 (D.C. Cir. 1995)…………………………………14

*Dunlop v. Bachowski*,
    421 U.S. 560 (1975)………………………………………………...……11

*Fed. Deposit Ins. Corp. v. Bank of Coushatta*,
    930 F.2d 1122, 1129 (5th Cir. 1991)…………………………………………13

*Fed. Power Comm'n v. Idaho Power Co.*,
    344 U.S. 17 (1952)…………………………………………………………45

*Fla. Wildlife Fed'n, Inc. v. Jackson*,
    853 F.Supp.2d 1138 (N.D. Fla. 2012)………………………………………...17

*Franklin v. Massachusetts*,
    505 U.S. 788, 818-19 (1992)………………………………………………12, 13, 21

*Gifford v. Small Bus. Admin.*,
    626 F.2d 85, 86 (9th Cir. 1980)……………………………………………13

*Haitian Refugee Ctr., Inc. v. Baker*,
    953 F.2d 1498 (11th Cir. 1992)……………………………………………11

*Heckler v. Cheney*,
    470 U.S. 821 (1985)………………………………………………....4, 5, 7, 8, 12

*Local 2855, AFGE (AFL-CIO) v. United States*,
    602 F.2d 574, 578 (3d Cir. 1979)……………………………………..…...11, 12

*Marbury v. Madison*,
    5 U.S. 137…………………………………………………………………..33

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)…………………………………………………passim

*Miss. Comm'n on Natural Res. v.* Costle,
    625 F.2d 1269 (5th Cir. 1980)………………………………………………...44

*Mo. Coal. for the Env't v. Jackson*,
    853 F. Supp. 2d 903 (W.D. Mo. 2012)…………………………………………..8, 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29, 43 (1983)……………………………………………………………………6

*Nat'l Wildlife Fed'n v. Browner,*
    No. 95-1811, 1996 WL 601451 (D.D.C. Oct. 11, 1996)…………………………9, 17, 18

*Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.,*
    872 F. Supp. 2d 318 (S.D.N.Y. 2012) ("*NRDC v. FDA*")………………………………..6

*New York v. United States,*
    505 U.S. 144, 145 (1992)………………………………………………………………...20

*Nw. Envtl. Advocates v. EPA,*
    268 F. Supp. 2d 1255 (D. Or. 2003)……………………………………..17, 18, 19, 20, 21

*Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971)………………………………………………………………4, 5, 11, 17

*Reliable Home Health Care, Inc. v. Thompson,*
    No. Civ.A. 01-2343, 2002 WL 22025 (E. D. La. Jan. 4, 2002)…………………………..6

*Rodriguez v. Panasiuk,*
    844 F. Supp. 1033, 1037-38 (E.D. Pa. 1994)…………………………………………….46

*Sierra Club v. Gorsuch,*
    715 F.2d 653, 661 (D.C. Cir. 1983)………………………………………………….45, 46

*Tex. v. U.S. EPA,*
    690 F.3d 670 (5th Cir. 2012)……………………………………………………………..6

*Webster v. Doe,*
    486 U.S. 592 (5th Cir. 2012)………………………………………………………....12, 13

## **STATUTES**

5 U.S.C. § 555(e)…………………………………………………………………………6, 8

5 U.S.C. § 701(a)(2)………………………………………………………………………passim

33 U.S.C. § 1251……………………………………………………………………15, 20, 44

33 U.S.C. § 1313(c) (Act § 303(c))…………………………………………………...15, 16, 19

33 U.S.C. § 1313(c)(2)(A) (Act § 303(c)(2)(A))……………………………………...15, 17, 25

33 U.S.C. § 1313(c)(4)(B) (Act § 303(c)(4)(B))………………………………………passim

33 U.S.C. § 1313(d)(2) (Act § 303(d)(2))………………………………………………..21

**REGULATIONS**

40 C.F.R. § 122.44(d)…………………………………………………………………….31, 42

40 C.F.R. § 130.7………………………………………………………………………...31

40 C.F.R. § 131.11(a)(1)………………………………………………………………...16, 17

40 C.F.R. § 131.11(b)(1)(iii)……………………………………………………………...16

40 C.F.R. § 131.5(a)(4)…………………………………………………………………...16

40 C.F.R. § 131.2………………………………………………………………………...15, 16, 17

**FEDERAL REGISTER**

63 Fed. Reg. 34648, 34649…………………………………………………………….35, 37, 44

**PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN OPPOSITION
TO EPA'S CROSS-MOTIONS AND REPLY MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**Introduction**

Plaintiffs respectfully submit this combined Memorandum of Law in opposition to

EPA's[1] cross-motions to dismiss and for summary judgment, and Reply Memorandum of Law in

support of their motion for summary judgment (Reply Memorandum).  This Reply Memorandum

also responds to the briefs submitted by the Non-State Intervenors (Non-State Br.), the State

Intervenors (State Br.), and the National Association of Clean Water Agencies (NACWA Br.).

Defendants' multiple briefs, for all their lengthy defense of the *status quo*, offer only

minimal response to Plaintiffs' two straightforward contentions in this case, which are as

follows:

- First Claim for Relief:  EPA acted arbitrarily and capriciously because it refused to

  answer, one way or the other, the relevant statutory question whether numeric nutrient

  criteria are "necessary," and relied instead on extra-statutory considerations (Point II

  of this Reply Memorandum).

- Second Claim for Relief:  EPA acted arbitrarily and capriciously because it refused

  across the board to find criteria to be necessary in any state, despite an administrative

  record reflecting years of public pronouncements to the contrary (Point III of this

  Reply Memorandum).

With respect to the First Claim for Relief, Defendants put forth little defense of the Agency's

refusal to answer the statutory question, save a few weak attempts to distinguish *Massachusetts

v. EPA*, 549 U.S. 497 (2007) that fall apart under scrutiny.   They moreover fail to explain why,

---

[1] Abbreviations used in this Reply Memorandum are defined in Plaintiffs' initial Memorandum of Law unless
otherwise indicated.

if existing state nutrient programs are as effective as they assert (albeit unconvincingly), EPA could not have simply found federal nutrient criteria to be unnecessary on that basis. Concerning the Second Claim for Relief, Defendants offer no meaningful explanation as to how EPA's refusal to find federal criteria to be necessary squares with a decade and a half of its pronouncements to the contrary. EPA discusses these prior announcements only in passing, and the other Defendants not at all.

Instead of addressing the core issues raised by Plaintiffs' claims, Defendants turn the bulk of their firepower on a straw man: a far-reaching judicial remedy that Plaintiffs are not seeking. Plaintiffs have requested a classic, uncomplicated Administrative Procedure Act remedy: a declaration that EPA's Petition denial was arbitrary and capricious, and a remand of the denial to the Agency with an order that it reconsider and issue a response that complies with law and fact. A lawful response, as explained by Plaintiffs, requires a yes or no answer to the statutory question of necessity (or a statutorily-based reason why the question cannot be answered), that is supported by evidence in the record. Defendants, however, appear to assume that Plaintiffs are asking this Court for considerably more, *i.e.,* that it step in and answer the question on behalf of the Agency, effectively making a judicial necessity determination. They alternately characterize Plaintiffs' position as asserting that EPA has already made a necessity determination and therefore must proceed to promulgate criteria (EPA Br.,); or as demanding that this Court specifically order EPA to make such a determination for some or all states (Non-State Br.). Based on this false characterization, they warn of regulatory calamity, a protracted rulemaking that would purportedly bollix up the Agency's resources for half a century. Non-State Intervenors further contend that Plaintiffs would need to present evidence demonstrating necessity in each state for which they (supposedly) ask the Court to order criteria promulgation.

2

Such proof would perhaps be necessary if Plaintiffs were asking for any such thing, but they are not.  The bare remand that Plaintiffs seek requires only evidence that EPA's Petition denial was arbitrary and capricious on the current record.  An order directing the Agency to respond lawfully and rationally will not precipitate regulatory apocalypse.

In addition to these misdirected arguments, EPA also contends that regardless of whether its non-answer to the Petition was rational or not, the Court lacks jurisdiction to review it.  This remarkable claim, if true, would have severe detrimental consequences for the Clean Water Act standard-setting process, which depends upon EPA diligently executing its federal oversight role over frequently reluctant states.  Fortunately, EPA's claim has no merit.  As explained in Count I of this Reply Memorandum, the Agency's reliance upon APA § 701(a)(2), which exempts from review those statutes that are so broadly drawn that there is "no law to apply," is unsupportable given that the Act and its associated regulations abound with detailed parameters to guide EPA in a necessity determination under § 303(c)(4)(B).  In any event, regardless of the inherent reviewability of a § 303(c)(4)(B) determination in principle, EPA never made such a determination.  Plaintiffs' claims are grounded in its refusal to do so.  That refusal is itself reviewable, regardless of whether a determination, if made, would be.

Properly understood, Plaintiffs' claims are nothing "unprecedented," "radical,"[2] or out of the mainstream of established administrative law principles allowing Courts to ensure that agency decisionmaking meets basic standards of rationality and adherence to Congressional will. Plaintiffs seek the decidedly ordinary relief of an order compelling EPA to comply with a statute it is charged with implementing.  For all of the reasons explained in Plaintiffs' initial brief and this Reply Memorandum, such relief should be granted.

---

[2] Non-State Br. at 2, 23.

## Argument

## Point I

## THE COURT HAS JURISDICTION UNDER THE APA TO REVIEW EPA'S DENIAL OF PLAINTIFFS' PETITION

EPA's contention[3] that this Court lacks jurisdiction under APA § 701(a)(2)[4] to review the Agency's petition response is without merit.  It reflects a misreading of Plaintiffs' claims, the Clean Water Act, and case law interpreting the APA.  First, regardless of whether a substantive necessity determination would have been reviewable, EPA did not provide one.  Second, *Massachusetts v. EPA* and other courts have clearly held that the narrowly-framed *Heckler v. Chaney,* 470 U.S. 821 (1985) (EPA Br. at 13), and its progeny do not apply to responses to rulemaking petitions.  Finally, both the Act as a whole and its regulations provide extensive substantive basis for judicial review, and there is no indication that Congress intended that review be precluded.

In arguing that judicial review is unavailable, EPA is effectively proposing that it be given complete freedom from accountability in implementing § 303(c)(4)(B).  Even though Congress provided the Agency with express authority to find state programs inadequate, EPA takes the position that it should be allowed to simply disregard this section, or respond as irrationally as it likes to citizen petitions concerning it, without judicial consequences.  Nothing in the Act, or its history of judicial review, suggests that Congress intended to grant EPA such a sweeping exemption from judicial oversight.

---

[3] None of the intervenors make this argument in their briefs.

[4] EPA cites to APA § 701(a)(1), referencing statutory preclusion of judicial review, but makes no substantive argument that this section applies.  The Agency's arguments all pertain to APA § 701(a)(2), relating to actions committed to agency discretion by law – *i.e.,* per *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), situations where a statute is "drawn in such broad terms that in a given case there is no law to apply."

