UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GULF RESTORATION NETWORK, ET AL. | CIVIL ACTION |
| VERSUS | NO: 12-677 |
| LISA P. JACKSON, ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL. | SECTION: "A" (3) |

## ORDER AND REASONS

The following motions are before the Court: **Plaintiffs' Motion for Summary Judgment (Rec. Doc. 198)**; **Cross Motion for Summary Judgment (Rec. Doc. 201)** filed by defendants Gina McCarthy, Administrator, and the United States Environmental Protection Agency (collectively "EPA").[1] The motions, scheduled for submission on April 20, 2016, are before the Court on the briefs without oral argument.[2] For the reasons that follow, Plaintiffs' motion for summary judgment is DENIED and EPA's motion for summary judgment is GRANTED.

---

[1] Lisa P. Jackson was the EPA's administrator when the suit was filed as reflected in the case caption.
Numerous state and non-state parties have intervened as defendants to oppose the relief that Plaintiffs seek in this action.

[2] Oral argument has been requested by Plaintiffs but the Court is persuaded that the parties' excellent memoranda are sufficient to address the issues presented.

**I.     Background**

Plaintiffs are various not-for-profit environmental organizations that strive to protect the environment. Plaintiffs filed this action to assert alleged violations of the Administrative Procedure Act ("APA") by the EPA. The lawsuit derives from EPA's July 29, 2011 denial of a rule-making petition that Plaintiffs filed with the agency.[3]

Plaintiffs filed their original complaint on March 13, 2012. The case was submitted to the Court in 2013 for a decision on the administrative record and dispositive cross motions. On September 20, 2013, the Court denied EPA's motion in its entirety, and granted in part and denied in part Plaintiffs' motion. (Rec. Doc. 175). EPA appealed the adverse judgment, and the Fifth Circuit vacated and remanded to this Court for further proceedings. *Gulf Restoration Network v. McCarthy*, 783 F.3d 227 (5th Cir. 2015).

The appellate court having laid to rest certain issues of law, the case is before the Court once again on cross motions for summary judgment.

**A.     The Petition**

The July 30, 2008 Petition for Rulemaking Under the Clean Water Act ("the Petition") is Exhibit A to Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief (Rec. Doc. 22).[4] The Petition explains that high levels of nitrogen and phosphorous pollution are devastating the Gulf of Mexico as evidenced by a large "dead

---

[3] Defendants have not challenged Plaintiffs' standing to bring this action.

[4] The Petition is also Exhibit 1 to both parties' motions for summary judgment.

zone" or "hypoxic zone" in the northern Gulf. Plaintiffs point out that the states in the Mississippi River Basin have no numeric water quality standards for phosphorous in rivers or streams or for nitrogen in any waters. (Rec. Doc. 22-1, The Petition at 3). And most states do not attempt to limit nitrogen and phosphorous discharges in NPDES[5] permits. Because the States do not sufficiently limit levels of nitrogen and phosphorous in their own waters, the Mississippi River is inundated with excess levels of harmful nitrogen and phosphorous, thereby leading to the "dead zone" near the mouth of the river.

      The crux of the Petition is Plaintiffs' dissatisfaction with what they characterize as EPA's "hands-off approach" to dealing with the problem of nitrogen and phosphorus pollution in the United States. Acknowledging that the Clean Water Act assigns responsibility for such pollution control to the States in the first instance, Plaintiffs contend that most states to date have done little or nothing to meaningfully control the levels of nitrogen and phosphorous that pollute their waters, and that they have even less political will to protect downstream waters. (Rec. Doc. 22-1, The Petition at 2). Plaintiffs explain that over the years EPA has offered many plans and methods for addressing the nitrogen and phosphorous pollution problem but those plans have failed because they have never been backed by direct action by EPA. Recognizing that Congress gave EPA the authority to step in and address the nitrogen/phosphorus

---

[5] National Pollutant Discharge Elimination System

problem in light of the States' clear failure to do so, Plaintiffs requested under section 4 of the APA, 5 U.S.C. § 553(e),[6] that EPA use its rulemaking powers to promulgate federal standards to control nitrogen and phosphorous pollution. (*Id.* at 4).