### A. EPA's Refusal to Render a Determination Under § 303(c)(4)(B) is Reviewable Regardless of the Reviewability of a Determination Itself

As explained in Plaintiffs' initial memorandum in support of summary judgment (Plaintiffs' Br.), *Massachusetts v. EPA* made clear that a rulemaking petition triggers a duty by the Agency to provide a response setting forth "its reasons for action or inaction," and that those reasons "must conform to the authorizing statute." 549 U.S. at 533; *see* Plaintiffs' Br. at 25. When an agency receives a request for action under a statute – as in this case, a § 303(c)(4)(B) necessity determination – it has discretion to explain, within the parameters of the statute, why a decision one way or the other is consistent with the law; and it may even conclude that a decision is not technically possible. *Id.* at 534 ("If the scientific uncertainty is so profound that it precludes EPA from making a reasoned judgment . . ., EPA must say so.") But *Massachusetts v. EPA* made clear that EPA does *not* have discretion to simply not respond to the request for action, one way or the other, at all, based on extra-statutory considerations. *Id.*

If this were a situation where EPA had made a determination under § 303(c)(4)(B) regarding the necessity of numeric criteria, and Plaintiffs were objecting to the substance of that determination, one could address whether the Clean Water Act provides sufficient "law to apply" for judicial review of the determination for purposes of APA § 701(a)(2), as interpreted by *Heckler v. Cheney, Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), and others (although, as explained in Subsection C, *infra*, there clearly is). But this is not such a situation, because EPA did not make a determination. It did not even present reasons why it could not make such a determination. Rather, it sidestepped the question entirely, presenting only extra-statutory reasons why the legal consequences flowing from a necessity determination would be undesirable for the Agency. In *Massachusetts v. EPA*, the court acknowledged that it lacked "the expertise [and] authority to evaluate EPA's policy judgments," but nonetheless

reviewed the petition denial and found it wanting on the ground that the Agency had not

exercised its "reasoned judgment" to respond to the relevant statutory question at all.  549 U.S. at

533-34*; cf. Christopher Vill., Ltd. P'ship v. Retsinas,* 190 F.3d 310 (5th Cir. 1999) (challenge to

agency inaction was reviewable because plaintiff "is not appealing [the agency's] denial of its

requested rent increase; rather, it is appealing [the agency's] refusal to entertain the request" at

all); *Reliable Home Health Care, Inc. v. Thompson*, No. Civ.A. 01-2343, 2002 WL 22025 (E. D.

La. Jan. 4, 2002) (court distinguished between an agency's inherently unreviewable discretionary

determination not to grant relief and a hypothetical case where the agency "refused to consider a

request" for such relief).

The Act provides the "law to apply" in reviewing EPA's refusal to respond directly to

Plaintiffs' request.  Specifically, the plain language of § 303(c)(4)(B) specifies a determination

of necessity as the basis for the requested federal regulatory action; and such action must also

comport with the APA requirement (as expressed in *Massachusetts v. EPA* and elsewhere[5]) that

responses to rulemaking petitions respond to the question presented and be grounded in the

language of the relevant statute.  *See* APA, 5 U.S.C. § 555(e) (requiring a "statement of the

grounds for denial" of a rulemaking petition); *Massachusetts v. EPA*, 549 U.S. at 533; *see also*

Point II.B, *infra* (concerning the comparison between the statute at issue in *Massachusetts v.*

*EPA* and § 303(c)(4)(B) of the Act).  Based on that law alone, this Court plainly has the basis

and authority to determine that EPA's non-answer to the request for a determination was

insufficient.

---

[5] *See*, *e.g.*, *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987) ("reasoned" decision sufficient to support rulemaking petition denial must be based on consideration of "relevant factors"); *Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin..*, 872 F. Supp. 2d 318 (S.D.N.Y. 2012) ("*NRDC v. FDA*") (denial of rulemaking petition was arbitrary and capricious where the justification for the denial "did not discuss or appear to consider the controlling statute's governing criteria and overall purpose").  *See also Tex. v. U.S. EPA*, 690 F.3d 670 (5th Cir. 2012) (*quoting  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (court reviewing EPA disapproval of state implementation plan under APA must determine whether the decision "was based on a consideration of relevant factors").

**B. The Presumption of Unreviewability Does Not Apply Where Denial of Rulemaking Petition is Challenged Under the APA**

The Supreme Court in *Massachusetts v. EPA* expressly considered and rejected the applicability of *Heckler v. Chaney* to a challenge to a denial of a rulemaking petition under the APA, and held such denials to be reviewable even where other types of agency inaction may not be. The court held that there are "key differences between a denial of a petition for rulemaking and an agency's decision not to initiate an enforcement action." 549 U.S. at 527. Citing to *Am. Horse Prot. Ass'n, Inc. v. Lyng,* 812 F.2d 1, 3-4 (D.C. Cir. 1987), the Court stated:

> In contrast to nonenforcement decisions, agency refusals to initiate rulemaking "are less frequent, more apt to involve legal as opposed to factual analysis, and subject to special formalities, including a public explanation. *Id.* at 4; see also 5 U.S.C. § 555(e). They moreover arise out of denials of petitions for rulemaking which (at least in the circumstances here) the affected party had an undoubted procedural right to file in the first instance. Refusals to promulgate rules are thus susceptible to judicial review…."[6]

*Id.* The court articulated its holding that petition denials as a category are reviewable based on the procedural context provided by the APA, without reference to other underlying "law to apply," *i.e.*, the specific statutory provision at issue. Reviewability in this context therefore should not turn on the substance of the statutory provision upon which a petition is based.

The *American Horse* court set forth at length why denials of APA rulemaking petitions should be reviewable. It explained how the APA itself "serves to distinguish between *Chaney* nonenforcement decisions and refusals to institute rulemakings," citing to the *Chaney* court's express distinction between reviewable decisions to enforce – which provide a "focus for judicial review" – and unreviewable decisions not to enforce. 812 F.2d at 4. The court held that an APA § 555(e) petition denial provides a similar "focal point" for judicial review:

---

[6] The court further noted that the standard of review of such petition denials is "highly deferential," but as discussed in Plaintiffs' Brief, even granting such deference, found the Agency's non-answer to the relevant statutory question to be arbitrary and capricious.

7

> The *Chaney* Court noted that "when an agency *does* act to enforce, that action itself provides a focus for judicial review" since a court can "at least . . . determine whether the agency exceeded its statutory powers." 470 U.S. at 832, 105 S.Ct. at 1656 (emphasis in original). *APA provisions governing agency refusals to initiate rulemakings give a similar focal point.* The APA requires agencies to allow interested persons to "petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 555(e) (1982), and when such petitions are denied, to give "a brief statement of the grounds for denial," *Id.* § 555(e). *These two provisions suggest that Congress expected that agencies denying rulemaking petitions must explain their actions.*

*Id* (emphasis added).

The *American Horse* court also referenced other key exceptions to non-reviewability articulated in *Chaney* that apply to a rulemaking petition denial. The *Chaney* court analogized agency non-enforcement and prosecutorial discretion, 470 U.S. at 832, and the *American Horse* court observed that both such types of non-reviewable decisions are "numerous" and "typically based mainly on close consideration of the facts of the case at hand, rather than on legal analysis." 812 F.2d at 4. However, the *American Horse* court also observed that "[r]efusals to institute rulemakings, by contrast, are likely to be relatively infrequent and more likely to turn on issues of law." *Id.* The court further stated that the reviewability of APA petition denials finds support in *Chaney's* express distinguishing of cases where an agency "has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 4 (quoting *Heckler v. Chaney,* 470 U.S. at 833 n.4). It observed that, "[s]uch abdications are likely to both be infrequent and turn on matters remote from the specific fact of individual cases." *Id.*

Accordingly, the two district court cases cited by EPA finding the Agency's inaction under Act § 303(c)(4)(B) to be unreviewable have no bearing here, because neither involved denial of an APA § 553(e) rulemaking petition. While both were APA lawsuits challenging EPA's failure to act under § 303(c)(4)(B), neither plaintiff had first petitioned the agency for

relief.  *See Missouri Coal. for the Env't Found. v. Jackson*, 853 F. Supp. 2d 903 (W.D. Mo. 2012); *Davis v. Jackson*, No. 8:09-CV-1070-T-17 TBM, 2010 WL 2431952 (M.D. Fla. June 16, 2010); EPA Br. at 13.  Neither of these cases referenced or distinguished the *Massachusetts v. EPA* holding that APA petition denials are reviewable.[7]  Indeed, one of the district court cases referenced by EPA that holds inaction under § 303(c)(4)(B) to be reviewable contains the specific observation that an APA petition denial would be the most appropriate context for judicial review.  *See Nat'l Wildlife Fed'n v. Browner,* No. 95-1811, 1996 WL 601451 (D.D.C. Oct. 11, 1996), *aff'd* 127 F.3d 1126 (D.C. Cir. 1997); EPA Br. at 14 n. 8.  After determining in principle that "EPA's failure to exercise its discretion under [§ 303(c)(4)(B)] could be subject to a proper challenge under the APA," and that such discretion "is not committed to the agency as a matter of law," the court held that there was no final decision to review – a problem that could be corrected if the plaintiffs exhausted their administrative remedies by filing an APA petition for rulemaking.  *Id.* at *6.  The court stated,

> Should the agency reject such a petition on the merits or adopt the position that it lacks the authority under Section 303(c)(4)(B) [to act], the petitioners could institute a new suit challenging these decisions.  At that point, final agency action would have occurred, and the Court would presumably have an administrative record upon which to review that final action.

*Id.*s.[8]

Although the finding that petition denials are reviewable in *Massachusetts v. EPA* and *American Horse* was categorical and not context-dependent, the facts of this case underscore the

---

[7] In any event, as discussed in Subsection C. *infra*, both of these cases are poorly reasoned, and one of them (*Davis*) flat-out mischaracterizes a case holding that EPA inaction under § 303(c)(4)(B) is reviewable.

[8] The one case cited by EPA in which a court found a petition denial to be unreviewable, *Conservancy of Southwest Florida v. U.S. Fish & Wildlife Service*, 677 F.3d 1073 (11th Cir. 2012), should carry little weight here, as that decision did not address multiple courts' analyses, described *supra*, concerning the inherent reviewability of petition denials. Furthermore, the case addressed a very particular factual scenario – the denial of a petition to designate critical habitat for a species listed before the 1978 amendments to the Endangered Species Act. *Id.* at 1083-84. The case turned on the extraordinarily permissive language of the statute and noted that cases in which § 701(a)(2) precludes APA review are "uncommon." *Id.* at 1085.

correctness of those courts' reasoning.  This case turns predominantly on a legal question – *i.e.*, whether EPA's response to the petition considered the proper statutory factors.  To the extent this case turns on factual matters, *i.e.,* EPA's 20-plus year history of pronouncements of crisis followed by refusal to take action, that history does not call for close scrutiny of the facts of any particular local situation, but rather for a comprehensive look at whether the Agency's across-the-board refusal to make a necessity determination "'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Am. Horse*, 812 F.2d at 4; *see also* Point III.B, *infra* (explaining that Plaintiffs did not provide data to support a necessity determination in any particular state, because their allegation is that EPA's broad, categorical refusal to make *any* necessity determination for *any* state was arbitrary and capricious).  It is therefore a straightforward matter for this Court to assess whether the Agency's failure to make a necessity determination  was arbitrary and capricious or otherwise contrary to law in this broad context.

### C. Act § 303(c)(4)(B) Provides Ample Law to Apply to a Decision of Reviewability When Properly Interpreted in its Statutory Context

Even apart from the circumstances discussed in the subsections above – EPA's failure to make the requested determination at all, and its denial of an APA rulemaking petition – EPA inaction under § 303(c)(4)(B) would be reviewable.  The question of whether a decision under § 303(c)(4)(B) is reviewable must be considered in the context of the entire Act, which spells out its purposes and methods in great detail. EPA would have this Court look at the § 303(c)(4)(B) grant of authority in a vacuum, without reference to how the Act defines "the requirements of this chapter" in substance.  This blinkered approach to interpretation is unsupportable.  Courts require that a determination of whether there is sufficient "law to apply" for purposes of APA § 701(a)(2) be made in the context of the entire statute, and its regulatory scheme as well.  When

10

understood this way, the Act provides extensive and specific legal guidelines for reviewing a determination under § 303(c)(4)(B) – whether that determination is necessity, lack of necessity, or inability to make a determination.