The rulemaking powers referenced in the Petition derive from § 303(c)(4) of the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.* Section 303(c)(4) provides:

> The Administrator shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved—
>> (A) if a revised or new water quality standard submitted by such State under paragraph (3) of this subsection for such waters is determined by the Administrator not to be consistent with the applicable requirements of this chapter, or
>>
>> ***(B) in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of this chapter.***
>
> The Administrator shall promulgate any revised or new standard under this paragraph not later than ninety days after he publishes such proposed standards, unless prior to such promulgation, such State has adopted a revised or new water quality standard which the Administrator determines to be in accordance with this chapter.

33 U.S.C. § 1313(c)(4)(A), (B) (emphasis added).

Specifically, Plaintiffs urged EPA to invoke its rulemaking authority under § 303(c)(4)(B), the emphasized language above, to impose federal numeric water quality standards for the portion of the ocean protected by the CWA but outside the jurisdiction

---

[6] Section 553 of the Administrative Procedure Act, entitled Rule Making, requires that each federal agency "give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

of any state and for all water bodies in all states for which numeric water quality standards controlling nitrogen and phosphorous pollution have not yet been established. (Rec. Doc. 22-1, The Petition at 4). Alternatively, Plaintiffs proposed that EPA do this for the Northern Gulf of Mexico and for all waters of the United States within the Mississippi River Basin. (*Id.*). At a minimum, Plaintiffs urged EPA to establish water quality standards to control nitrogen and phosphorous pollution in the mainstem of the Mississippi River and the Northern Gulf of Mexico. (*Id.*). Additionally, Plaintiffs urged EPA to establish TMDLs for nitrogen and phosphorous for the Gulf of Mexico, the Mississippi River, and each Mississippi River tributary that fails to meet the numeric standards set for nitrogen and phosphorous for which a TMDL[7] had not already been prepared. (*Id.*). At the least, Plaintiffs suggested that EPA should prepare a TMDL for nitrogen and for phosphorous for the mainstem of the Mississippi River and the Northern Gulf of Mexico. (*Id.*).

**B.   EPA's Denial**

On April 11, 2011, Plaintiffs wrote to EPA threatening to take legal action if EPA did not respond to the Petition by June 30, 2011, which would be a full three years after Plaintiffs had filed the Petition. (Rec. Doc. 133, Exhibit 14 to Plaintiffs' 1st MSJ; Exhibit 4 to Plaintiffs' 2nd MSJ). Plaintiffs argued that EPA's failure to provide a timely decision on the Petition was unreasonable.

---

[7] Total Maximum Daily Load. Plaintiffs did not challenge EPA's denial of their request that EPA establish TMDLs. (Rec. Doc. 141, EPA's Memo in Support of 1st MSJ at 8 n.5).

EPA issued its formal response ("the Denial") on July 29, 2011, and the Denial is Exhibit B to Plaintiffs' Amended Complaint (Rec. Doc. 22).[8] EPA neither determined that a new or revised standard was necessary — a threshold determination which would have triggered EPA's non-discretionary duty under § 303(c)(4)(B) to promulgate federal standards — nor determined that a new or revised standard was not necessary — a conclusion that might have been difficult to reconcile with the undisputed evidence demonstrating the significant and serious water quality problems caused by nitrogen and phosphorous pollution. Instead, EPA declined to make a "necessity determination," essentially deciding not to decide. *See Gulf Restoration Network*, 783 F.3d at 238 n.61.

### C. The Complaint

Plaintiffs filed their Original Complaint on March 13, 2012, and their Amended Complaint (Rec. Doc. 22) on April 3, 2012. The federal complaint alleges that the Denial violates the APA for two reasons: 1) the Denial is not supported by reasons that conform to the relevant statutory factors in § 303(c)(4)(B) of the CWA, including a reasoned explanation as to why revised or new water quality standards are not "necessary" to meet the requirements of the CWA; and 2) the Denial is contrary to the undisputed evidence that NNC are "necessary" to meet the requirements of the CWA. Plaintiffs requested that the Court declare that EPA's denial of the Petition was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of

---

[8] The Denial is also Exhibit 5 to Plaintiffs' motion for summary judgment and Exhibit 2 to EPA's cross motion.

the APA, 5 U.S.C. § 706(2)(A), and the CWA, 33 U.S.C. § 1313(c)(4)(B). Plaintiffs moved the Court to order EPA to provide an adequate response within 90 days. (Rec. Doc. 22, Amended Comp. ¶ 5).