> 1. The General Standard for Determining Reviewability Under APA § 701(a)(2) Calls for a Broad Review of the Statute as a Whole and its Associated Regulations

The burden of proving nonreviewability under APA § 701(a)(2) is that of the agency involved. *Bullard v. Webster*, 623 F.2d 1042, 1045 (5th Cir. 1980) (citing *Dunlop v. Bachowski*, 421 U.S. 560 (1975)). "[O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574, 578 (3d Cir. 1979) (internal quotation marks and citations omitted). The Eleventh Circuit has noted that cases in which § 701(a)(2) precludes APA review are "uncommon," and that the exception to judicial review applies only in "rare instances." *Conservancy of Southwest Fla.*, 677 F.3d at 1084 (quoting *Overton Park*, 401 U.S. at 410).

In determining the applicability of § 701(a)(2), courts have made clear that it is essential to consider the statute as a whole in determining whether the agency's discretion is sufficiently circumscribed to allow for judicial review.  The Supreme Court has held, "Whether and to what extent a particular statute precludes review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 345 (1984).  *See Haitian Refugee Ctr., Inc. v. Baker,* 953 F.2d 1498 (11th Cir. 1992) ("In order to determine whether Congress intended to preclude judicial review under the APA, the courts look not only at the express language of the statute but the statutory scheme as a whole.").  In *Local 2855,* 602 F.2d at 578 (internal quotation marks and citations omitted), the court observed, "The

Supreme Court has emphasized repeatedly that the APA's generous review provisions must be given a hospitable interpretation."  Accordingly, it held, "in the absence of a specific statutory preclusion of review, agency action may be determined to be 'committed to agency discretion by law' [under APA § 701(a)(2)] only when a fair appraisal *of the entire legislative scheme, including a weighing of the practical and policy implications of reviewability*, persuasively indicates that judicial review should be circumscribed."  *Id.* (emphasis added).

 In performing this broad review of the statutory scheme, courts most often look at whether such scheme falls into the narrowly defined categories that the court has held to be inherently discretionary and unreviewable.  The Supreme Court summarized in *Franklin v. Massachusetts*, 505 U.S. 788, 818-19 (1992), as follows:

> [T]he Court has limited the exception to judicial review provided by 5 U.S.C. § 701(a)(2) to cases involving national security, such as *Webster v. Doe* and *Department of Navy v. Egan*, or those seeking review of refusal to pursue enforcement actions, see *Heckler v. Chaney,* 470 U.S. 821 . . . These are areas in which courts have long been hesitant to intrude.

*See Cody v. Cox,* 509 F.3d at 620 (finding judicial review available under a statute that "does not fall into one of the narrow categories that usually satisfies the strictures of subsection 701(a)(2)," which include "second-guessing executive branch decisions involving complicated foreign policy matters," enforcement action, or a "determination about how to spend a lump-sum appropriation") (internal citations omitted).  In *Webster v. Doe*, cited in *Franklin* and relied upon by EPA in its brief, EPA Br. at 14, the court declined to review the termination of a Central Intelligence Agency (CIA) agent on the ground that "the overall structure" of the National Security Act governing CIA employment confirms that such employment "entails a high degree of trust" by the director "perhaps unmatched in Government service."  486 U.S. 592, 601 (1988). The Court held that the provision at issue, allowing termination whenever the director "shall

deem .advisable in the interests of the United States," was framed so that it "fairly exudes deference." *Id.* at 600. The court stated, "Short of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests, we see no basis on which a reviewing court could properly assess an Agency termination decision." *Id.*

Courts will also look to whether the statutory scheme as a whole is framed in deferential language such as "deem . . .advisable" and "discretion." *Fed. Deposit Ins. Corp. v. Bank of Coushatta,* 930 F.2d 1122, 1129 (5th Cir. 1991) (court found that the relevant statutory section as a whole "uses the terms 'deem' or 'discretion' in almost every provision"); *see Gifford v. Small Bus. Admin.,* 626 F.2d 85, 86 (9th Cir. 1980) (finding that the relevant provision is "couched in permissive rather than mandatory language" in the context of a "broad directive" given the agency administrator to effectuate policy); EPA Br. at 14. *Cf. Franklin v. Massachusetts*, 505 U.S. at 817 (holding that challenge was reviewable because "[n]o language equivalent to 'deem . . . advisable' exists in the census statute"). However, the mere presence of discretionary language in a statute is insufficient to render an agency's decisions under it unreviewable without other indicia of Congressional intent. *See Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994) (citations omitted) ("[T]he mere fact that a statute contains discretionary language does not make agency action unreviewable. In finding that the CIA's decision to terminate an employee was not reviewable under the APA, the *Webster* Court relied not only on the discretionary language of the statute at issue but also on 'the overall structure' of the statute."); *Cody v. Cox,* 509 F.2d at 610 (*citing Dickson v. Sec'y of Def.,* 68 F.3d 1396, 1399-1404 (D.C. Cir. 1995) ("[W]e found judicial review was available for abuse of discretion when the statute stated that a board 'may

excuse a failure to file [a request to correct an error in a military record] within three years after discovery if it finds it to be in the interest of justice").

Beyond the overall purpose and language of the statute, courts also seek to determine whether the specific provision at issue is further defined in another part of the statute so as to circumscribe agency discretion. *Cody v. Cox*, 509 F.3d at 610 (finding that while the statutory provision at issue affords "broad discretion," the section references another part of the statute that limits such discretion). Moreover, in scrutinizing the entire statutory scheme for "law to apply" that would render APA § 701(a)(2) inapplicable, courts look not only to the statute as a whole but to its regulatory scheme and associated guidance to determine whether the agency's discretion is sufficiently cabined to allow judicial review. *See CC Distrib., Inc. v United States,* 883 F.2d 146, 153 (D.C. Cir. 1989) (finding agency action reviewable under § 701(a)(2) based upon agency regulations, and holding that "[n]otwithstanding the lack of judicially manageable standards in the underlying statute, regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review of agency action"); *Davis Enter. v. U.S. EPA,* 877 F.2d 1181, 1185 (3d Cir. 1989) ("[W]hen agency regulations or internal policies provide sufficient guidance to make possible federal review under an abuse of discretion standard, agency decisions are not unreviewable, even absent express statutory limits on agency discretion.").

2.   Act § 303(c)(4)(B) Clearly Provides Sufficient Legal Standards for Judicial Review Within the Context of the Act as a Whole

As explained at length in the "Statutory Background" section of Plaintiffs' Brief at 20-22, § 303(c)(4)(B) is part of, and references, an extensive set of Act provisions establishing water quality goals and procedures to meet and maintain them. Thus, § 303(c)(4)(B), taken as a whole

and in context of the Act, enables a determination whether a revised water quality standard (such as that sought by Plaintiffs) is necessary "to meet the requirements of this chapter."

EPA cites the language of § 303(c)(4)(B) – and only this language – in support of its claim that the provision is drawn too broadly for judicial review under APA § 701(a)(2).  EPA Br. at 13.  However, it fails to acknowledge, identify, and evaluate the particular "requirements of this chapter" being referenced in that subsection.  In fact, § 303 very clearly specifies what the "requirements of this chapter" are with respect to water quality standards, the subject governed by that section, and provides extensive definition of those requirements.  It specifies that water quality standards (including use designations and criteria) shall "protect the public health or welfare, enhance the quality of water and serve the purposes of this Chapter"; and shall be established "taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation."  Act § 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A).  The "purposes of this Chapter," referred to in § 303(c)(2)(A) as well as in § 303(c)(4)(B), are in turn defined in Act § 101, 33 U.S.C. § 1251, as the "fishable and swimmable" standard for all waters of the United States.  *See* Plaintiffs' Br. at 20-21.

EPA-promulgated regulations provide even more specificity concerning the nature of the "requirements of this chapter" as they pertain to water quality standards.  These regulations expressly define a substantively very similar phrase found elsewhere in § 303 – "serve the purposes of the Act" – using the § 303 language setting forth the requirements for water quality standards.  *See* 40 C.F.R. § 131.2 ("'Serve the purposes of this Act' (as defined in Sections 101(a)(2) and 303(c) of the Act) means that water quality standards should, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for

15

recreation in and on the water and take into consideration their use and value of public water supplies, propagation of fish, shellfish, and wildlife, recreation in and on the water, and agricultural, industrial, and other purposes including navigation.").  The regulations also require that water quality criteria to "protect the designated use" be based on "sound scientific rationale," "scientifically defensible" methods, and "appropriate technical and scientific data and analyses."  40 C.F.R. § 131.11(a)(1), (b)(1)(iii); 131.5(a)(4).  *See* Non-State Br. at 3 (referencing these same criteria as applicable to water quality standard-setting determinations). None of these explicit criteria implicate the policy considerations EPA cited in its petition denial letter. *See infra* Point II.B (explaining that § 303(c)(4)(B) requires a technical determination and not merely a policy determination by the Agency).

Thus, an EPA determination under § 303(c)(4)(B) – and judicial review of that determination – can and should turn on, among other things, whether states' current water quality standards are supporting attainment of the various uses listed in § 303 and 40 C.F.R. § 131.2 (protection and propagation of fish, shellfish, and wildlife as well as recreation); and if not, whether promulgation of federal criteria is "necessary" for attainment.  EPA determinations and judicial review should also turn on whether existing state standards are "based on sound scientific rationale," per 40 C.F.R. § 131.11(a)(1).  If this were not the case, and there were no "law to apply" in reviewing EPA's failure to make a necessity determination, what law then would govern such determinations when EPA did make them?  How could the agency ever decide, without applicable law, whether a water quality standard was necessary?  In fact, EPA's 2009 necessity determination in Florida expressly cited to other portions of § 303(c) and associated regulations.  *See* Letter Dated January 14, 2009 to Michael Sole, Florida Department of Environmental Protection, from Benjamin H. Grumbles, EPA, at 8 (AR 1039 at 1046-47, EPA

16

Br. Ex. F at 8-9) ("For all of these reasons EPA hereby determines under CWA section 303(c)(4)(B) that new or revised water quality standards for nutrients in the form of numeric nutrient criteria are necessary in the State of Florida to meet the requirements of the CWA section 303(c)(2)(A) and 40 CFR 131.1 1(a)(1)").  Likewise, in *Florida Wildlife Federation, Inc. v. Jackson*, 853 F.Supp.2d 1138 (N.D. Fla. 2012), the court upholding EPA's necessity determination expressly identified the "requirements of this Chapter" referenced in that provision as including the remainder of § 303 as well as the regulations associated with that section:

> The question for the Administrator thus was whether a revised or new standard— specifically a numeric nutrient standard—was necessary to meet the Act's requirements, or whether, instead, the existing narrative criterion was adequate. The Act's "requirements" include water-quality criteria that are "such as to protect the public health or welfare, enhance the quality of water and serve the purposes of [the Act]." *Id.* § 1313(c)(2)(A). The Administrator has explained that to "serve the purposes of the Act,"
>
>> water quality standards should, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water and take into consideration their use and value [for] public water supplies, propagation of fish, shellfish and wildlife, recreation in and on the water, and agricultural, industrial, and other purposes including navigation.
>
> 40 C.F.R. § 131.2.