### D. The Court's Ruling

In late 2012 and early 2013, the parties filed cross motions for summary judgment (Rec. Docs. 133 & 141). As part of its ruling on those motions, the Court rejected EPA's argument that the Court lacked subject matter jurisdiction to review the Denial under the APA. (Rec. Doc. 175, Order and Reasons at 8-9).

As to the parties' cross motions for summary judgment on the merits, the Court concluded that the Supreme Court's decision in *Massachusetts v. Environmental Protection Agency*, 549 U.S. 497 (2007), precluded EPA from refusing to make a § 303(c)(4)(B) necessity determination in response to Plaintiffs' petition for rulemaking. (Rec. Doc. 175, Order and Reasons at 13); *Gulf Restoration Network v. Jackson*, No. 12-677, 2013 WL 5328547, at *6 (E.D. La. Sept. 20, 2013). The Court rejected, however, Plaintiffs' contention that *Massachusetts v. EPA* also compelled the conclusion that EPA could not rely on non-scientific factors when making a necessity determination under § 303(c)(4)(B). *Id.* The Court declined to grant Plaintiffs' motion insofar as they sought to have the Court rule as a matter of law that a necessity determination under § 303(c)(4)(B) would be limited solely to scientific data. The Court remanded the matter to EPA with instructions to respond to Plaintiffs' rulemaking petition in a manner consistent with *Massachusetts v. EPA. Gulf Restoration Network*,

2013 WL 5328547, at *8.

### E. The Appeal

EPA appealed the Court's ruling. As to the question of whether the Court had subject matter jurisdiction to review the EPA's decision not to make a necessity determination, the Fifth Circuit reached the same conclusion as this Court after an extensive analysis. *Gulf Restoration Network*, 783 F.3d. at 242.

As to the second question of whether EPA was required to make a necessity determination, in other words whether EPA had discretion under § 303(c)(4)(B) of the CWA to choose not to make a determination, the Fifth Circuit disagreed with the Court. The appellate court was convinced that *Massachusetts v. EPA* did not deprive EPA of discretion to decline to make a necessity determination so long as it provided a "reasonable explanation" grounded in the statute for why it had elected not to do so. *Gulf Restoration Network*, 783 F.3d at 242-43. The Fifth Circuit vacated the ruling, and remanded the case to have this Court decide in the first instance whether EPA's explanation for why it declined to make a necessity determination was legally sufficient. *Id.* at 244. In doing so, the appellate court not only explained the proper way to apply the *Massachusetts v. EPA* decision but also provided several legal principles to guide this Court's next course of action.

## II. Discussion

This Court's task on remand is a narrow one: To determine whether EPA's

explanation for why it refused to make a necessity determination was legally sufficient.[9] Per the Fifth Circuit's application of *Massachusetts v. EPA*, legal sufficiency turns on whether EPA has provided a "reasonable explanation," which must be grounded in the statute, as to why it declined to make a necessity determination. In reviewing EPA's refusal to make a necessity determination, the Court applies the arbitrary and capricious standard of review set out in the APA. *Gulf Restoration*, 783 F.3d at 244 (citing 5 U.S.C. § 706(2)(A)). This standard will be "at the high end of the range of deference" in this case, which while dealing specifically with a refusal to make a threshold determination, is analogous to a refusal to initiate rulemaking. *See id.* This Court's review is therefore "extremely limited," and must be "highly deferential." *Id.* EPA's burden is "slight." *Id.* at 244.