*Id.*, 853 F.Supp.2d at 1156.

Compared to the minimal statutory guidelines found sufficient in other cases to form the basis for judicial review – *e.g.*, *Citizens to Preserve Overton Park*, 401 U.S. at 411 (requirement to determine whether a "feasible and prudent" alternative existed held sufficient to overcome the APA § 701(a)(2) bar) – § 303(c)(4)(B) contains robust "law to apply" when read in the context of the statute and its implementing regulations.  This was understood by the courts in *National Wildlife Federation*, 1996 WL 601451, and *Northwest Environmental Advocates v. EPA*, 268 F. Supp. 2d 1255 (D. Or. 2003), both of which held that agency refusals to act under § 303(c)(4)(B)

17

are reviewable under the APA.[9]  The court in *Northwest Environmental Advocates* cited specific

regulations authorized by § 303, holding:

> Here, there are clear standards for both the state and EPA to evaluate with regard
> to implementation plans.  The agency's own regulations require the state to
> "develop and adopt a statewide antidegradation policy and identify the methods
> for implementing such policy. . . ."  40 C.F.R. § 131.12(a).  The policy must "be
> sufficient to maintain existing beneficial uses of navigable waters, preventing
> their further degradation."  Because this process is not entirely committed to
> EPA's discretion as a matter of law, EPA's inaction regarding Oregon's sparse
> implementation policy is reviewable under the APA.[10]

*Id*. at 1264.  Similarly, the court in *National Wildlife Federation* held, referencing the § 303

regulations, "In this case, while the legal standards are general in nature, criteria nevertheless

exist to guide the state's discretion in the first instance, and EPA's discretion in the second, as to

whether certain bodies of water should be designated [Outstanding National Resource

Waters]."[11]  1996 WL 601451, at *6.  That court recognized that the cited regulations are "of

general applicability" to guide federal and state water quality standards decision making, such

that EPA had discretionary authority under § 303(c)(4)(B) to apply them in making a

determination whether a revised or new standard was necessary.  *Id.* at *5.

---

[9] EPA unsuccessfully attempts to distinguish both cases.  *See* EPA Br. at 14 n.8.  EPA asserts that neither court "grappled with the fact that § 303(c)(4)(B) provides for EPA regulation *only when the Administrator determines such regulation necessary,*" but in fact the courts did not have to "grapple" with that because they appropriately found that other portions of the Act and its regulations contained sufficient specific language guiding the Agency's discretion.  *National Wildlife Federation* at *6; *Northwest Environmental Advocates,* 268 F.Supp.2d at 1264.  The Agency then asserts that the courts never explained how the regulations could guide EPA's decisionmaking under § 303(c)(4)(B), even though *Northwest Environmental Advocates* cited specific regulatory provisions as providing "clear standards for both the state and EPA to evaluate with regard to implementation plans."  With respect to EPA's other argument, the fact that the problem in Plaintiffs' petition was more complex than the problem at issue in *National Wildlife Federation* and *Northwest Environmental Advocates* is legally beside the point because, as explained in Point I of Plaintiffs' Brief, complexity of the consequences flowing from a necessity determination is not a basis for refusing to make it.
[10] Antidegradation, at issue in *Northwest Environmental Advocates*, is an EPA regulatory policy derived from § 303. It prohibits new or increased discharges of pollutants to waterbodies that meet standards except under narrowly defined circumstances.  The EPA antidegradation regulation cited by the court requires states to develop their own policies implementing it, which Oregon had not done.
[11] Designation of Outstanding National Resource Waters is one aspect of the antidegradation regulation explained in the previous note.

The two cases cited by EPA in which courts held inaction under § 303(c)(4)(B) to be unreviewable are poorly reasoned, aside from being altogether inapplicable because they did not address challenges to the denial of a rulemaking petition.  Not only does *Davis v. Jackson*, EPA Br. at 13, rule on the matter with a single sentence unadorned by citation or analysis ("This discretionary power is the type that is exempted from action under 5 U.S.C. § 701(a)(2)" (*Id.* at *3)), it also distinguishes *Northwest Environmental Advocates* for demonstrably incorrect reasons.  The *Davis* court asserts that in *Northwest Environmental Advocates*, EPA had already made a determination rejecting water quality standards submitted by the state, such that the challenged inaction was actually EPA's failure under § 303(c) to promulgate its own standards within the required time frame.  However, this is simply not what happened.  The case was brought specifically *because* neither EPA nor the state had done anything at all to address the state's inadequate regulations, and the court consequently held that the plaintiff's remedy was an APA action reviewing EPA's failure to act under § 303(c)(4)(B), not its failure to meet the timeline established by § 303(c) and (c)(4)(A).[12]  *Nw. Envtl. Advocates*, 268 F. Supp. 2d at 1262-64.  *Missouri Coalition for the Environment v. Jackson* provides similarly thin reasoning as to why § 303(c)(4)(B) decisions cannot be reviewed under the APA (in that case, again, without benefit of an Agency petition denial). 853 F. Supp. 2d 903.  The court asserted that if judicial review were allowed under this section, it would create a mandatory duty on the part of EPA "to act whenever a state was not in compliance with the Act."  *Id.* at 912.  This is straw-man logic.

---

[12] The *Davis* court may have been confused by the fact that the state had in fact submitted a different set of standards, pertaining to temperature not antidegradation, that EPA had specifically rejected.  268 F. Supp. 2d at 1259.  The *Davis* court also appeared to be confused regarding the § 303 standard-setting process generally, as well as about what the *Northwest Environmental Advocates* court said about it.  It cannot be the case that "the failure to act was the EPA's failure to promulgate new and revised standards within the allotted time as specified in the CWA (i.e. ninety days)," *Davis*, 2010 WL 2431952, at *3, because § 303(c) only requires that EPA notify the state within 90 days of any deficiency in its submission of water quality standards.  If the state does not respond to EPA's satisfaction, then § 303(c)(4)(A) requires that EPA shall "promptly" (not specifically within 90 days) prepare and publish its own regulations for the state.

Courts have never suggested (and Plaintiffs do not assert here) that § 303(c)(4)(B) creates a mandatory duty to make an affirmative necessity determination.  *See Nat'l Wildlife Fed'n*, 1996 WL 601451, at *5 (§ 303 regulations do not "impose a mandatory duty" under § 303(c)(4)(B) to apply them when the state has not acted, but may apply them "as a matter of discretion" under that section).  Review was sought there, and here, for discretion that was exercised arbitrarily and capriciously.

More generally, the § 303 statutory scheme, and the Act as a whole, reflect strong policy bases to permit intended judicial oversight.  It is clear throughout the Act, and in particular in § 303, that federal oversight over state action is critical to ensuring its proper implementation.  As described in Plaintiffs' Brief at 20-22, § 303 requires that EPA evaluate the sufficiency of every water quality standards submission from states, and reject those submissions when they are inadequate.  Section 303(c)(4)(B) is merely the catch-all "cleanup" provision at the end, giving EPA authority to step in when problems with states' regulatory regimes are not addressed in the ordinary course of required periodic reviews under § 303(c)(2)(B).  *See generally New York v. United States*, 505 U.S. 144, 145 (1992) (in a "cooperative federalism" statute such as the Act, Congress offers states the choice "of regulating [an] activity according to federal standards or having state law pre-empted by federal regulation").  The court in *Northwest Environmental Advocates* appropriately stated in holding inaction under § 303(c)(4)(B) to be judicially reviewable,

> This conclusion is consistent with the administrative scheme established by the [Act] and the APA.  If defendants' contention that EPA's inaction is entirely unreviewable were taken to its logical end, the agency could thwart the legislative scheme by failing to act in any number of circumstances without judicial review. In the process, the [Act's] goal of restoring and maintaining "the chemical, physical, and biological integrity of the Nation's waters" could be completely undermined. 33 U.S.C. § 1251(a).  In order to fulfill the [Act's] goal of having EPA oversee state water quality standards and to enhance that oversight with

20

> judicial review, the court will consider EPA's failure to exercise its §
> 303(c)(4)(B) discretion under an "arbitrary and capricious" standard.  5 U.S.C. §
> 706(2)(A).

268 F.Supp. at 1264.  In a comparable albeit not directly analogous situation, a court upheld

plaintiffs' ability to challenge EPA inaction under § 303(d)(2) – a provision requiring that EPA

promulgate a total maximum daily load (TMDL) for a water body not meeting standards if the

state's TMDL is inadequate – using similar analysis concerning the goals of the Act.[13]  *Am.*

*Canoe Ass'n, Inc. v. U.S. EPA,* 30 F. Supp. 2d 908 (E.D. Va. 1998).  The court stated:

> In the final analysis, the most compelling reason to follow *Scott* and its progeny is
> that EPA's alternative interpretation of the statute would allow recalcitrant states
> to short-circuit the Clean Water Act and render it a dead letter.  The structure and
> purpose of the [Act], coupled with the mandatory tone Congress adopted
> throughout § 303, counsel against such a reading.  It seems highly likely that
> Congress intended that EPA should be required to act not only when states
> promulgate lists that fail to meet the standards set forth in § 303, but also when
> states completely ignore their mandatory statutory responsibilities and fail to
> promulgate any list at all.

*Id.* at 921.

The analysis of the structure and purpose of the Act in *Northwest Environmental*

*Advocates* and *American Canoe*, highlighting the "mandatory tone" of § 303, throws into sharp

relief how misguided is EPA's reliance on *Webster v. Doe*'s analysis of a national security

statute that "fairly exudes deference."  486 U.S. at 600.  The Supreme Court and numerous

others have distinguished *Webster* and cases like it, and held it to be narrowly applicable to

regulatory areas requiring a high degree of deference.  *See, e.g.*, *Franklin v. Massachusetts*, 505

U.S. at 2785 (listing *Webster* as representing one of the limited areas "in which the courts have

been hesitant to intrude," and holding APA § 701(a)(2) inapplicable in view of the fact that

"[t]he taking of the census is not such an area of traditional deference"); *Beno v. Shalala*, 30 F.3d

---

[13] The state had submitted no TMDL at all, which the court interpreted as a constructive submission triggering
EPA's duty to promulgate.  *American Canoe Ass'n,* 30 F.Supp.2d at 920-21.

at 1067 ("The statute does not give the Secretary unlimited discretion . . . *Cf. Webster*, 486 U.S. at 600 (emphasizing that the statute 'allows termination of an Agency employee whenever the Director 'shall deem such termination necessary or advisable in the interest of the United States''')."; *C.K. v. Shalala*, 883 F. Supp. 991 (D.N.J. 1995) ("This is not a case where an agency's employee termination implicates national security concerns (*Webster v. Doe, supra*) .... Rather, in this case the Court is confronted with an AFDC program circumscribed by comprehensive regulations with no intimation from Congress that the Secretary's discretion is immune from judicial scrutiny.").  It is clear from the Act itself that, unlike the CIA director making employment decisions, the EPA Administrator making decisions regarding water quality can and should be held accountable by courts under provisions designed to ensure that the Act's goals cannot be thwarted.