Turning to the Denial, EPA did not take issue with Plaintiffs' contentions regarding the significant and serious water quality problems caused by nitrogen and phosphorous pollution. But EPA disagreed that use of its federal rulemaking authority would be the most effective or practical means of addressing the nitrogen/phosphorous problem at this time. (Rec. Doc. 201-3, The Denial at 1). Instead, EPA explained that in its judgment the most effective and sustainable way to address widespread and pervasive nutrient pollution in the Mississippi-Atchafalaya River Basin ("MARB") and

---

[9] Plaintiffs direct the Court's attention to EPA internet sources that are not part of the administrative record and they ask the Court to take judicial notice of the information contained on the web. (Rec. Doc. 198-2 at 8 n.7). The Court agrees with EPA's contention that the issue before the Court is limited to the decision that EPA rendered in July 2011 based on the record and information that the agency had at that time. (Rec. Doc. 201-1 at 11 n.29).

elsewhere would be to build on its earlier efforts and to continue to work cooperatively with states and tribes to strengthen nutrient management programs. (*Id.* at 4). EPA characterized Plaintiffs' proposed rulemaking solution as "unprecedented and complex" as well as "highly resource and time intensive." (*Id.*). EPA explained that efforts to promulgate federal numeric nutrient criteria ("NNC") for 50, 31, or even 10 states at one time would involve EPA staff from across the entire agency, as well as support from technical experts outside the agency. (*Id.*). Then after the daunting task of completing a rulemaking process of the magnitude proposed, EPA would be faced with sizable regulatory and oversight burdens. (*Id.* at 4). EPA summarized its position by stating that it did not believe that the use of its rulemaking authority, especially in light of the sweeping scope of the Petition, would be a practical or efficient way to address nutrient pollution on a national or regional scale. (*Id.*).

EPA also reiterated its long-standing policy, which it viewed as being consistent with the CWA, of encouraging states to develop and adopt water standards in the first instance. (Rec. Doc. 201-3, The Denial at 5). EPA clarified that it was not concluding that NNC were not necessary to meet CWA requirements but rather that EPA would exercise its discretion to continue in its partnership efforts with the states, not foreclosing its ability to resort to federal standards at some future time should that become necessary. (*Id.*).

Thus, the Denial was grounded primarily on EPA's assessment that working in partnership with the States to reduce nutrient pollution would be a more effective

approach at present. In other words, EPA was not ready to give up on the cooperative states-first model upon which the CWA is based. EPA gave a thorough explanation as to why the agency believed that federal rulemaking would not be the most efficacious approach to the nitrogen/phosphorous problem. EPA also explained the non-rulemaking programs that it was implementing to address the problem with the states. EPA did not deny that rulemaking may become necessary at some point if continued efforts at the cooperative approach either fail to improve current water quality conditions appreciably or conditions worsen. EPA did explain the administrative burdens associated with the rulemaking that Plaintiffs were proposing but this explanation was given in light of the sweeping nature of the rulemaking that Plaintiffs were requesting.[10]

The question then is whether the reasons given in the Denial are sufficiently "grounded in the statute" to pass muster as a "reasonable explanation" for EPA's refusal to render a necessity determination. The parties have opposite views as to what constitutes an explanation "grounded in the statute."

Plaintiffs argue that EPA's reasons for refusing to make a necessity determination — as provided in the Denial — are not "grounded in the statute," and reflect the very type of alternative policy arguments that the Supreme Court found unacceptable in *Massachusetts v. EPA*. Plaintiffs characterize the Denial as a "laundry

---

[10] The Supreme Court expressly recognized in *Massachusetts v. EPA* that agencies have broad discretion to choose how best to marshal their limited resources and personnel to carry out their delegated responsibilities. 549 U.S. at 527 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-845 (1984)).

list of reasons not to regulate," that like the unacceptable reasons at issue in *Massachusetts v. EPA*, reflect EPA's own policy preferences rather than the requirements of the CWA. Plaintiffs contend that the Fifth Circuit's opinion on appeal demonstrates that an explanation "grounded in the statute" must include the specific statutory and regulatory requirements of the CWA, which are incorporated by reference into § 303(c)(4)(B). Plaintiffs posit that the strongest evidence that the Denial is not "grounded in the statute" is that it barely mentions the law at all, and omits any analysis of how the specific statutory and regulatory "requirements" of the CWA informed EPA's decision.