### Point II

### EPA'S FAILURE TO RESPOND, ONE WAY OR THE OTHER, TO THE CENTRAL QUESTION IN THE PETITION DID NOT COMPLY WITH THE ACT OR THE APA

The issue raised in Plaintiffs' First Claim for Relief and addressed in this Point II (as well as Point I of Plaintiffs' Br.), is a straightforward legal question: whether EPA's refusal to respond to the request in the petition for a § 303(c)(4)(B) necessity determination triggering promulgation of nutrient criteria, coupled with its proffered extra-statutory reasons not to promulgate, complied with the requirements of the Act and the APA.  Plaintiffs set forth clear reasons why, under *Massachusetts v. EPA*, the Agency's tortured non-response to Plaintiffs' direct question ("EPA is *not* determining that [numeric nutrient criteria] are *not* necessary to meet Act requirements") was arbitrary and capricious and not in compliance with law.  This claim is separate from Plaintiffs' Second Claim for Relief – addressed in Plaintiffs' Br. Point II and Point III of this Reply Memorandum – contending that EPA's non-response was arbitrary

22

and capricious in substance as well, *i.e.*, the Agency declined across the board to make a necessity determination for any state notwithstanding its pronouncements over the years that numeric criteria are a necessary element of solving the nation's large and growing nutrient problem.

Evidently unable to define a clear reason why EPA should not have been required to clearly state a "yes or no" answer to the question of whether criteria are necessary, or provide a statutorily permissible reason why it cannot, EPA and the Intervenors resort to a dodge once again. Their responses conflate Plaintiffs' two separate claims, pay little attention to the Agency's refusal to answer the question in the Petition, flat-out misstate the terms of the governing statute, and generally bury the straightforward Count I question in a slew of irrelevant issues.

To the extent Defendants address issues pertinent specifically to Plaintiffs' First Claim for Relief, their arguments revolve around distinguishing *Massachusetts v. EPA* based on differences between the language of Clean Air Act § 202 (at issue in *Massachusetts v. EPA*) and the language of § 303(c)(4)(B). EPA Br. at 16-17; Non-State Br. at 18-20. They attempt to distinguish *NRDC v. FDA,* 872 F. Supp. 2d 318, progeny of *Massachusetts v. EPA*, for the same reason. EPA Br. at 17-18; Non-State Br. at 19. The stated grounds for distinguishing these cases include (i) that Clean Air Act § 202 is mandatory where § 303(c)(4)(B) is not, Non-State Br. at 18-19, State Br. at 5-7; (ii) that necessity determinations, unlike endangerment findings, need not involve a technical determination, EPA Br. at 17, Non-State Br. at 20-23, and (iii) that unlike § 202, § 303 affords federal oversight only after states take the first cut at rulemaking, EPA Br. at 18-19, Non-State Br. at 21-22, State Br. at 2-5.

These arguments have no merit, and are addressed in turn below.  As an overall matter, defendants fail to recognize in these arguments that it is not the comparative breadth or level of discretion as between § 202 and § 303(c)(4)(B) that matters for purposes of Plaintiffs' First Claim for Relief, but rather the *parallel structure* of the two sections.  Both provisions require that upon rendering a specified technical determination (endangerment or necessity as the case may be), EPA shall promulgate rules to address the problem.  Thus, the *Massachusetts v. EPA* holding – that EPA could not simply refuse to make the determination as a means of declining to promulgate rules in response to a petition – is equally applicable here.   Non-State Intervenors may be correct that the case carved out an "exception to the rule . . . [that] an agency has broad discretion to choose how best to marshal its limited resources and personnel," but that exception applies with equal force here.  Non-State Br. at 22-23 (quoting *Massachusetts v. EPA*, 549 U.S. at 527).

### A.  Section 303(c)(4)(B), like § 202, Contains a Non-Discretionary Mandate Triggered by a Discretionary Determination

The Non-State Intervenors rely on the baffling claim that § 303(c)(4)(B) lacks the mandatory requirement that EPA "shall" take regulatory action upon an affirmative determination.  They assert, "in the case before this Court, Congress unquestionably did *not* direct that EPA 'shall' regulate when it determines that a pollutant is causing a problem.  Rather, Congress directed . . . that EPA may intervene to issue federal criteria" upon a necessity determination.  Non-State Br. at 20.  Yet the § 303(c)(4)(B) language that these Intervenors quote, Non-State Br. at 19, on its face does not say this.  On the contrary, it says:  "The Administrator *shall* promptly prepare and publish proposed regulations setting forth a revised or new water quality standard. . . (B) in any case where the administrator determines that a revised or new standard is necessary to meet the requirements of this chapter."  Act § 303(c)(4)(B), 33

24

U.S.C. § 1313(c)(4)(B) (emphasis added).  Sections 202 and 303(c)(4)(B) are thus parallel with respect to the interplay between discretion and mandate.  Indeed, the *Massachusetts v. EPA* court recognized this interplay and based its holding upon it.  The Court acknowledged that the Administrator's "endangerment" determination is discretionary; but held that "[u]nder the clear terms of the Clean Air Act, EPA can avoid taking further action only if it determines that greenhouse gases do not contribute to climate change" or finds based on statutorily-appropriate scientific criteria that it cannot.  549 U.S. at 533-34.

Accordingly, the State Intervenors' extended explanation that a necessity determination is discretionary, State Br. at 5-7, while correct, has no bearing on the applicability of *Massachusetts v. EPA*.  Plaintiffs have never suggested that a necessity determination, a statutory prerequisite to the rulemaking sought in the Petition, is non-discretionary.  Plaintiffs' argument, rather, is that the Agency's discretion is bounded by the statute – per *Massachusetts v. EPA*¸ "not a roving license to ignore the statutory text," but rather "a direction to exercise discretion within defined statutory limits."   Plaintiffs' First Claim for Relief is not that EPA improperly exercised discretion where it had none, but rather that the agency refused to exercise reasoned discretion to make *any determination at all* concerning necessity under § 303(c)(4)(B), and instead based  its response on non-statutory factors.  Plaintiffs are not asking that EPA "side-step this requisite process" of making a discretionary determination as a prerequisite to rulemaking, Non-State Br. at 13, but to the contrary are asking that the Agency fulfill it in accordance with the Act.

**B.  Section § 303(c)(4)(B), Like § 202, Requires that the Necessity Determination be Grounded in Technical and Scientific Factors, Not Policy Preferences**

Defendants argue that, because the language of § 303(c)(4)(B) itself does not reference technical and scientific criteria, EPA's necessity determination was not bounded by any such criteria the way it was in *Massachusetts v. EPA*.  EPA Br. at 17; Non-State Br. at 20-23.   In the

first instance, this argument fails for the reasons discussed in Point I.C., *supra*.  The fact that the language of § 303(c)(4)(B) *itself* does not define the technical and scientific criteria for a necessity determination does not mean those criteria do not exist.  Rather, they are found in other portions of the statute and regulatory scheme.  Indeed, the State and Non-State Intervenors appear to clearly recognize, and endorse, the technical nature of a necessity determination when they are arguing *against* a finding of necessity.  State Intervenors assert that a decision *not* to regulate is a "highly complex, scientific balancing of factors," State Br. at 6-7; and Non-State Intervenors explain in considerable detail the technical findings they believe EPA would be required to make with respect to each individual state as the basis for a necessity determination.  Non-State Br. at 21-22 ("The [Act's] requirement that water quality criteria be based on sound science therefore requires that necessity be analyzed independently for discrete waterbody types"); and at 27 (a necessity determination would require that EPA determine that "(i) nutrients adversely affect specific types of waterbodies of each . . . state; (ii) each state's authorities and programs cannot be relied upon to address those specific problems satisfactorily; and (iii) numeric federal criteria alone accomplish that effectively in each state").

In this regard, Plaintiffs take no issue with the Non-State Intervenors' contention (accompanied by a discourse on the dictionary definition of "necessary"[14]) that a necessity determination requires not merely identification of an environmental problem, but a conclusion that state efforts are inadequate to resolve it such that new or revised criteria are necessary.  Non-State Br. at 11-13, 15-16.  Indeed, this reasoning was at the heart of EPA's 1998 pronouncements in the Clean Water Action Plan and National Strategy – *i.e.*, that the Agency would act to promulgate criteria only if it became necessary because states failed to do so.  Clean Water

---

[14] Non-State Intervenors cite in this discourse *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999).  It bears note that in this case, the Court struck down an agency's decision made for policy reasons on the ground that it "had not interpreted the terms of the statute in a reasonable fashion."  *Id.* at 389-92.

Action Plan at 58 (AR 9120, 9195); Pl. Ex. 2.  Similarly, in the 2011 Framework Memo, EPA referenced not only nutrient pollution itself but also state strategies and programs designed to address it, before concluding, "It has long been EPA's position that numeric nutrient criteria targeted at different categories of water bodies and informed by scientific understanding of the relationship between nutrient loadings and water quality impairment are ultimately necessary for effective state programs."  Clean Water Action Plan at 2-3 (AR at 680, 681-82, Pl. Ex. 13).

However, this evaluation of existing state programs' sufficiency is *itself* a technical and scientific determination, not just a policy determination.  The issue in assessing the adequacy of state strategies is whether those strategies are robust and effective enough to ultimately bring the state's waters into compliance with the "fishable and swimmable" goal of the Act.  Indeed, Non-State Intervenors describe in considerable detail EPA's scientific and technical analysis used to "identify effective regulatory solutions" in Florida before promulgating federal numeric criteria there.  Non-State Br. at 25-27.  The fact that a necessity determination involves reviewing states' policy decisions to see if the federal government needs to establish standards does not mean that all manner of agency political, resource and administrative considerations may be employed by the Agency in place of science.  The fact that the determination must revolve around the question of "necessity" of new or revised standards logically excludes policy considerations that have nothing to do with necessity.  As a simple matter of language and reason, the question whether criteria are necessary *cannot* turn on whether EPA believes it has the resources to do something about it if they are.  Responding to the question, "Are criteria necessary?" with, "We have insufficient resources to promulgate them," is a *non sequitur*.

Non-State Intervenors additionally argue that since § 303(c)(4)(B) references the Act as a whole – *i.e.*, "necessary to meet the requirements of this Chapter" – the breadth of that

27

reference must encompass more or less any policy consideration that EPA may wish to bring to bear on a necessity determination, whether technical or not.   Non-State Br. at 20, 22-23.   They fail to explain, however, how this reference alters the fact that EPA is still being authorized to determine specifically *whether new or revised water quality standards are necessary* to meet any of those requirements.   Regardless of the breadth of the review, the Agency is still charged with making a *necessity* determination, not a resources determination or a preferred approach determination.   In any event, the facial breadth of the reference to the Act's requirements has no practical import, because there is no substantive "requirement of the Act" other than its water quality goals in § 101 and its instructions how to set standards to meet them in § 303 that could be furthered by new or revised water quality standards.[15]

Finally, State Intervenors assert that EPA's non-responsive dodge was permissible because *Massachusetts v. EPA* allowed that the Agency could have provided "some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether" greenhouse gases contribute to climate change.  549 U.S. at 533; State Br. at 6.  However, the Court was clear that a decision by the Agency that it "cannot or will not" decide the central discretionary question must, like a decision one way or the other, be grounded in permissible statutory factors – *i.e.*, scientific or technical factors regarding necessity.  It held, concerning EPA's proffered "laundry list" of policy reasons not to regulate:

> Although we have neither the expertise nor the authority to evaluate these policy judgments, it is evident they have nothing to do with whether greenhouse gas emissions contribute to climate change.  Still less do they amount to a reasoned justification for declining to form a scientific judgment. . . .  Nor can EPA avoid its statutory obligation by noting the uncertainty surrounding various features of climate change and concluding that it would therefore be better not to regulate at this time.  If the scientific uncertainty is so profound that it precludes EPA from

---

[15] As discussed in subsection 3, *infra*, while it is true that there is a "requirement" of the Act that states take the first cut at water quality standards, *see* Non-State Br. at 22-23, that first-cut requirement is not logically impacted by a determination as to whether additional, federal standards are necessary where the state standards are inadequate.

making a reasoned judgment as to whether greenhouse gases contribute to global
warming, EPA must say so.

549 U.S. at 533.

Along these same lines, EPA's argument that by refusing to make the technical and
scientific determination requested in the petition, it was "reserving the possibility of a future
necessity determination," does not make sense.  EPA Br. at 23.  If EPA's answer to Plaintiffs'
question is that numeric criteria are not *currently* needed, the Agency must say so – based on
statutorily permissible criteria.  Nothing in the Act requires – or permits – the Agency to
"reserve" decision until a later time when circumstances may change.  If there is no need today,
then the Agency should make a negative determination.  If circumstances changed and such
need arose in the future, EPA could then make an affirmative determination.

### C.  States' Role in the § 303 Standard Setting Process Has No Bearing on the Applicability of *Massachusetts v. EPA*

Defendants address at great length the fact that, unlike the federal rulemaking scheme at
issue in *Massachusetts v. EPA*, § 303 generally allows states to proceed first in issuing
regulations, which are then reviewed by EPA.  *See* EPA Br. at 18-19; Non-State Br. at 21-23;
State Br. at 2-5; NACWA Br. at 6-8.  These briefs, like Plaintiffs' Brief at 20-22, lay out the
cooperative federal process outlined in § 303, and contrast it with the § 202 scheme which does
not include an opportunity for an initial state determination.

For purposes of the question at issue in Plaintiffs' First Claim for Relief, however, this is
a distinction without a difference.  Regardless of the decisionmaking structure that precedes it, §
303(c)(4)(B) is inalterably a grant of federal authority.  Although states are charged in the first
instance with coming up with water quality standards that will meet the requirements of the Act,
§ 303(c)(4)(B) defines what happens when they fail to do so.  Thus, when the Agency receives a

rulemaking petition under that section, it is in the same position as when it receives a rulemaking petition under § 202: in both instances, it must make a determination, based on technical factors, as to whether to trigger a rulemaking obligation.  As discussed in Point I.C., *supra*, courts have not shied away from enforcing EPA's obligation to fulfill its oversight role merely because states have regulatory primacy under the Act, but on the contrary have held such enforcement necessary to avoid an "interpretation of the statute [that] would allow recalcitrant states to short-circuit the Clean Water Act and render it a dead letter."  *Am. Canoe*, 30 F. Supp. 2d at 921; *see Nw. Envtl. Advocates,* 268 F. Supp. at 1264 (court would review § 303(c)(4)(B) decision "In order to fulfill the [Act's] goal of having EPA oversee state water quality standards").

Non-State Intervenors' argument that state primacy in standard-setting under § 303(c)(4)(B) is itself a "requirement of the Act" that must be met fails for similar reasons, and collapses on its own logic.  Non-State Br. at 22-23.  State primacy is fully granted by requiring that EPA act only when it has found that the state or states in question have failed to do so. Since § 303(c)(4)(B) is the provision authorizing a *federal* determination whether states have met their obligation to promulgate standards that meet the requirements of the Act, it is circular reasoning to suggest that this question can be answered with reference to the "requirement" that states act initially.  More to the point, this manner of too-clever-by-half logic would effectively gut federal oversight of states under § 303(c)(4)(B), as it would to minimize this federal role merely by referencing the fact that states proceed first.

Defendants also echo the statements in the Petition Response that state efforts are "the most effective and sustainable way" to address nutrient pollution.  EPA Br. at 24-25, Non-State Br. at 21, State Br. at 7-10.  Similarly, State Intervenors and NACWA argue that controls on point sources alone are not an effective means of compliance with the Act's clean water goals as

to nutrients.  State Br. at 12-15; NACWA Br. at 2-10.  This is beside the point. Establishment of numeric criteria as requested by the petition does not determine how the criteria are to be met, nor would it foreclose the "collaborative watershed approach" preferred by NACWA and other intervenors. NACWA Br. at 8.  Federal regulations guide implementation of criteria through "watershed-based" TMDLs and other measures involving both point and non-point sources.  *See* 40 C.F.R. § 130.7.

 As explained in the Petition, Plaintiffs' Br. Point II, and Point III, *infra*, of this Reply Memorandum, EPA has provided nothing to support the  conclusion that state efforts are  most effective in addressing nutrient pollution, and in fact has contradicted such multiple times in its public pronouncements that numeric criteria are necessary.  However, specifically with respect to Plaintiffs' First Claim for Relief, even if these assertions were true, they would not excuse EPA's failure to answer the statutory question in response to the Petition.  If state efforts outside of promulgating numeric nutrient criteria were sufficient to meet the requirements of the Act, then EPA could have made a negative finding under § 303(c)(4)(B) in response to the Petition.  That is, the Agency could have determined, in accordance with that provision, that federally-promulgated numeric nutrient criteria are *not* necessary to meet the requirements of the Act, and Plaintiffs could then if need be have appealed on the record of that decision.  Here, however, we have only the record of EPA's explicit refusal to answer the statutory question directly.

 EPA responds generally with what can only be described as taking offense at Plaintiffs' characterization of its non-answer to the necessity question, presenting a defense of its good faith.  EPA Br. at 27-28.  The language of the denial letter ("EPA is not determining that numeric nutrient criteria are not necessary") speaks for itself.  But its import, and whether it had the effect of sidestepping a legal duty to respond as defined in *Massachusetts v. EPA*, is not a

question of good faith, or any kind of faith.  It is a legal question.  Indeed, EPA's real concern
appears to be with that case itself.  EPA complains of Plaintiffs' "curious" argument that, as
characterized, would require the Agency to "affirmatively determine" that numeric criteria are
not necessary.  EPA Br. at 23.  While the Agency mischaracterizes Plaintiffs' argument as
requiring burden shifting (a necessity determination carries with it no presumption),
*Massachusetts v. EPA* did nonetheless hold that a rulemaking petition triggers an affirmative
duty to respond one way or the other.  549 U.S. at 533-34  ("[O]nce EPA has responded to a
petition for rulemaking, its reasons for action or inaction must conform to the authorizing
statute").

       Similarly, EPA expresses dismay that "Plaintiffs argue that the denial of a rulemaking
petition is reviewable 'under the statutory criteria governing the substance of the requested
rulemaking,' and appear to suggest that courts may enforce their own view of the statute even in
the face of contrary agency policies."  EPA Br. at 12.  However, there is no way to read
*Massachusetts v. EPA* as doing anything *other* than tying denial of a rulemaking petition to the
underlying statutory criteria, and reviewing the denial based on those criteria.  549 U.S. at 533-
34.  *See NRDC v. FDA*, 872 F.Supp.2d at 838 (emphasis added) ("The Agency *did not discuss or
appear to consider the controlling statute's governing criteria and overall purpose*—whether the
drugs at issue pose a threat to human health and, if so, the obligation to withdraw approval for
such health-threatening drugs. *See Massachusetts v. EPA,* 549 U.S. at 535 (holding that an
agency "must ground its reasons for action or inaction in the statute").  *See also* Jack M.
Beermann, *The Turn Toward Congress in Administrative Law*, 89 B.U. L. Rev. 727, 742 (2009)
(*Massachusetts v. EPA* requires that "when Congress specifies the criteria for decisionmaking,
courts are required to enforce those criteria in the face of contrary agency policies and

preferences"). More generally, the idea that "courts may enforce their own view of the statute" even in the face of a different construction by an agency is as old as *Chevron v. Natural Resources Defense Council*, 468 U.S. 1227 (1984) – or for that matter, conceptually speaking, as old as *Marbury v. Madison*, 5 U.S. 137. The courts have never held that deference to agency decisionmaking extends to allowing the agency to make decisions without reference to the statutes under which the agency operates.

### Point III

### EPA'S FAILURE TO MAKE A NECESSITY DETERMINATION IN RESPONSE TO THE PETITION WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND OTHERWISE NOT IN ACCORDANCE WITH LAW

In Plaintiffs' Brief Point II, which concerns the Second Claim for Relief in the Complaint, Plaintiffs described EPA's long history of having repeatedly identified nutrient pollution (including in the Denial Letter) as a massive problem facing the nation; coupled with statements that numeric standards are necessary to solve it, and that the Agency would promulgate them if states did not. In view of this history, Plaintiffs stated that EPA's categorical refusal, without more, to make a formal finding under § 303(c)(4)(B) that numeric criteria are necessary anywhere was arbitrary and capricious, and not in accordance with law. Plaintiffs' Br. at 28-31. Accordingly, in the Complaint and Plaintiffs' Brief, the relief requested is an order that EPA "produce a response consistent with the APA, and the underlying requirements of the Act."[16] *Id.* at 34.

Instead of simply addressing this claim in the form presented on the merits, Defendants respond with straw man arguments against positions that Plaintiffs have never taken, complete with threats of apocalyptic regulatory scenarios that would ensue. Plaintiffs have asked, simply,

---

[16] Plaintiffs' address their request that this response be produced within 90 days, and EPA's argument that the court lacks power to set such a time frame, in Point IV of this Reply Memorandum.

for a remand to the Agency with an order to produce a petition response that complies with the basic level of rationality, legal compliance, and factual support demanded by the APA – *i.e.,* a determination one way or the other on the question of necessity under § 303(c)(4)(B) that is legally and factually supported in the record.  Defendants have somehow translated this standard APA relief into a request that this Court specifically order EPA to promulgate federal nutrient criteria.  According to the varying Defendants, Plaintiffs are asking the Court to make the necessity determination itself, or to hold that it has already been made, and/or to specifically require that EPA issue numeric criteria for all or some specific number of states.  This purported request for relief is then attacked as an unlawful overreach of judicial authority into the realm of agency discretion, which will inexorably bog EPA down for the next half century in a "radical," "unprecedented," and "massive" effort.  EPA Br. at 27; Non-State Br. at 23, 25, 27.  Defendants vigorously tear down their straw man construct of Plaintiffs' requested relief, but never effectively demonstrate how EPA's decision not to make a finding of necessity – in the face of its many prior pronouncements on the matter – can be construed as substantively rational.

Specifically, varying Defendants proffer the following arguments pertinent to Plaintiffs' Second Claim for Relief – some addressing the actual issues raised by Plaintiffs, but most not. First, they argue (as though Plaintiffs were alleging to the contrary) that EPA has not, in fact, "made a Section 303(c)(4)(B) determination that new or revised water quality standards are necessary to meet the requirements of the Act" for the states primarily at issue here, EPA Br. at 20-24, Non-State Br. at 13-18, and hence that Plaintiffs are seeking to "bypass" or "circumvent" this requirement.  Non-State Br. at 15, 27.  Second, they argue that Plaintiffs are not entitled to the relief (purportedly) sought – an order that EPA promulgate criteria – without a specific demonstration, on the record in this lawsuit, that federal criteria are "necessary" for each state at

issue.   Third, they contend that EPA's efforts to "guide, coordinate, and support" states are more effective at alleviating nutrient pollution than promulgating federal criteria would be.  *Id.* a 24-25.  And fourth, reiterating the Petition Denial, they contend that promulgating criteria would be inappropriate as a policy matter because their implementation would be inordinately time-consuming and/or unfair. *Id.* at 25-28; NACWA Br. at 3.  These arguments are addressed in turn below.

### A.  Plaintiffs Have Demonstrated that the Current Record Does Not Support EPA's Categorical Refusal to Make a Necessity Determination

Plaintiffs have demonstrated through the record that EPA's 15-year history of pronouncements concerning nutrient pollution and what must be done to solve it cannot, without more, rationally support a categorical refusal to render a necessity determination for any state. *See* Plaintiffs' Br. at 28-31.  EPA twice stated in 1998 that, if states did not promulgate numeric criteria, the Agency would step in and do it for them, in view of its conclusion that nutrients are "one of the leading causes of water quality impairment in our Nation's rivers, lakes and estuaries."  Clean Water Action Plan at 58 (AR 9120 at 9195, Pl. Ex. 2); National Strategy, 63 Fed. Reg. at 34648-49.  Leaving entirely aside the question of whether such statements could be construed as actually constituting a necessity determination – which Plaintiffs have not alleged here (*see infra* Subsection B) – EPA plainly thought the factual predicate existed, as EPA has no legal authority to promulgate criteria on its own initiative (*i.e.*, without a disapproved state submission) absent a § 303(c)(4)(B) necessity determination.  As discussed *supra,* EPA was equally explicit concerning the necessity of criteria in its 2011 Framework Memo.  Framework Memo at 2-3 (AR at 680, 681-82, Pl. Ex. 13) ("It has long been EPA's position that numeric nutrient criteria . . .are ultimately necessary for effective state programs").  Accordingly, for EPA to *fail* to determine that criteria are necessary to meet the requirements of the Act in response to

Plaintiffs' petition would require presentation of facts and explanation concerning these previous statements:  how and why the Agency was incorrect in these statements, or how circumstances have changed since they were made.  Absent any such explanation supported in the record, EPA's across-the-board categorical refusal to make a determination – for any or all states – that comports with its previous conclusions regarding the necessity of numeric criteria is arbitrary and capricious.

In view of this argument, EPA's protracted insistence that it has not yet made a necessity determination and Plaintiffs cannot "cobble together" one (EPA Br. at 22) – as though Plaintiffs had claimed otherwise – is perplexing.  Not only have Plaintiffs never claimed that EPA has already made a determination, but their Second Claim for Relief, and Plaintiffs' Br. Point II, are expressly premised upon the contention that the Agency has *failed* to make a formal necessity determination when by all rights it should have.[17]  Indeed, the section heading for Point II reads, "EPA's *Failure* to Make a Necessity Determination in Response to the Petition was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not in Accordance with Law."  Plaintiffs' Br. at 28 (emphasis added).  Plaintiffs are hard pressed to think how they could have made any clearer that their concern was with the *lack* of a necessity determination, not that EPA had made one and was not acting on it.  By the same token, the Non-State Intervenors' arguments that Plaintiffs are seeking to avoid or circumvent a necessity determination make no sense either, given that Plaintiffs have brought suit challenging EPA's failure to make one.  Non-State Br. at 15, 27.

EPA makes a weak attempt in passing to explain away its declarations of intent to promulgate federal criteria in the Clean Water Action Plan and National Strategy as being merely

---

[17] Plaintiffs take no position on the separate question whether the Agency's 1998 pronouncement of intention to promulgate federal nutrient criteria should be construed as a necessity determination, the argument that the Agency is addressing but that Plaintiffs did not make.

36

"programmatic in nature," because they include discussion of "working with states to address nutrients and, in the case of the Action Plan, many other water pollution problems throughout the country." EPA Br. at 22. However, specifically with respect to nutrients, by their plain terms, these documents contained a clearly articulated regulatory hammer (although it was never used): if the Agency's programs and strategy of collaboration and support for states did not achieve their end, and states still lacked numeric nutrient criteria by 2003, then EPA would promulgate nutrient criteria itself. Clean Water Action Plan at 58 (AR 9120 at 9195, Pl. Ex. 2) ("Within three years of the EPA issuance of applicable criteria, all states and tribes should have adopted water quality standards for nutrients. Where a state or tribe fails to adopt a water quality standard for nutrients within that three-year period, EPA will begin to promulgate water quality standards for nutrients."). EPA also asserts, oddly, that neither document "cites Section 303(c)(4)(B) as authority." EPA Br. at 22. However, the National Strategy draws verbatim from the language of that provision, stating, "if EPA *determines that a new or revised nutrient standard is necessary for a State* or Tribe (e.g., because EPA determines that the State or Tribe has not demonstrated reasonable progress toward developing numerical nutrient standards), EPA will initiate rulemaking to promulgate nutrient criteria appropriate to the region and waterbody types." 63 Fed. Reg. 34648, 34649 (June 25, 1998) (emphasis added). EPA suggests no other statutory authority that the Agency could have been drawing on to support this pronouncement, because there is none.

## B.  Plaintiffs Need Not Prove Necessity Because They Are Not Asking the Court to Order a Necessity Determination

The Non-State Intervenors ground a substantial portion of their argument in the contention that Plaintiffs have not "demonstrated that federal numeric criteria are needed" in any

of the individual states on a list of Mississippi River Basin[18] states they have provided. Non-State Br. at 13-18. They observe that Plaintiffs have "failed to demonstrate that the current, proposed, and planned programs administered by any state are inadequate to address specific problems in the specific waters of any specific state," and contend, "[t]hat failure alone is dispositive of their action here."

Plaintiffs' acknowledged failure to "demonstrate" necessity in any or all states would, indeed, be "fatal" *if* Plaintiffs were asking this Court to order directly that EPA make a necessity determination. However, as discussed in the previous section, they are not. Their contention, as explained, is that in view of EPA's multiple sweeping pronouncements of necessity rendered in the past, and stated intentions to promulgate federal nutrient criteria wherever states did not, the Agency acted arbitrarily and capriciously in making an equally sweeping contradictory decision in its Petition denial *not* to find necessity under § 303(c)(4)(B). Accordingly, plaintiffs are requesting that the denial be remanded to EPA with an order that it render a decision on the petition that complies with that section and with APA requirements of rationality.

That is a critical distinction. On remand, EPA will not be divested of the inherent discretion afforded by § 303(c)(4)(B). As long as it acts *within the bounds of the statute*, it can make whatever discretionary finding regarding necessity that is legally and factually supportable. Indeed, it is quite unlikely that the Agency could find federally-promulgated numeric criteria to be "necessary" in all Mississippi River basin states, because one – Wisconsin – has already promulgated criteria for rivers and streams that the Agency has already approved. *See* Approval of Wisconsin Phosphorus Criteria dated December 39, 2010 (AR 9099, Pl. Ex. 8); Plaintiffs' Br. at 12-13. As to the others, however, EPA would need to either make a finding of necessity, or

---

[18] Non-State Intervenors have defined the Mississippi River Basin states as those listed on page 14 of their brief. This list is not inaccurate. However, in their briefs, Plaintiffs reference the Mississippi River Basin states as the 10 states immediately adjacent to the River, whose tributary rivers and streams most clearly affect it.

else explain why its past pronouncements of necessity were no longer operative.  The Agency

would also need to explain why the National Research Council Report was wrong in concluding

that EPA "has the statutory duty" to step in and promulgate federal criteria, and that "[a] more

aggressive role for EPA in this regard is crucial to maintaining and improving water quality in

the Mississippi River and the northern Gulf of Mexico."  *Id.*, at 137 (AR 6713 at 6862, Pl. Ex. 6).

It would need to further explain why its own Inspector General was wrong in concluding that

"[i]neffective management control and accountability over the approach to promoting State

adoption of nutrient water quality standards has resulted in an unnecessary delay in the start of

the clean-up process," and that "EPA cannot rely on the States alone to ensure that numeric

nutrient standards are established."  Inspector General Report at 5 (AR 1016 at 1025, Pl. Ex. 10).

And it would, one would hope, look to the finding in the joint State-EPA Urgent Call that "what

we *do* know paints a sobering picture and a compelling reason for more urgent and effective

action," and that "[c]urrent tools such as numeric nutrient criteria" are "underused and poorly

coordinated."  *Id.* at 2 (AR 1049 at 1052, Pl. Ex. 12).  The Agency would have to address these

and any other relevant documents on remand and take a factually supportable position, one way

or the other, on the question it avoided in the Denial Letter: whether existing state programs and

strategies short of numeric nutrient criteria are robust and effective enough to render

promulgation of federal criteria unnecessary.  That said, these requirements of evidentiary

support and rationality do not diminish the fact that it is still EPA's job to make the discretionary

determination under § 303(c)(4)(B) – not this Court's job to directly order or Plaintiffs' job to

factually justify.  Decisions whether and how to promulgate nutrient criteria may indeed be

"complex," Non-State Br. at 17, but the Act charges the EPA with making and rationally

explaining them.[19]

---

[19] Non-State Intervenors' evident confusion over the nature of the remedy sought by plaintiffs has led, in turn, to

### C. Defendants have Failed to Demonstrate that Existing State Efforts are Adequate to Meet the Requirements of the Act

As discussed in Point II.C., arguments that states' current efforts are sufficient should, if true, have been articulated in support of a negative determination under § 303(c)(4)(B). Additionally, however, for purposes of supporting the rationality of EPA's Petition denial with respect to the Second Claim for Relief, Defendants have failed to present evidence that current state efforts could in any way be construed as sufficient to address the severe and pervasive nutrient problem long acknowledged by EPA.

The State Intervenors proffer a wide-ranging defense of their current approaches short of criteria promulgation. State Br. at 10-16. However, their gauzy references to task groups and multiple tools and stakeholder engagement, State Br. at 13-14, cannot change the fact that states' current policies have failed spectacularly to make a dent in the nation's severe nutrient problem, with its resulting mats of foul-smelling green slime and rotting dead fish, and Dead Zone that periodically reaches the size of New Jersey. Defendants' briefs are noticeably devoid of any information suggesting that current approaches have actually reduced nutrient pollution to a significant degree anywhere.

The States fail, moreover, to address EPA's repeated and emphatic statements that criteria are a linchpin of any plan to address nutrient pollution, except to mischaracterize them.

---

confusion over what states are at issue. They suggest that Plaintiffs have "reduce[d]" the number of states at issue to 10, and complain of Plaintiffs' "ever fluctuating specification of the states they seek to target" for federal criteria promulgation. Non-State Br. at 14 n.4, 17 n.6. To be clear, Plaintiffs are not "targeting" one state or another for federal criteria. Rather, they complain of EPA's failure to "target" any state at all, in contravention of 15 years of prior statements and reams of factual evidence weighing in favor of such action. In explaining that evidence, Plaintiffs have focused on the subset of states where the need for federal criteria seems most plainly evident: those that adjoin the Mississippi River, and whose rivers and streams flow most directly towards the Gulf Dead Zone. They have additionally referenced subsets of states – "10 states (or even 1 or 2 states)" to make the point that even EPA's non-statutory reasoning based on administrative resources is irrational, because it refused categorically to render a § 303(c)(4)(B) necessity determination without even considering an approach with a limited or tiered scope. Plaintiffs' Br. at 33. But once again, the appropriate scope of a necessity determination remains EPA's to make, so long as that decision is appropriately bounded by law and fact.

The States assert that the Urgent Call report cited by Plaintiffs, Plaintiffs' Br. at 13-14, "noted that the usefulness of numeric criteria was moderate."  State Br. at 13, *citing* Urgent Call at Appendix B-2 (AR 1049 at 1108, Pl. Ex. 12).  In fact, the Urgent Call in that discussion identified numeric criteria as "the ideal framework within which to integrate programs and approaches to insure that WQS goals are met," Urgent Call at Appendix B-2, and elsewhere concluded that numeric criteria are currently "underused and poorly coordinated."  *Id.*; cover summary at 2 (AR at 1052).  The obvious facts, also noted in the Urgent Call, that criteria do not by themselves clean up nutrient pollution but need to be implemented in permits, and that their promulgation can require complex analysis, do not diminish repeated EPA acknowledgement of their necessity as an underpinning of any successful nutrient control strategy.

The States additionally tout their current progress toward putting in place numeric criteria, and provide a short list of jurisdictions where some manner of criteria have been proposed or promulgated.  State Br. at 7-8 and Ex. C (AR 6492-6494) (summarizing state standards to date).[20]  The list speaks for itself in demonstrating the insufficiency of current state efforts.  Only three of the eight states cited (Montana, Oklahoma, and Wisconsin) have promulgated federally-approved criteria for any rivers and streams, the source of pollution in the Gulf Dead Zone.  Only one of these, Wisconsin, borders the Mississippi River; and Montana's and Oklahoma's apply only to a "selected" or "scenic" subset of rivers.  States Br. Exs. G, J.  The other approved criteria cited apply to lakes and other non-flowing waterbodies, not rivers and streams.  Additionally, many of them are incomplete in that they apply to only one nutrient

---

[20] State Br. Ex. C must be reviewed in the color original, not the black and white copy filed electronically, as it differentiates between red X's indicating criteria submitted but not approved, and black X's indicating approved criteria.  The color version indicates that, as of 2010, only Florida had approved criteria for rivers and streams within the relevant EPA regions.  Wisconsin's phosphorus criteria were also approved in December 2010, although Ex. C (the color version) identifies those criteria as proposed but not approved.

parameter – *e.g.*, Alabama's are for chlorophyll *a* only; and many do not include nitrogen.  *See* State Br. Ex. C. [21]

### D.  Policy Arguments Against Numeric Criteria are Irrelevant and Unavailing

In addition to arguing that states are making acceptable progress toward criteria promulgation (which they are not, as explained above), Defendants offer the alternative policy argument that numeric criteria are not an efficient, complete, or fair approach to solving the nation's nutrient problems.  The separate NACWA brief argues (without statutory reference) that programs to control nutrients must be "fair and balanced," and hence that a focus on point sources rather than non-point agricultural runoff – which is not generally regulated under the Act – is inappropriate.  NACWA Br. at 3.

However, questions of whether criteria are on the whole good policy, or are complicated to implement, or represent a sufficiently comprehensive approach to the problem of nutrients, overlap very little with the statutorily relevant question of whether such criteria are "necessary." The issue whether criteria are a fundamental *prerequisite* to any larger solution to nutrient pollution – as EPA has repeatedly acknowledged –  is conceptually and legally separate from issues related to the ease or difficulty of implementing that solution, or what other additional efforts may need to be made.  In this regard, the question of whether criteria are "necessary" is not the same as whether they are sufficient.  While it may or may not be the case, as NACWA

---

[21] EPA asserts errors in Plaintiffs' summary of states that have EPA-approved nutrient criteria since the Petition was filed in July 2008.  EPA Br. at 7 n.3.  However, the examples it cites, save one, do not reflect errors by Plaintiffs. Minnesota's standards were approved by EPA in May 2008, not 2012 as asserted by EPA; and as noted, the Minnesota standards cited are for lakes only.  The Missouri standards were disapproved by EPA.  (The disapproval is not in the Administrative Record, but is available on EPA's web site at http://www.epa.gov/region7/newsevents/legal/pdf/mowqs_2009decision.pdf.) West Virginia is not in the Mississippi River Basin as defined by Plaintiffs in this context (*i.e.*, states bordering the River) and therefore was not referenced. Plaintiffs only error, which Plaintiffs regret, was in failing to identify Nebraska's standards for lakes only, not rivers and streams, approved by EPA in the few months prior to the summary judgment filing.

argues, that controls on non-point runoff will also be necessary to fully address the nation's nutrient problem, that fact would not make numeric criteria any less necessary.

In any event, for reasons addressed in Point II of this Reply Memorandum, it is irrelevant as a legal matter whether Defendants may prefer approaches other than or in addition to criteria if criteria are, in fact, necessary.  The Court clearly held in *Massachusetts v. EPA* that to the extent the statute "constrains agency discretion to pursue other priorities of the Administrator or the President, this is the congressional design."  549 U.S. at 533.  Defendants may complain of Congress's decision to mandate promulgation of federal criteria upon a finding of necessity, and to regulate point sources more heavily than non-point agricultural runoff, but such complaints do not justify EPA's failure to implement the statute.

That said, Defendants do not make a compelling case that the consequences of a necessity determination would be insurmountably complex.  They argue that EPA's Florida determination was complex and time-consuming.  But the Agency did, in fact, promulgate criteria there, and Defendants present no good reason why this could not be done at least a second time.  EPA Br. at 26, Non-State Br. at 25-27.  EPA also presents a calculation, of sorts, purporting to show that since the Florida rulemaking took five years, a series of rulemakings for all 10 Mississippi River Basin states would take fifty years.  EPA Br. at 27.  This specious use of math fails to account, among other things, for the fact that EPA has already developed general criteria numbers for different ecoregions.  Indeed, it specifically anticipated in 1998 that these ecoregional criteria would be used by states to develop nutrient criteria in the absence of more site-specific data.  The Agency stated in the National Strategy,

> An essential technical element of this strategy will be waterbody-type guidance documents describing the techniques for assessing the trophic state of a waterbody and methodologies for developing regional nutrient criteria. In addition, each technical document will provide criteria guidance under section

> 304(a) of the Clean Water Act in the form of Regional numerical target ranges for phosphorus, nitrogen, and other nutrient endpoints. *EPA expects States and Tribes to use these target ranges as the basis for adopting nutrient criteria into water quality standards in the absence of more site-specifically developed water quality criteria and standards.*

63 Fed. Reg. at 34649 (emphasis added). While the ecoregional criteria may not be directly translatable into state-specific criteria in every circumstance, they would provide EPA with a solid basis to build upon. Moreover, particularly in states with similar ecosystems, the initial rulemakings would set precedent for others , thus diminishing the time and resources required for promulgation. EPA's assumption that it will need to re-invent the wheel for every state is baseless.

Defendants' argument boils down to a contention that, since the nutrient problem is large and complex, the Agency should be excused from dealing with it at all. Or, put another way, that since Plaintiffs are asking too much, the Agency will respond by doing nothing. Such an approach not only fails to comport with the requirements of the Act in § 303, but vitiates the statute's purpose of bringing waters of the United States into compliance with the Act's "fishable and swimmable" water quality goal. 33 U.S.C. § 1251, *Miss. Comm'n on Natural Res. v. Castle*, 625 F.2d 1269 (5th Cir. 1980). It is not plausible that Congress intended the Agency only address small and easily manageable problems, leaving untouched the large and more difficult problems – like runaway nutrient pollution – that continue to degrade our nation's water quality.

## Point IV

## PLAINTIFFS HAVE REQUESTED APPROPRIATE RELIEF

EPA takes issue with the specific relief articulated in Plaintiffs' Brief. Specifically, Plaintiffs stated, consistent with the wording of the Prayer for Relief in their Complaint, that the Court "should remand EPA's response to the Petition with an order

that it produce a response consistent with the APA, and the underlying requirements of the Act, within 90 days." Plaintiffs further explained, "Specifically, the Court should order that EPA within the 90-day period make a determination concerning the necessity of new or revised nutrient standards that conforms to section 303(c)(4)(B) of the Act."

EPA objects specifically to the second sentence, requesting that the Court order EPA to make a determination one way or the other under § 303(c)(4)(B). However, Plaintiffs have established, per *Massachusetts v. EPA* and other authority, that compliance with the APA and the Act *requires* the Agency to render a determination under that section (or provide statutorily compliant reasons why it cannot) in response to a rulemaking petition. Thus, the second sentence is merely a more specific restatement of the first. It does not ask the court to intrude on the substance of EPA's discretion under § 303(c)(4)(B), but merely asks for an order that EPA exercise such discretion rationally as required by law. The core relief sought remains an order requiring EPA to comply with Act and APA requirements for reasoned decisionmaking, which would be fully consistent with the basic principles governing agency remands articulated in *Federal Power Commission v. Idaho Power Company*, 344 U.S. 17 (1952), EPA Br. at 29. *See Sierra Club v. Gorsuch,* 715 F.2d 653, 661 (D.C. Cir. 1983) (where environmental organization successfully challenged EPA's failure to regulate strip mines notwithstanding a countervailing scientific report, the court ordered on remand, "We expect EPA to give explicit consideration to the PEDCo report and to consider whether it forms a sufficient basis for including strip mines on the list of sources subject to regulation").

EPA also objects to Plaintiffs' request for a 90-day time frame for EPA's response. It does not articulate any basis for a prohibition against establishing a

reasonable time frame of this nature, but rather cites several examples of courts declining to do so.  EPA Br. at 29-30.  Certainly, other courts have at times been willing to indicate that expeditious agency action was expected.  *See Sierra Club v. Gorsuch,* 715 F.2d at 661 & n.47 (court stated in remanding to EPA, "we trust that the agency will act on this remand in an appropriately expeditious manner," and added in a footnote, "Absent cause shown, we anticipate final action by the agency pursuant to the remand within ninety days"); *Rodriguez v. Panasiuk*, 844 F. Supp. 1033, 1037-38 (E.D. Pa. 1994) (court ordered on remand to agency, "So that this matter is reexamined expeditiously, we shall direct that the agency conclude its reconsideration within ninety days").

A 90-day time frame is a reasonable exercise of this Court's power to ensure expeditious compliance with its orders.  The *Sierra Club v. Gorsuch* court observed that, while "the agency's control over the timetable of rulemaking is entitled to considerable deference, . . . such deference diminishes with the passage of time."  Here, EPA has substantially delayed taking action on concerning a § 303(c)(4)(B) necessity determination, a rulemaking precursor.  Not only did the Agency fail to render a formal determination concerning the necessity of nutrient criteria during the decade and a half it has been sounding the alarm about the lack of them, but took three years just to answer Plaintiffs' petition – which still did not respond to the relevant statutory question.

## **CONCLUSION**

For the foregoing reasons, this Court should remand EPA's response to the Petition with an order that it produce a response consistent with the APA, and the underlying requirements of the Act, within 90 days.  Specifically, the Court should order that EPA within the 90-day period

make a determination concerning the necessity of new or revised nutrient standards that

conforms to section 303(c)(4)(B) of the Act.

Dated: April 3, 2013

Respectfully submitted,


/s/ Machelle Lee Hall    (with consent)_____
Machelle Lee Hall, Staff Attorney LA Bar No. 31498
Adam Babich, La. Bar No. 27177
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118-6321
Phone: (504) 865-5789, direct 862-8814 or 862-8800
Fax: (504) 862-8721
*Counsel for All Plaintiffs*


_____
Ann Alexander (admitted pro hac vice)
Natural Resources Defense Council
2 N. Riverside Plaza, Ste. 2250
Chicago, IL 60606
(312) 651-7905
aalexander@nrdc.org
*Counsel for Plaintiffs Gulf Restoration Network,*
*Missouri Coalition for the Environment, Iowa*
*Environmental Council, Tennessee Clean Water*
*Network, Minnesota Center for Environmental*
*Advocacy, Sierra Club, Waterkeeper Alliance, Prairie*
*Rivers Network, Kentucky Waterways Alliance, and*
*Natural Resources Defense Council*


_____
Bradley Klein (Admitted pro hac vice)
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600

47

Chicago, IL 60601
312-673-6500
bklein@elpc.org
*Counsel for Plaintiff Environmental Law and Policy Center*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 3, 2013, I caused as copy of the foregoing to be served through the Court's CM/ECF system to all parties.

Ann Alexander

_____