EPA, on the other hand, argues that Plaintiffs' position reflects a far more demanding standard than what either *Massachusetts v. EPA* or the Fifth Circuit's opinion in this case requires. EPA contends that the type of detailed scientific and technical analysis that Plaintiffs want is more akin to what is required when EPA actually makes a necessity determination one way or the other. EPA argues that Plaintiffs are misreading the Fifth Circuit's opinion when they argue that the appellate court's discussion of the specific statutory requirements of the CWA — a discussion that was held to determine judicial reviewability — dictates the content of what a reasonable explanation "grounded in the statute" must contain.

This Court is convinced that the Denial, which again is grounded primarily on EPA's assessment that working in partnership with the States to reduce nutrient pollution would be a more effective approach at present, is sufficiently "grounded in the

statute." Section 303(c)(4)(B) draws upon the entire body of the CWA, which itself is a broadly-worded statutory scheme. And as the Court previously explained, the CWA is by design a states-in-the-first-instance regulatory scheme. *See* 33 U.S.C. § 1251(b) ("It is the policy of Congress to recognize, preserve, and protect **the primary responsibilities and rights of States** to prevent, reduce, and eliminate pollution . . . and to consult with the Administrator in the exercise of his authority under this chapter.") (emphasis added). Under the CWA the States are charged with adopting water quality standards for their territorial waters, and EPA exercises oversight, stepping in only when the states demonstrate that they either cannot or will not comply. With the CWA the federal role is properly characterized as a secondary or backstop role. Focusing more narrowly on § 1313 to Title 33 or § 303 of the Act, the primacy of the States' role permeates the text. As a matter of law, the Denial is not based on reasons divorced from the statutory text of the CWA.

      Plaintiffs argue that the Denial is deficient because it does not address the specific statutory considerations that the Fifth Circuit identified in its opinion as those that EPA must consider when it declines to make a necessity determination. *Gulf Restoration*, 783 F.3d at 240. The Court disagrees with this characterization of the Denial. As EPA detailed in its brief, the Denial and in particular the substance of EPA's Framework Memo, which is referenced in the Denial, demonstrates that EPA did consider the text of both § 303 and the CWA as a whole when formulating its partnership strategy with the States. (Rec. Doc. 201, EPA Exhibit 4). A reasonable

explanation grounded in a statute need not necessarily contain a verbatim recitation of a statute or parse its provisions to the letter.

Furthermore, *Massachusetts v. EPA* does not preclude EPA from relying on policy grounds in the Denial, only those without clear textual support in the statute. The "policy" of partnering with the States and maintaining a states-in-the-first-instance approach is not an alternative policy as was the case in *Massachusetts v. EPA* but rather is an integral part of the CWA as enacted by Congress. And as the Court previously explained, *Massachusetts v. EPA* does not stand for the broad proposition that every discretionary EPA determination that serves as a restraint or hurdle to federal action must be based on scientific data. *Gulf Restoration Network*, 2013 WL 5328547, at *6-*7.

Of course, what Plaintiffs really question in this case is whether EPA's *continued* reliance on the CWA's states-first approach is reasonable in light of the undisputed scientific data surrounding the serious nature of the nitrogen and phosphorous pollution in the nation's waters. According to Plaintiffs, the state-driven approach upon which the CWA is built is simply not working and the scientific data proves it. Even if the Court were to disagree with EPA's stance on rulemaking the Court cannot properly substitute its own judgment for that of the agency. EPA's assessment that the best approach at this time is to continue in its comprehensive strategy of bringing the States along without the use of federal rule making is subject to the highly deferential and limited review that that the Fifth Circuit described in its opinion. Presumably, there is a point in

time at which the agency will have abused its great discretion by refusing to concede that the current approach — albeit the one of first choice under the CWA — is simply not going to work. But for now, Plaintiffs have not demonstrated that EPA's assessment was arbitrary, capricious, or contrary to law. EPA is entitled to judgment as a matter of law in its favor.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 198)** filed by Plaintiffs is **DENIED**;

**IT IS FURTHER ORDERED** that the **Cross Motion for Summary Judgment (Rec. Doc. 201)** filed by defendants Gina McCarthy, Administrator, and the United States Environmental Protection Agency is **GRANTED**. Judgment will be entered in favor of Defendants.

December 15, 2016

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE